UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**Amended Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2)**

| | |
|---|---|
| UNITED STATES OF AMERICA | 10-CR-0480 |
| – against – | |
| KENNETH MARSH, BALDWIN ANDERSON, RICHARD BORRELLO, ROBERT ANTHONY BUDION, JOHN DEGLIUOMINI, JEANNE LADA, JAMES T. LEVIER, CHRISTOPHER PERROTTA, GREGORY ROSSOMANDO, MICHAEL SCARPACI, ROBERT SEIDOR, DOMINIC SPINELLI, and PAUL STOKES, | |
| Defendants. | |
| UNITED STATES OF AMERICA | 10-CR-0697 |
| – against – | |
| ANTHONY VECCHIONE, | |
| Defendant. | |
| UNITED STATES OF AMERICA | 10-CR-0700 |
| – against – | |
| GREG PRASKER, | |
| Defendant. | |
| UNITED STATES OF AMERICA | 10-CR-0800 |
| – against – | |
| ANTHONY DELLAVENTURA, | |
| Defendant. | |
| UNITED STATES OF AMERICA | 10-CR-0801 |
| – against – | |
| NICOLE MARSH, | |
| Defendant. | |

**Appearances:**

Patrick Sean Sinclair, Jonathan E. Green, Karen R. Hennigan, Michael Lloyd Yaeger, and Roger Anson Burlingame, United States Attorneys' Office, Eastern District of New York, for the United States.

Alan S. Futerfas, Law Offices of Alan S. Futerfas Esq., New York, NY, for defendant Kenneth Marsh.

Michael P. Padden, Federal Defenders of New York, Inc., New York, NY, for defendant Baldwin Anderson.

Harlan J. Protass, Clayman & Rosenberg LLP, New York, NY, and Frank Anthony Doddato, Garden City, NY, for defendant Richard Borrello.

Gerard M. Marrone, Law Office of Gerard M. Marrone, Middle Village, NY, for defendant Robert Anthony Budion.

Joseph Mure, Jr., Brooklyn, NY, and Priya Chaudry, New York, NY, for defendant John Degliuomini.

Joseph V. Sorrentino, Law Offices of Joseph V. Sorrentino, Esq., Staten Island, NY, for defendant Jeanne Lada.

Steven R. Kartagener, New York, NY, for defendant James T. Levier.

Mathew J. Mari, New York, NY, for defendant Christopher Perrotta.

Edward A. McDonald, Dechert LLP, New York, NY, for defendant Gregory Rossomando.

Joseph R. Corozzo, Jr., Rubinstein & Corozzo LLP, New York, NY, for defendant Michael Scarpaci.

Alan M. Abramson, Schuman Abramson & Morak, New York, NY, for defendant Robert Seidor.

Louis E. Diamond, Staten Island, NY, for defendant Dominic Spinelli.

Mark J. Fonte, Staten Island, NY, for defendant Paul Stokes.

John Frederick Carman, Garden City, NY, for defendant William Vecchione.

Richard A. Roth, The Roth Law Firm, New York, NY, for defendant Greg Prasker.

Mario F. Gallucci, Helbock Nappa & Gallucci, Staten Island, NY, for defendant Anthony Dellaventura.

James Kousouros, Kew Gardens, NY, for defendant Nicole Marsh.

**JACK B. WEINSTEIN, United States District Judge:**

I.    Introduction ............................................................................................... 6

II.   Facts ......................................................................................................... 9

   A.   Fraud and Conspiracy.......................................................................... 9

      1.   Scheme ............................................................................................ 9

      2.   Distinctions Among Defendants.................................................... 14

      3.   Defendants' Knowledge of the Fraud............................................ 17

III.  Victim Statements ................................................................................... 19

   A.   Economic Effects of the Fraud ........................................................... 19

   B.   Non-Economic Effects of the Fraud................................................... 20

      1.   Depression ..................................................................................... 20

      2.   Physical Effects ............................................................................. 20

      3.   Family Stress ................................................................................. 20

   C.   Vulnerability of the Victims................................................................ 21

IV.   Law of Sentencing: Issues Common to All Defendants ......................... 23

   A.   Number of Victims.............................................................................. 23

   B.   Sophisticated Means............................................................................ 24

   C.   Loss Calculation ................................................................................. 24

   D.   Restitution ........................................................................................... 29

V.    Individual Sentences .............................................................................. 36

   A.   Kenneth Marsh .................................................................................... 36

      1.   Background....................................................................................... 36

      2.   Offense............................................................................................. 40

3.     Sentence ....................................................................................................... 41

B.     Nicole Marsh ................................................................................................... 43

    1.     Background ............................................................................................... 43

    2.     Offense ..................................................................................................... 45

    3.     Sentence ................................................................................................... 47

C.     Baldwin Anderson .......................................................................................... 49

    1.     Background ............................................................................................... 49

    2.     Offense ..................................................................................................... 50

    3.     Sentence ................................................................................................... 51

D.     Richard Borrello ............................................................................................. 52

    1.     Background ............................................................................................... 53

    2.     Offense ..................................................................................................... 55

    3.     Sentence ................................................................................................... 56

E.     Robert Anthony Budion ................................................................................. 57

    1.     Background ............................................................................................... 57

    2.     Offense ..................................................................................................... 60

    3.     Sentence ................................................................................................... 62

F.     John Degliuomini ........................................................................................... 63

    1.     Background ............................................................................................... 63

    2.     Offense ..................................................................................................... 65

    3.     Sentence ................................................................................................... 66

G.     Jeanne Lada .................................................................................................... 67

    1.     Background ............................................................................................... 67

    2.     Offense ..................................................................................................... 70

    3.     Sentence ................................................................................................... 71

H.     Anthony Dellaventura ................................................................................... 72

    1.     Background ............................................................................................... 72

    2.     Offense ..................................................................................................... 75

    3.     Sentence ................................................................................................... 77

I.     James T. Levier .............................................................................................. 77

    1.     Background ............................................................................................... 77

    2.     Offense ..................................................................................................... 80

    3.     Sentence ................................................................................................... 81

J.     Christopher Perrotta ................................................................. 82

   1.    Background ................................................................. 82

   2.    Offense ................................................................. 84

   3.    Sentence ................................................................. 85

K.    Greg Prasker ................................................................. 86

   1.    Background ................................................................. 86

   2.    Offense ................................................................. 88

   3.    Sentence ................................................................. 89

L.    Gregory Rossomando ................................................................. 90

   1.    Background ................................................................. 90

   2.    Offense ................................................................. 92

   3.    Sentence ................................................................. 94

M.    Michael Scarpaci ................................................................. 94

   1.    Background ................................................................. 95

   2.    Offense ................................................................. 98

   3.    Sentence ................................................................. 99

N.    Robert Seidor ................................................................. 100

   1.    Background ................................................................. 100

   2.    Offense ................................................................. 102

   3.    Sentence ................................................................. 104

O.    Dominic Spinelli ................................................................. 105

   1.    Background ................................................................. 105

   2.    Offense ................................................................. 107

   3.    Sentence ................................................................. 109

P.    Paul Stokes ................................................................. 110

   1.    Background ................................................................. 110

   2.    Offense ................................................................. 112

   3.    Sentence ................................................................. 114

Q.    Anthony Vecchione ................................................................. 115

   1.    Background ................................................................. 115

   2.    Offense ................................................................. 118

   3.    Sentence ................................................................. 119

R.    William Vecchione ................................................................. 120

1. Background.................................................................................................... 120

2. Offense.......................................................................................................... 122

3. Sentence........................................................................................................ 123

VI. Conclusion .................................................................................................... 124

VII. Appendix A: Restitution Order ...................................................................... 126

VIII. Appendix B: Sentencing Charts ...................................................................... 139

A. Table 1: Sentences........................................................................................ 139

B. Table 2: Sociological Factors........................................................................ 141

I. **Introduction**

The eighteen defendants in this case are sentenced for participating in a criminal scheme to defraud thousands of investors in publically traded securities of millions of dollars in fees for investment advice. These criminals, operating under the aspirational name Gryphon, used telephones, the internet, and elaborate brochures and reports to mislead victims about their experience and skills as investment advisors (of which they had none); the well-known and successful named investors who were part of their staff (who did not exist); and their history of predicting guaranteed short-term investment gains of hundreds of percentage points (a lie). Customers were told of their magnificent trading offices on Wall Street, when they operated from tawdry quarters in a small Staten Island strip mall. Defendants assured victims of their good faith concern for their customer's welfare, when they held their customers in utter contempt, cruelly and ruthlessly squeezing them for their last dollars.

Based on the factors described below, each defendant has been sentenced to a term of incarceration—ranging from three months for cooperators to eight years for the organizer and chief culprit—for general and specific deterrence. In view of the large burdens of restitution and forfeiture each defendant now bears, it is desirable to limit incarceration to a term no greater than

the law and protection of the public requires. The defendants need to begin earning a living as soon as possible in order to pay the victims the restitution due to them, while reducing the cost to the taxpayers of unnecessary prison expenditures.

Considering the nature of the fraud perpetrated by the defendants, general deterrence is of great importance. Unlike defendants in gun and drug cases, who often act without reflection, individuals who engage in financial fraud can, at least in theory, be deterred by a substantial threat of penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished. Since the crime was designed for monetary gain, defendants will be forced to lose all their assets.

In addition to the burdens of high restitution and forfeiture, long periods of supervised release, and special assessments, periods of incarceration are imposed on each defendant. In total, they are sentenced to 262 months of incarceration. Had incarceration been based on the minimum period required by the Sentencing Guidelines, the total would have been 1,940 months. The average cost of a prisoner in the federal system is $2,104.25 per month. *See* Bureau of Prisons, U.S. Department of Justice, Annual Determination of Average Cost of Incarceration, 76 Fed. Reg. 6161, 6161 (Feb. 3, 2011) ("The fee to cover the average cost of incarceration for Federal inmates in Fiscal Year 2009 was $25,251."). Although each defendants' sentence is determined based on the facts of his or her individual case, the total amount of prison time sends a substantial warning.

Specific individual deterrence is also important. Within the group of defendants, there is significant variation in the amount required. Kenneth Marsh, the mastermind, requires harsh

penalties. He created the scheme. He has demonstrated a blatant disregard for his victims, as well as for those that he recruited from legal occupations for an illegal venture. Significantly, he attempted to recreate his fraudulent enterprise while out released bail in this case.

The other defendants' need for sanctions is not as great. Prior to their involvement with Gryphon, they were, with few exceptions, law-abiding, supportive of their families, and earning a decent living through legal means. Many of the defendants have a history of drug abuse. These addictions may have contributed to the ease with which they slipped into criminality. Notable too is the prevalence of gambling among defendants, perhaps leading to less respect for the law and for the need for large sums to pay for losses.

Defendants were attracted into the conspiracy by the promise of an easy dollar. They had to know almost immediately that they were engaged in criminal fraud. Nonetheless, they continued to participate because of the large sums they were earning. Long periods of supervised release should keep them from backsliding.

What is particularly striking about the case is: First, how many people earning decent livings were so easily induced to become members of this corrosive criminal conspiracy, and how cruelly they acted towards the customers they dealt with. Second, how naïve were many of the victims and how easily they were suckered into turning over their fortunes to unknown, bodiless voices and emails. The first group requires incarceration; the second suggests the need for better education of the public about the pitfalls of the securities market.

Substantial evidentiary hearings revealed the harm to the victims and the nature of the individual defendant's participation and background. Individual names of those not criminally involved have been eliminated where possible to avoid unnecessary embarrassment.

## II.     Facts

### A.     Fraud and Conspiracy

#### 1.     Scheme

Kenneth Marsh founded Gryphon Holdings, Inc. ("Gryphon"), also known as Gryphon Financial, in April 2005.  Pre-Sentence Investigation Report of Kenneth Marsh ("PSR"), June 27, 2010, ¶ 4 ("Kenneth Marsh PSR").  The company operated out of strip mall in Staten Island, New York.  *Id.* ¶ 15.  It sold and marketed internet "investment newsletters" that included specific trade recommendations.  *Id.* ¶ 5.  Customers purchased subscriptions at rates that ranged from $99 to $1,000,000.  *Id.*  Depending on the level, a subscription also included direct telephone access to Gryphon staff and investment advice that was supposedly tailored to the individual customer.  *Id.*  Defendants also sold advice regarding individual stocks and stock options.  *Id.*  Recommendations ranged in price from $1,000 to $50,000.  *Id.*  At times, Marsh and other sales representatives would directly manage investment accounts.  *Id.*

Defendants made gross misrepresentations about almost every aspect of the business. Promotional materials painted the picture of an established, multi-national operation, replete with endorsements from people like George Soros.  In reality, the company's history, international locations, testimonials, purported in-house hedge fund, and research facilities were entirely fabricated.

Although the company was located in Staten Island, the sales representatives and promotional materials referred to a virtual address that made the company appear to be located

on Wall Street in Manhattan. *Id.* ¶ 14. They also claimed non-existent offices in Chicago, Illinois; London, England; and Sydney, Australia. *Id.* ¶ 15.

Promotional materials regularly discussed the company's "trading desk" and the formidable expertise of its traders. *Id.* ¶ 8. Sales representatives typically referred to themselves as traders. *Id.* In fact, Gryphon had no trading desk and the sales staff never worked as traders. *Id.* Sales representatives routinely informed customers that trade recommendations were the product of Gryphon's experienced team of financial analysts and researchers. *Id.* ¶ 17. Gryphon never employed such people. *Id.* The sales representatives and promotional materials also regularly referred to the company's hedge fund, which was fictional. *Id.* ¶ 9.

Sales representatives touted the trading and investment prowess of several fake employees who possessed detailed false backgrounds. Gryphon's president, founding partner, owner, and head trader, "Ken Maseka," was described as a Harvard- and Oxford-educated former Goldman Sachs executive and billionaire stock picker. *Id.* ¶ 10. Gryphon's vice president, partial owner, chief financial strategist, head of equity fund strategies, and manager of the firm's offshore hedge fund and structured products division, "Michael Warren," was described as a graduate of Columbia University and the Wharton School of Business at the University of Pennsylvania. *Id.* ¶ 11. Customers were sold premium services that offered direct access to Maseka and Warren. *Id.* ¶¶ 10-11. In speaking with clients, representatives frequently referred to discussions they personally had with these figments. *Id.* They would even arrange conversations between Gryphon subscribers and Kenneth Marsh, alias "Maseka" or "Warren." *Id.*

Many of the sales representatives used fake names and fabricated biographies. *Id.* ¶ 12. They often told clients that they themselves made money from the deals they recommended, or that they placed their money or their family's money behind trades they advocated. *Id.* ¶ 19.

The defendants employed these fabrications and high pressure sales techniques to persuade investors to purchase increasingly expensive advice. *Id.* ¶ 7. More expensive recommendations were no different than those from less-expensive programs. But defendants would persuade their investors that they needed to purchase high-cost subscriptions for fake services in order to have access to the best trading tips. The investors would pay tens of thousands of dollars to join "Raging Bull," "Daily Options," "Private Plays," "Inner Circle," "Genome," and "Trilogy of Trades." Tr. of Baldwin Anderson Trial, at 174:6 – 176:25; 180:18 – 180:22; 185:12 – 186:2. The same useless services were variously labeled to defraud the investors out of more money. As long as the investors remained willing to pay, defendants would continue to trump up new services that required additional fees.

Defendant Paul Stokes was recorded discussing the numerous phony services Gryphon sold to its customers:

> You see all these stupid different services we sold them. Inner Circle, Inner Circle fuckin' VIP, Inner Circle Lifetime, Michael Warren's Executive Deal Team, Ken Maseka's Deal Team, you just keep coming up with new shit. It never ends.

Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, Court Ex. 3, Tr. of Tape Recording at 3.

Several victims discussed how they would pay thousands of dollars for a particular investment service, only to be told soon afterwards that the really good trades required them to pay for an additional service. Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, at 71:15 - 75:13. Defendants generally persuaded customers to purchase additional services by telling

them that they could pay for the service from their winnings.  But, before customers could

purchase a new service, they had to pay in full for any previous services that they had purchased

from Gryphon.  Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, at 61:12-23.  As a result,

customers were often required to pay out of pocket or go into debt because their previous

winnings (if any) had not covered the costs they incurred in purchasing earlier trade

recommendations.

One victim explained that he started with trades that were recommended in the $99

Gryphon newsletter.  When he did not have much success with those trades, he agreed to pay

$5,000 for the VIP Option Service, which he could pay for from his winnings.  Tr. of Kenneth

Marsh Sentencing Hr'g, Aug. 11, 2011, at 72:2-4.  When those trades lost money, he was

persuaded to join the "Inner Circle," which was supposed to provide access to trades of

Gryphon's "core trading group," the "Group of Ten."  *Id.* at 72:23 – 73:5.  This service cost an

additional $15,000 and required him to pay his previous balance.  *Id.*  When those trades lost

money, he was convinced to purchase a service called "Lifetime Trade" for an additional

$25,000.  *Id.* at 73:20-24.  And when those trades failed to make money, he was persuaded to

buy yet another service, "Gryphon Black," which was said to provide recommendations from

Gryphon's foreign offices.  *Id.* at 74:5-9.

Kenneth Marsh trained the other defendants to get money from their customers on a

regular basis.  As part of his training program, he had the following interaction with defendant

William Vecchione:

| | |
|---|---|
| Kenneth Marsh: | Bill, what's a client? |
| Vecchione: | Guy who consistently sends you money – |
| Kenneth Marsh: | Yes! |
| Vecchione: | – every time you ask. |

> Kenneth Marsh: Thank fuckin' God. Anthony, that guy, not a client. He's a page in the book. Once they stop sending you money, then they're no longer a client. It's over.

Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, Court Ex. 3, Tr. of Tape Recording at 1.

Marsh instructed the other defendants that they should move the customers to ever more expensive "services" as they developed relationships with their customers:

> Kenneth Marsh: If you're doing it the way that I'm telling you, you will move the little guys to the fives, tens, twenties, fifties, and possibly hundreds. You're getting them in the habit of sending money. You're getting them in the habit of doing what you want them to do when you call them, like a trained fucking dog. Okay?

*Id.* The goal was simple: "to get as much [money] as we could, you know, everything" from each customer. Tr. of Baldwin Anderson Trial, at 170:23 – 171:2, June 13, 2011.

Whether Gryphon's trade recommendations made money or lost money, defendants spun it as a reason to pay more fees. One of the victims testified that, two minutes after one of Gryphon's trade recommendations went up, a Gryphon sales representative "was on the phone with me asking me how well I did because he wanted his money, and immediately pressuring me to get into this next level called the 'Inner Circle,' which was $25,000." Tr. of John Degliuomini Sentencing Hr'g, Aug. 15, 2011, at 7:10 – 8:21. Another declared that a salesman told her, "When these [investments] come in you will get it so big, you will make so much money, you will forget about the small losses you got." Tr. of Sentencing Hr'g of Kenneth Marsh, Aug. 11, 2011, at 74:1-4.

Gryphon convinced its victims to purchase more services even when its trade recommendations lost money. A victim described dealing with a Gryphon salesman who gave him a couple of winning trades. *Id.* at 58:7-24. After his trades started to turn bad, he received a

call from a different sales representative.  *Id.* at 59:19 – 60:1.  This salesman told the victim that he should not have been given the trades that went bad because they were "questionable trades." *Id.* at 60:2-5.  The representative said that, although he couldn't change what had been done, he would take the problem to the top—to Michael Warren—and try to rectify the situation.  *Id.* at 60:6-13.  When he called the victim back the next day, he relayed the news that Michael Warren "was pissed" that the client had been given bad trades, that "that shouldn't have happened," and that he would take the victim under his wing.  *Id.*  The salesman said how fortunate the victim was – Michael Warren didn't take just anyone under his wing.  According to the victim, "The only catch was, we are going to move to a better trading scenario and each time it involved more money."  *Id*. at 60:14-17.

### 2.     Distinctions Among Defendants

In weighing individual sentences, the amount of time that the defendant worked for Gryphon was critical.  Some were employed for several years, earning millions of dollars while defrauding hundreds or thousands of victims.  *See infra* Part V.  Others worked for only a few months, making substantially less money and interacting with many fewer victims.  *Id.*  Those defendants that were involved longer are more culpable than those who only were employed for a few months; they caused harm to more victims, and they more clearly demonstrated that they would continue acting illegally until they were caught and punished.

Considered was whether defendants were architects of the scheme or were brought in as employees and trained in the fraud.  Kenneth Marsh demonstrated the highest level of culpability.  He was a co-owner of Gryphon and the mastermind behind the fraud that stole more than $20 million from 5,446 victims.

14

Others may have joined the company believing that it was a legitimate enterprise. None of them had substantial previous experience in the financial sector. Many came from car sales, where puffery is generally accepted. They were told that the company's conduct was entirely legal. Marsh even secured the opinion of an attorney who informed the employee defendants (presumably based on what Marsh told him) that all of Gryphon's conduct was lawful. *E.g.* Tr. of Anthony Vecchione Sentencing Hr'g, Aug. 11, 2011 at 42:22 – 43:2. And it appears that some defendants believed the attorney for a time. When they figured out that they were participating in a fraud, they were making more money and working fewer hours than they had previously. The benefits were too great to walk away from. Although the employee defendants are culpable for knowingly perpetrating the fraud, they are not as culpable as those who created the fraud and hired others to perpetrate it.

Nicole Marsh's participation was different from that of Kenneth Marsh and from that of the employee defendants. As the wife of Kenneth Marsh, she was a co-owner of Gryphon and helped create the company. Nicole Marsh PSR ¶ 24. She was fully aware of the company's fraudulent conduct. Tr. of Nicole Marsh Sentencing Hr'g, Aug. 11, 2011 at 36:20-21. Her day-to-day responsibilities, however, did not involve interacting with individual victims. *Id.* at 37:2-9. Because she controlled the office, she received a three point adjustment for being a manager within the fraud scheme. Yet her conduct was not nearly as culpable as that of her husband.

Considered was defendants' enthusiasm when engaged in the fraud. Some fully embraced the fraudulent pitches. Richard Borrello was recorded during a training session describing how he manipulated customers into buying additional expensive services. Tr. of Richard Borrello Sentencing Hr'g, Aug. 19, 2011, at 25:21 – 29:13. He would describe a

fictional meeting between Michael Warren and investors and then pressure and cajole reluctant customers into joining the "Inner Circle VIP service." He went on:

> 'Cause I'm unstoppable. I'm unbeatable. Nobody can tell me no, and if they fucking tell me no, I'm gonna get five yeses thereafter. So, it doesn't make a difference to me. I'm just moving through. I'm a killer. But, if you put on the swagger that you're a big guy, you put on the swagger that you're a billion dollar trader, you put on that swagger, you're on the phone, man, be yourself.

*Id.* at 29:20 – 30:2. Borrello's goal was clear: "Success in this business, to me, is making a shitload of fuckin' money." *Id.* at 25:13-14. John Degliuomini was also extremely successful. During one two-week period, he earned $86,467 in commissions. Tr. of John Degliuomini Sentencing Hr'g, Aug. 15, 2011, at 44:2-8.

Other defendants were less keen. Christopher Perrotta, although a hard-worker, was not adept at spinning fraudulent tales. Tr. of Christopher Perrotta Sentencing Hr'g, Aug. 15, 2011, at 16:24 – 17:2. Similarly, William Vecchione was not effective at defrauding his customers, and was disliked by Kenneth Marsh as a result. Tr. of William Vecchione Sentencing Hr'g, Aug. 15, 2011, at 30:12-19, 39:6-11. Marsh went so far as to sequester Vecchione from the other salespeople so that they would not mimic his passive style. *Id.* at 30:12-19. These less enthusiastic defendants were mainly relegated to opening accounts by offering the $99 newsletter. *Id.* at 30:23-31:2; 39:1-5. They would then hand off the new customers to other defendants who were able to defraud victims of larger sums.

The defendants who regularly persuaded victims to part with large sums, some of which the victims took out of their retirement accounts or charged to their credit cards, are more culpable then those whose conduct was limited to opening accounts. The account openers did not develop relationships with their customers; they did not persuade customers to part with

money that the salespeople knew was needed for their customers' retirement, or which they knew the customers did not have. The defendants who developed intimate relationships with their customers, and then exploited that trust to take as much of their money as they could, demonstrate a higher level of callousness and culpability.

Other defendants crafted the newsletters and other printed materials that lured customers to Gryphon. While they were not the architects of the fraud, they were integral to the operation. *See generally* Tr. of Jeanne Lada Sentencing Hr'g, Aug. 12, 2011; Tr. of Greg Prasker Sentencing Hr'g, Sept. 12, 2011. Each defendant made misrepresentations as to the credentials of Gryphon's employees, the scope of the company's operations, and the performance of prior investment recommendations.

### 3. Defendants' Knowledge of the Fraud

Many of the smaller players in the fraud contend that they did not know that what they were doing was wrong. If these defendants acted out of ignorance, they willfully rendered themselves blind. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2070 (2011) ("The doctrine of willful blindness is well established in criminal law. . . . [D]efendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances. . . . [D]efendants who behave in this manner are just as culpable as those who have actual knowledge. . . . [P]ersons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts.").

When defendants started at Gryphon, they were told that the techniques employed by the company were legal. *E.g.* Tr. of Anthony Vecchione Sentencing Hr'g, Aug. 11, 2011 at 42:22 –

43:2.  Soon after, each defendant realized that the conduct was illegal.  They continued to work for the company, however, because they were making hundreds of thousands of dollars a year.

 Two defendants quit before the enterprise was shut down, apparently because they could not avoid acknowledging—and feeling guilty about—what they were doing for the company. Christopher Perrotta left Gryphon in March 2010, after four months.  Tr. of Christopher Perrotta Sentencing Hr'g, Aug. 15, 2011, at 12:24 – 13:12.  He had never been effective at using fraudulent pitches to increase sales, and he did not want to continue to participate in the fraud. Dominic Spinelli left the company in September 2009.  While his departure was partially motivated by his conflicts with Kenneth Marsh, he says he would have left anyway.  Tr. of Dominic Spinelli Sentencing Hr'g, Aug. 15, 2011, at 16:13 – 17:22.

The majority of the defendants had successful careers available and other means of supporting themselves. The motivating factor for the fraud was greed.  In comparison to most other cases, such as routine drug and immigration cases, these defendants had bountiful opportunities for legitimate work, and the majority had a record of professional success and good salaries.

Those who cross the line from legal occupation to illegal acts are rarely shielded from criminal liability because they acted in conformance with the instructions of supervisors or the advice of legal counsel.  This is particularly so in the high-risk, highly regulated financial industry.  Puffery of the sort that may be winked at when utilized by a used car salesperson can constitute a serious crime when made in connection with the sale of securities.

## III.    Victim Statements

### A.    Economic Effects of the Fraud

The fraud severely and adversely impacted the lives of thousands of people.  Many testified or submitted statements describing how the fraud wiped out or seriously depleted their retirement accounts.  One victim wrote:  "[Gryphon] took my retirement money and I have serious doubts now that I will ever be able to retire.  I am 59 years old and I don't have enough time to make this money loss up. . . . I fear for my family's well-being and future."  Gov't Letter Regarding Victim Impact Statements, Doc. Entry 358, Ex. 10.  According to another, "Prior to the crime, my financial house was in order and I had saved plenty of money for retirement.  Now, I have to 'start over.'"  *Id.* Ex. 27.

Other victims lost their children's college tuition money.  One declared:  "I informed Mr. Leveir [sic] that I was going to use my daughters' college tuition money and asked him to please not be scamming me as a loss of this money was detrimental to me."  *Id.* Ex. 22.  Another complained:  "My children were saddled with college loans they should never [have] had to take out because their father was stupid enough to fall for all the misleading advertising they sent out via e-mail.  Getting involved with these crooks was the stupidest and most financially devastating thing I have ever done."  *Id.* Ex 8.

Still others were forced to declare bankruptcy or were left with crippling debt.  *See, e.g., id.* Exs. 9, 13, 20.  Because Gryphon only accepted credit card payments, many of the victims were saddled with substantial debt as a result of the fees charged by Gryphon.  *See, e.g., id.* Exs. 14, Ex. 19. According to one victim:

> [The fraud] left us in bankruptcy for our credit cards, our savings, were no more. We had to give up [our] dreams, to remodel our home, to give money to our sons

so they could get a good start at life.  After my husband died it [left us] almost destitute.

*Id.* Ex. 9.

**B.      Non-Economic Effects of the Fraud**

Equally devastating were the non-economic effects.  These included physical and emotional strains that were, in many ways, more significant.

**1.      Depression**

Many of the victims suffered from depression following the realization that they had been defrauded of large sums.  One victim wrote:  "These people completely stole my dignity and my self-worth as I just had to keep going to try and get my money back.  I was totally desperate.  I have never been treated for depression until this affair with Gryphon happened to me."  *Id.* Ex. 11.  Another "became so depress[ed] that [he] stayed in bed for days at a time.  Now [he] do[es] not trust anybody."  *Id.* Ex. 9.

**2.      Physical Effects**

The stress caused by the fraud manifested itself in physical disorders for some.  One victim "developed a sleeping disorder and was suffering with stomach issues due to the stress."  *Id.* Ex. 13.  Another "is addicted to sleeping pills now and [has] to take two a night to sleep."  *Id.* Ex. 26.  A third accumulated several thousand dollars of medical bills as a result of the fraud.  *Id.* Ex. 20.

**3.      Family Stress**

Many victims discussed the toll that the fraud inflicted on their families.  Several had their spouse leave them as a result of the fraud.

One stated that his wife of twenty-eight years left him soon after he admitted that defendants' scheme had caused him to go $125,000 into debt, $100,000 of which resulted from fees and failed trades. Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, at 62:17-20. According to him, "I'll never forget her look of disgust with me. For what I have done with Gryphon Financial." *Id.* at 63:3-5. Another declared:

> I have also lost my marriage of 28 years due to solely the loss of over 33 thousand dollars of my wife's and my retirement account. She has called me an idiot for good reason and this has been the hardest part. I truly let her down and it now has caused our separation. She still thinks I am a complete moron. I can't even look her in the eye due to extreme embarrassment.

Gov't Letter Regarding Victim Impact Statements, Doc. Entry 358, Ex. 11.

Even when victims' marriages survived the terrible losses, they did so in a weakened state. One stated that his wife prevented him from having a nervous breakdown when he discovered that they had been defrauded. Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, at 76:5-8. However, she no longer trusts him, especially with regard to financial decisions. *Id.* Another victim informed the court:

> My wife and I rarely speak. Before this, we ran several businesses as a couple. We now have the business (bar and grill), but work different shifts so we don't argue. Yes, our marital relations have also suffered. I guess that's called loss of consortium.

Gov't Letter Regarding Victim Impact Statements, Doc. Entry 358, Ex. 20.

### C.    <u>Vulnerability of the Victims</u>

The emotional effects of the fraud were often exacerbated by the fact that the defendants clearly took advantage of the unique vulnerabilities of their victims. Although defendants stole from victims covering virtually all ages, education levels, and socio-economic backgrounds, their victims were concentrated among particularly vulnerable groups.

Several were old and infirm.  The wife of a former customer who suffers from progressive dementia and Alzheimer's wrote:

> I was involved in the traumatic events as I tried to recover the funds from Gryphon Financial after discovering that [my husband] paid $25,000 for investment consulting services we did not want or need.  When we attempted to cancel the services, even explaining my husband had dementia and was not of the capacity to understand fully what he was purchasing, . . . we were told the funds were non-refundable and then we were threatened with legal action from attorneys . . . .

*Id.* Ex. 12.  According to another:  "I'm 80 years old, a widow, living with . . . part time care workers.  My soc. security, and small widow pensions etc. are my current situation.  I'm in a wheelchair.  They were well informed of my health and age."  *Id.* Ex. 23.

One victim was a quadriplegic who was saddled with large medical bills.  John Degliuomini defrauded him out of $150,000 from an insurance recovery that he relied on for living and medical expenses.  Tr. of John Degliuomini Sentencing Hr'g, Aug. 15, 2011, at 42:14-19.

Others were caring for young children or grandchildren at the time they were defrauded.  As one put it:

> At the time this unfolded my only daughter was killed in a car accident not of her fault and we were left with two beautiful twin boys aged three.  My wife and I are in our mid-sixties.  I informed John Stevens of this happening and that I wanted to be left alone but they continued to press me and I folded . . . .  I hoped to help the family but obviously I did not.

Gov't Letter Regarding Victim Impact Statements, Doc. Entry 358, Ex. 1.  One client was raising her grandchildren on a fixed pension, *id.* Ex. 2, while another was a single mother of five children, *id.* Ex. 28.  A particularly cruel snare obtained money "that was going to be used to get [a victim's] kidnapped daughter back from Brazil."  *Id.* Ex. 16.

Defendants used victims' vulnerabilities to their own advantage. One of the victims was in the process of separating from her husband when she received a call from someone claiming to be Michael Warren. Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, at 41:8-13. She was "looking for ways to manage [her] own finances so I could live independently and look after my children and I needed to get a flat and ensure that I maintain a retirement fund for the future." *Id.* Over the course of several phone calls, "Warren" (Kenneth Marsh) "spent a long time getting to know [her] and telling [her] all about himself and his colleagues." *Id.* He then induced her to invest over half a million dollars with him, *id.* at 44:17-19, assuring her that the investment package was "something that he offered to very select few, that he really got to know me and like me and that he thought this would be the best solution for me," *id.* at 43:7-10.

A client testified that he made the mistake of telling the first person he spoke to at Gryphon that he had just been laid off from his job of twenty years. The Gryphon salesman assured him that he need not worry – this would be "the start of [his] new career" *Id.* at 59:11-15.

## IV.     Law of Sentencing: Issues Common to All Defendants

### A.     Number of Victims

The Sentencing Guidelines include an enhancement based on the number of victims attributable to each defendant. U.S. Sentencing Guidelines Manual § 2B1.1(b)(2)(C). Defendants are held liable for all customers who were defrauded by Gryphon during the time they were employed by the company. Because defendants worked together to defraud their victims and to create fraudulent sales pitches, and encouraged each other to perpetrate the fraud,

*see supra* Part II(A)(1), they are each liable for all of the victims who were defrauded by Gryphon during the time they were employed.

### B.  **Sophisticated Means**

The fraud perpetrated by the defendants involved sophisticated means.  It included a fake trading desk and hedge fund, an extensive false company history, and phony employees with their own fake histories.  With the exception of Anthony Vecchione, *see infra* Part V(Q)(2), all of the defendants are subject to a sentencing enhancement based on sophisticated means.  U.S. Sentencing Guidelines Manual § 2B1.1(b)(9)(C).

### C.  **Loss Calculation**

The loss that could be determined as having been caused by the defendants' fraud totaled $19,900,077.48 (though it was incalculably larger in fact).  While the total and individual allocation of losses in the pre-sentence reports—generally adopted by this court—were somewhat inconsistent, they all placed the defendants in the appropriate guidelines range.  They resulted in a twenty point enhancement.  As a co-conspirator in the total scheme, each defendant is held responsible for the total calculated loss suffered by the victims.  Defendants raised several objections to this loss assessment.  Their arguments lack force.

First, defendants contend that they should be liable only for the losses suffered by their own clients, not by clients of other sales representatives of Gryphon.  This argument is rejected.

The Sentencing Guidelines provide that a base offense level shall be determined:

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), [on the basis of] all reasonably foreseeable acts and omissions of others in furtherance of the *jointly undertaken criminal activity,*

that occurred during the commission of the offense of conviction, in preparation
for that offense, or in the course of attempting to avoid detection or responsibility
for that offense....

U.S. Sentencing Guidelines Manual § 1B1.3(a)(1)(B) (emphasis added); *Id.* § 1B1.3 app. n.2 (A

defendant "is accountable for the conduct . . . of others that was both: (i) in furtherance of the

jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that

criminal activity."); *see also United States v. Studley*, 47 F.3d 569, 573 (2d Cir. 1995). "In order

to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B),

the court must first determine the scope of the criminal activity the particular defendant agreed to

jointly undertake ( *i.e. the scope of the specific conduct and objectives embraced by the*

*defendant's agreement* )." U.S. Sentencing Guidelines Manual § 1B1.3 app. n.2 (emphasis

added). Particularized findings regarding whether the activity was foreseeable to the defendant

and the scope of the criminal activity agreed upon by the defendant are required. *Studley*, 47

F.3d at 573. "In determining the scope of the criminal activity that the particular defendant

agreed to jointly undertake (*i.e.* the scope of the specific conduct and objectives embraced by the

defendant's agreement), the court may consider any explicit agreement or implicit agreement

fairly inferred from the conduct of the defendant and others." U.S. Sentencing Guidelines

Manual § 1B1.3 app. n.2. *Compare United States v. Eisner*, No. 10–1192–cr, 2011 WL 2411011

(2d Cir. June 16, 2011) (holding that defendant was responsible for co-defendant's conduct in

Ponzi scheme where the defendant knew "the extent of the losses caused [by the] scheme . . . ,

was instrumental in its initial development, and continued to participate in and profit from the

scheme throughout [its] existence"); *with Studley*, 47 F.3d at 576 (holding that salesman who

was defrauding customers was not responsible for the frauds of his co-workers where the

defendant did not contribute resources to the scheme, "had no interest in the success of the operation as a whole, and took no steps to further the operation beyond executing his sales").

The fraudulent activity of the other defendants was foreseeable and known by each individual defendant and was within the scope of the activity agreed upon by the individual defendants. The defendants in this case worked together to defraud their victims and encouraged each other to perpetrate the fraud with passion and vigor. They were all involved in frequent training and pep sessions. Defendants often handed customers off to one another as part of the fraud. This shifting of handlers was an integral part of defendants' scheme to get victims to continue to pay more and more for Gryphon's services. Several victims testified that, when investment decisions went bad, a new sales representative would take over the account. *See* Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, at 59:16 – 60:16 (stating that when trade recommendations started to turn bad, he received a phone call immediately from another salesman saying he would provide better trades, but that it would cost more money); *id.* at 73:11-15 (stating that after several trades recommended by a Gryphon employee using the name John Stevens lost money, Richard Borrello (using the name Richard Lanza) took over victim's account, claiming that he was in the "inner group of ten" and that he would "get me the trades to make up for all my other losses").

Defendants also worked together in creating the fraudulent pitches that they used on their victims. During one training session, Borrello discussed an approach that had been created jointly by Stokes and Kenneth Marsh. When Borrello mentioned that the scam had been jointly created by Stokes and Marsh, Marsh interjected, "That's collaboration," demonstrating the high

level of importance he placed on working together to carry out the fraud. Tr. of Richard Borrello Sentencing Hr'g, Aug. 19, 2011, at 25:8-20.

Finally, defendants encouraged each other in training sessions. At one meeting, after Borrello demonstrated methods of fraud, the other salespeople in the room broke into applause. Tr. of Richard Borrello Sentencing Hr'g, Aug. 19, 2011, at 31:10. Because defendants acted in concert and encouraged each other to behave aggressively, they are jointly and severally liable for all damages caused by the enterprise during the time they worked for Gryphon.

Second, defendants argue that the loss figure should be limited to the amount of money paid for the initial $99 newsletter, and should exclude any subsequent fees paid by Gryphon customers. So limited, the loss figure would be $550,000 for defendants who were employed for the entire course of the scheme, and less for defendants who were only employed for shorter periods of time. They argue that the government cannot prove that it was the company's fraudulent conduct, and not the success that they achieved investing by relying on its advice, that caused the victims to purchase additional services.

This argument has no merit. The victims were encouraged to purchase investment services based on numerous fraudulent representations regarding, *inter alia*, the value of the investment advice, the experience of the individuals providing the investment advice, the history of the company, and the success that the company had achieved using similar investment strategies. If the truth had been revealed, there is little doubt that none of the victims would have paid to receive investment advice from defendants.

Finally, defendants fruitlessly argue that they are entitled to seek credit against the loss resulting from the offense for the value of the services provided, even if the purchase of the

services was fraudulently induced.  U.S. Sentencing Guidelines Manual § 2B1.1 app. 3(E); *see also United States v. Gordon,* 71 F. Supp. 2d 128 (E.D.N.Y. 1999) (discounting victim's losses for the purposes of sentencing; the victims were fraudulently induced into buying a membership to "Who's Who" professional registries based on the representation that the publications were selective and prestigious, but received some networking value from the publication), *aff'd in part and rev'd in part,* 291 F.3d 181 (2002).  They urge that the total loss suffered by the victims was zero, since any loss attributable to defendant's fraudulent inducement was offset by the value the subscribers received from the advice.

The facts of this case do not require the court to delve into the details of the victims' various securities transactions to determine whether their losses were offset by their gains.  The fraud was committed when the defendants made gross misrepresentations to the victims regarding the background of those giving advice and the location and expertise of the organization itself.  In a fully informed market place, the value of Gryphon's services would be zero.  Any incidental benefit that the victims received from trading on the advice is irrelevant for the purposes of evaluating the scale of the fraud and the defendant's culpability.  It was on this theory that the court repeatedly ruled that all discovery on the issue of loss or gains in particular trades was to be excluded.

Even if it had been determined that it was appropriate to consider the victims' gains, the loss calculation would still be appropriate.  Attempting to determine what, if any, benefits the victims received from Gryphon's advice would involve extensive discovery, expert testimony, and a complicated analysis of the trade losses suffered by each individual victim.  Where determining loss would involve such complex issues, it is appropriate to consider the loss the

amount the victims paid for Gryphon's services. *See* U.S. Sentencing Guidelines Manual § 2B1.1 advisory note B ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it cannot reasonably be determined."). Here, the $19,900,077.48 loss represents Gryphon's minimum ascertainable illegal income—i.e., the gain to the defendants.

Ultimately, the defendants' arguments about loss are irrelevant. Because non-Guidelines sentences were imposed on all defendants, a precise determination of loss was not required. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) ("[P]recise calculation of the applicable Guidelines range may not be necessary . . . where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence . . . . This leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters, for example, determination of monetary loss.").

### D. Restitution

After a full evidentiary hearing, the restitution in this case was determined by agreement between the defendants and the government upon the urging of the court and its suggestions for compromise. While the acceptance of the final restitution order by the parties represents a waiver of any objections, the issue nevertheless requires some discussion because of the mandatory statutory provision at play.

The Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. 3663A requires sentencing courts to order restitution for certain offenses, such as "an offense against property

under this title . . . including any offense committed by fraud or deceit" where a victim has suffered a pecuniary loss.  18 U.S.C. § 3363A(a)(1), (c)(1).  The MVRA provides that "in each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A).  The statute defines "victim" broadly as any:

> person *directly and proximately* harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2) (emphasis added); *see also United States v. Marino*, No. 09–1965–cr, 2011 WL 3625087, at *7 (2d Cir. Aug. 18, 2011).  The provision does not apply, however, when the number of identifiable victims makes restitution impracticable or when determining complex issues of fact related to restitution would unduly complicate or prolong sentencing.  18 U.S.C. § 3663A(c)(3); *United States v. Catoggio*, 326 F.3d 323, 326 (2d Cir. 2003).

Restitution is only authorized "for losses that [were] . . . directly caused by the conduct composing the offense of conviction," *United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994), and only for the victim's "actual loss," *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998).  *See also United States v. Paul*, 634 F.3d 668, 676 (2d Cir. 2011) ("In determining the proper amount of restitution, a court must keep in mind that the loss must be the result of fraud.").  The causation requirement imposed by the MVRA is not a "rigid 'direct' causation standard that would foreclose restitution where even the slightest intervening event severs factually or temporally the link between the defendant's crime and victim's loss."  *Marino,* 2011

WL 3625087, at *8.  In securities fraud cases, the Court of Appeals for the Second Circuit has found that there is a sufficient causal nexus between the fraud and the losses where the victims would not have transacted with the defendant but for the defendants' fraudulent misrepresentations.  *Paul*, 634 F.3d at 677-78 (holding that victims are those who "would not have made the [payments to the defendant] had they known [about the fraudulent scheme]"); *see also United States v. Archer*, No. 10–4683–cr, 2011 WL 4360013, at *18 (2d Cir. Sept. 20, 2011); *cf. Marino,* 2011 WL 3625087, at *11  (holding that the defendant's misprision of felony caused the victim's losses for the purposes of restitution; investors entrusted money to fraudulent firm "in reliance of the false representation that [it] was a legitimate investment firm that was audited by an independent financial accounting firm.  But for appellant's role in affirmatively concealing the falsity of this representation, these investors would certainly not have invested in [the company], as no reasonable investor would invest in a known Ponzi scheme.").  A crime is the proximate cause of victims' losses where the nature of the scheme makes those losses reasonably foreseeable.  *Marino*, 2011 WL 3625087, at *13.  Where "no reasonable person would have given the defendant her money had she known of his plan[,] . . . a generalized description of the fraudulent scheme is enough to support restitution."  *Archer*, 2011 WL 4360013, at *9.  A defendant charged with conspiracy can be subject to a restitution order that holds him liable for all reasonably foreseeable acts of all co-conspirators, even on counts for which defendant was not charged or was acquitted.  *United States v. Boyd*, 222 F.3d 47, 51 (2d Cir. 2000).

Marked as Appendix C to this opinion (but not publicized) is the list of the victims who came forward to claim restitution, their addresses, and the amount of money stolen from them.  It

identifies 1,059 victims who claim $10,583,829.47 in losses. Supplied by the government, its accuracy is not contested by the defendants. The document is ordered sealed and separately filed to be used if necessary by the Court of Appeals for the Second Circuit in case of an appeal. Making this information available in the public record would unnecessarily embarrass the victims, and could provide a convenient list for future predators.

Based on this evidence, the defendants were the direct and proximate cause of losses of $10,583,829.47 to the 1,059 identified victims. As indicated above, but for the fraudulent misrepresentations of the defendants regarding the nature of the company and the recommendations it gave, no reasonable investor would have paid for the advice tendered. *See supra* Part IV(C). Since the advice sold by Gryphon was not backed by the expertise and research defendants claimed, the losses to the victims were reasonably foreseeable. The defendants were often told by victims that they lost money on trades based on advice purchased from Gryphon; defendants used their own ineptitude as an opportunity to sell victims additional, higher priced services. The government's burden of persuasion has been met by a clear and convincing standard.

Each defendant participating in the conspiracy can be held liable for the full amount of restitution owed to victims. *Boyd*, 222 F.3d at 51. As described in detail, *supra* Part IV(C), the actions of the other defendants in defrauding customers were reasonably foreseeable to all those involved. The terms of the restitution order agreed to by defendants and the government are fully justified by the evidence and findings of the court.

Independently, Kenneth Marsh is jointly and severally liable with Nicole Marsh for $484,546.45 in restitution to Complete Merchant Solutions, L.L.C. ("CMS"). CMS markets

credit card payment-processing services provided by third-party service providers. Certification of Kyle Hall, Doc. Entry 424, Sept. 9, 2011, ¶ 1. It marketed the services of Global, a third-party service provider, to Gryphon to help it process credit card payments from the victims to Gryphon. *Id.* ¶ 4. In its contract with Global, CMS agreed to bear losses from credit card "chargebacks," which occur when a customer is dissatisfied with a purchase and asks for a refund. *Id.* ¶ 2. When Gryphon was shut down, and the fraud became known, many victims demanded refunds. Tr. of Order to Show Cause, Sept. 9, 2011, at 17:20-24. CMS paid out $484,546.45 in refunds to customers, which it has not been able to recover from Gryphon. *See id.* at 18:9-14.

The loss of this money to CMS was the direct and proximate cause of the Marshes' own actions in perpetrating the fraud. Much like the victims, CMS relied on the information provided by Gryphon and believed it was a legitimate business. But for these misrepresentations, CMS would not have marketed Global's services to Gryphon. *Id.* at 15:11-13. No reasonable legitimate business would contract with a fraudulent enterprise to facilitate its crime by permitting victims to transfer money more efficiently to the criminals using credit cards. CMS is thus a victim entitled to compensation under 18 U.S.C. 3663A(j)(1). Because the contract was between CMS and Kenneth and Nicole Marsh, as co-owners of the company, *see* CMS Letter Regarding Final Master Restitution Order, Ex. B, Doc. Entry 424, Sept. 9, 2011, only these two defendants will be held responsible for this amount. CMS did not object to this limitation. *See generally* Tr. of Order to Show Cause, Sept. 9, 2011.

The restitution issues were appropriately resolved by agreement between the government and the defendants. *Cf. In re W.R. Huff Asset Management Co.*, 409 F.3d 555, 563 (2d Cir.

2005) (finding that district court did not abuse its discretion in approving a settlement agreement that established a restitution fund, even where that fund would not ensure full restitution under the MVRA, where the complexity in resolving the factual and causal issues to determine the precise amount of losses to the victims would extend the sentencing process inordinately). The restitution figure will be based on the amount of fees paid into Gryphon by the 1,059 victims who have filed claims for restitution, as determined by Gryphon's payroll records. This amount was $10,583,829.47. *See* Appendix A, Master Order of Restitution, Doc. Entry 427, Ex. 1, Sept. 14, 2011.

Each defendant will be held jointly and severally liable for all fees paid to Gryphon during the months that the defendant worked at the company. Tr. of Order to Show Cause, Sept. 9, 2011, 8:9 -9:8. The restitution owed by the sales representative defendants will be capped at the amount of money that they were directly responsible for bringing into Gryphon in the form of fees, either individually or in cooperation with others. *Id.* Defendants are deemed to have directly participated in obtaining money for Gryphon if they received a full or partial commission for the fees charged to customers. *Id.* at 8:25 – 9:8. As the ringleaders, Kenneth and Nicole Marsh are responsible for the full amount. *See* Appendix A, Master Order of Restitution, Doc. Entry 427, Ex. 1, Sept. 14, 2011; Appendix B, Sentencing Table.

Individual caps on liability are not foreclosed by the MVRA. The fundamental purpose of the Act is to "make victims of crime whole." *United States v. Boccagna,* 450 F.3d 107, 112 (2d Cir. 2006). The statute contemplates "the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution calculation in a given case." *Id.* at

114. Since these caps do not decrease the total amount of restitution, but merely limit an individual defendant's liability, they do not dilute the MVRA's fundamental purpose.

The court exercised discretion to reduce the amount suggested by the government for periodic payments out of defendants' income after they were released from prison. Tr. of Order to Show Cause, Sept. 9, 2011, at 7:15-23. This reduction will permit them to support their families and will not unduly inhibit rehabilitation.

A hearing was held on September 9, 2011 to discuss any objections to the proposed restitution order. At the hearing, Michael Scarpaci objected to the way the defendants' individual caps on their joint and several liability were calculated. *Id.* 9:14 – 11:13. He argued that the restitution statute required that the defendants' individual liability be limited to the amount they received from the victims that came forward. *Id.* Instead, the government had calculated the caps based on the total amount received by the defendants from all customers during the period they worked at Gryphon, including those victims who did not claim restituion. *Id.*

Scarpaci's contention is rejected. As co-conspirators, each defendant may be held liable in restitution for the total amount of loss caused by Gryphon during the period the defendant worked at the company. *See* 18 U.S.C. § 3664A(a)(2); *Boyd*, 222 F.3d at 51. The current restitution order is appropriate for the defendants as well as the victims. It caps most defendants' individual liability substantially below the total amount claimed while requiring the defendants collectively to make all their victims whole. Moreover, Scarpaci's theory would require difficult and time consuming calculations regarding how much each victim paid Gryphon during the period that a particular defendant worked at the company.

## V.    Individual Sentences

### A.    Kenneth Marsh

#### 1.    Background

Kenneth Marsh, now forty-four years old, was born in Washington, D.C.  Kenneth Marsh PSR ¶ 63.  He was raised by both of his parents until the age of twelve, when they divorced.  *Id.* Prior to the separation, he witnessed regular verbal fights between his parents.  *Id.* ¶ 65.  His father struck the child in order to discipline him.  *Id.*  The divorce was emotionally difficult for the defendant; he was disappointed when his parents were unable to work out their problems.  *Id.* He lived with his mother after the divorce.  While his basic needs were always met, they lived from "paycheck to paycheck" and received very little financial support from his father.  *Id.*  His father remarried in 1988, and his mother remarried in 1999.  *Id.* ¶ 63.  Defendant had a good relationship with his mother's husband until he died in 2005.  *Id.* ¶¶ 63, 66.

Marsh had one brother, Kevin, who was killed in a car accident when the defendant was twenty-one.  *Id.* ¶ 77.  Defendant had progressively less contact with his father after his parents' divorce; after his brother's death, he completely lost touch with his father.  *Id.* ¶ 65.  After his arrest, Marsh reinitiated contact with his father.  *Id.* ¶ 66.  Both parents are aware of his arrest and remain supportive.  *Id.*

Having moved several times following the divorce, defendant completed high school in Laurel, Maryland.  *Id.* ¶ 94.  He attended George's Community College for one semester, Howard Community College for one year, and the University of Maryland in Baltimore for one year.  *Id.*  Despite being in good standing at school, he left before obtaining his degree due to

financial constraints. *Id.* ¶ 93. While attending school, he worked at several odd jobs, including as a lifeguard and waiter. *Id.* ¶ 99.

In 1996, defendant received a stockbroker license. *Id.* ¶ 95. Between 1996 and 2004, he was employed as a stockbroker with various companies located in New York and Florida. *Id.* ¶ 100. In 2004, began working at Solomon Grey Financial, earning $50,000 per month. *Id.* ¶ 99. He stayed in that position for two years. *Id.* In 2006, his stockbroker license was revoked following a settlement in connection with a complaint for having outside employment, and he left the company. This license revocation apparently had nothing to do with fraud. *Id.* ¶ 95.

After leaving Solomon Grey Financial, the defendant became fully involved in the Gryphon scheme. Defendant claims that he owned and operated Gryphon from 2007 until his arrest, but government records indicate that Gryphon was in operation beginning in April 2005. *Id.* ¶¶ 98.

Kenneth Marsh married Nicole Marsh, a co-defendant in this case, in October 2005. *Id.* ¶ 69. The couple has a three-year-old son, D. *Id.* ¶ 70. In March 2010, a temporary protection order was issued that prohibited defendant from contacting his wife and son, and a second order prohibited his wife from contacting him. *Id.* ¶ 71. Both temporary orders expired less than a month after they were issued. *Id.* The couple separated and divorced in April 2011. *Id.* ¶ 69. They have joint custody of D. *Id.* ¶ 70. The boy currently lives with his mother. In the event that both parents are incarcerated, he can be well taken care of either by Nicole Marsh's parents or by the defendant's mother. *Id.* Defendant has maintained open communication with Nicole Marsh in order to maintain contact with his son, who is brought regularly to see his father in custody. *Id.* ¶ 71.

In 2009, some Gryphon employees attempted to "shake down" the business. Allegedly among these were co-defendants Nicole Marsh, Michael Scarpaci, and Anthony Vecchione. *Id.* ¶ 69. Scarpaci and Nicole Marsh purportedly held a joint account in which she deposited money from the company with the intention of starting a similar business. *Id.* Defendant suspects a romantic connection between Scarpaci and Nicole Marsh. *Id.*

Kenneth Marsh has an extensive history of illegal drug use. Since he was twenty-three years old, he has used several grams of cocaine every weekend. *Id.* ¶ 87. In his thirties, he used gamma-Hydroxybutyric acid on a daily basis, eight to ten pills of ecstasy each weekend, and began binge drinking. *Id.* In 2007, an employee of Gryphon began supplying him with ketamine and various prescription painkillers containing oxycodone, including Oxycontin and Percocet, which he used on a daily basis. *Id.* ¶ 88. Ketamine and oxycodone have been the most problematic for him, but the prescription medication for his psychotic bipolar symptoms seem to reduce his addiction to these drugs. *Id.* ¶ 89.

In 2008, he briefly attended an inpatient substance abuse treatment program. *Id.* ¶ 90. He broke the facility rules. *Id.* He also attended Narcotics Anonymous from 2008 to 2010, but his illicit drug use continued. *Id.* While he has been drug-free since being remanded to custody, he expresses concern that he may not be able to maintain this state once released. *Id.* ¶ 89.

Defendant also struggles with a long history of mental health problems. He first sought counseling following the death of his brother. *Id.* ¶ 77. While he was in his thirties, he was diagnosed with, and treated for, depression, although the medication he was prescribed proved ineffective. *Id.* ¶ 78. Marsh and his wife sought marriage counseling in July 2008. *Id.* ¶ 79.

The counseling, which was ultimately ineffective, focused on his drug use, which caused conflicts in the relationship. *Id.*

In August 2009, he attempted suicide by slashing his wrists with a sword following an altercation with his wife and while under the influence of illegal drugs. *Id.* ¶ 80. He spent ten days in the hospital and was diagnosed with bipolar disorder while he was there. *Id.* Following this incident, he was prescribed a different medication to help deal with his mental health issues. *Id.* ¶ 81.

In June 2010, Marsh was again hospitalized because of a suspected suicide attempt. *Id.* ¶ 82. Following an argument with his wife on the telephone, she called the police to report that he was attempting suicide. *Id.* Defendant maintains that his wife's report was motivated by the pending divorce proceedings and that he had no intention of committing suicide at that point. *Id.*

An intake report from the New York Center for Neuropsychology and Forensic Behavioral Science in September 2010 indicates that he acknowledged and exhibited symptoms of depression, manic behavior, and suicidal ideation (although no suicidal intent was indicated). *Id.* ¶ 83. It notes that he displayed compulsive behavior, such as spending $30,000 to cover his arms with tattoos in the last two and a half years. *Id.* Defendant admitted to having problems with lying all of his life due to feelings of inadequacy, and that he had a tendency to become very aggressive, although medication significantly diminishes his anger. *Id.*

Since being remanded to custody in November 2010, he has had some trouble coping, as indicated by excessively sleeping, feeling as if he is in a daze, and short term memory loss. *Id.* ¶ 84.

## 2. Offense

Marsh co-owned Gryphon and supervised its operations, including all aspects of the fraudulent scheme. He hired all of the staff, inducing otherwise law-abiding individuals to join him in this illegal enterprise. He conceived of the fraud and trained the sales representatives in how to perpetrate it. He created the fictional financial advisors "Michael Warren" and "Ken Maseka" and assumed their identities.

Over the course of the fraud, Marsh victimized over 5,000 people, with severe effects on their financial, physical, and mental health. *See supra* Part III. He callously referred to his victims as "trained fucking dogs." Tr. of Kenneth Marsh Sentencing Hr'g, Aug. 11, 2011, Court Ex. 3, Tr. of Tape Recording at 3.

When Nicole Marsh was contemplating cooperating with the government investigation of the fraud, the defendant threatened to turn their three-year old son against her. Tr. of Nicole Marsh Sentencing Hr'g, Aug. 22, 2011, at 27:16-22.

Defendant was arrested on April 20, 2010 for his involvement with Gryphon. Kenneth Marsh PSR ¶ 27. On April 14, 2011, he pled guilty to Count Two of a three-count indictment. Count Two charges that between January 2007 and April 2010, Marsh and others defrauded Gryphon customers in connection with securities, in violation of 18 U.S.C. § 1348. *Id.* ¶ 1.

The total offense level is thirty-six. This included a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, a twenty-point enhancement for causing losses of $19,900,077.48, and a four-point enhancement for his role as the organizer of the scheme. Kenneth Marsh PSR ¶¶ 49-58. His

criminal history category is I, yielding a guidelines range of 188 months to 235 months of imprisonment. The maximum imprisonment term is twenty-five years. 18 U.S.C. §§ 1348.

### 3.  Sentence

Kenneth Marsh had a sentencing hearing on August 11, 2001.  He was sentenced on September 20, 2011 to ninety-six months of incarceration and five years of supervised release. A $100 special assessment was imposed.  No fines were imposed because defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  By plea agreement, he is subject to a forfeiture of $774,792.15.  *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.  He is jointly and severally liable for restitution to victims in the amount of $10,583,829.47.  His liability is not capped.  In addition, he is jointly and severally liable with Nicole Marsh for $484,546.45 in restitution to CMS.  This amount is not to be paid to CMS until all other victims have received full restitution.  *See* 18 U.S.C. § 3664(j)(1).

In addition to the general factors described in Parts IV and VI, specific deterrence is of particular concern for this defendant, since Mr. Marsh continued to participate in fraudulent activity similar to the Gryphon scheme while released on bail for this offense.  In or around July 2010, Marsh started up another business called Online Trader Daily with two partners.  Kenneth Marsh PSR ¶ 21.  For the few months that it was in operation, the business closely resembled the operations of Gryphon.  It used the company's website and customer lists, *id.,* as well as similar misrepresentations and high-pressure sales techniques, *Id.* ¶ 24.  Marsh's responsibilities in this venture included explaining the Gryphon business model to his new partners, making trade recommendations, writing pitches to be used during customer calls, and training employees to use the pitches.  *Id.* ¶ 22.  As before, Marsh used an alias when making sales calls—this time,

"Marcus Strong." *Id.* ¶ 23. During a status conference in connection with the instant offense on October 20, 2010, the court was informed and found that the defendant had engaged in this activity, which constituted a violation of his pretrial release conditions. *Id.* ¶ 25. He was remanded to custody. *Id.*

Other defendants in similar fraud cases have received sentences significantly below the Guidelines. The two cases closest to the one at hand are *United States v. Butler,* 264 F.R.D. 37 (E.D.N.Y. 2010), and *U.S. v. Khemraj*, No. 08-CR-332 (E.D.N.Y Apr. 1, 2010), Doc. Entry 382.

Butler initially received a five year sentence for securities fraud. His crime was substantial, involving a $1 billion fraud. But the losses were far less, since what was lost was primarily liquidity rather than a long-term decrease in the value of the securities purchased. Moreover, in *Butler*, sophisticated investors were involved. These investors carelessly failed to pay attention to the investments, and defendant's employer neglected to supervise Butler properly. Unlike Marsh, Butler has a stable marriage, as well as strong family and community support. 264 F.R.D. at 38-39. He is likely to be a law-abiding citizen, good father, and good husband.

In *Khemraj,* the defendant received a sentence of ninety-seven months of incarceration for selling a relatively small number of inflated and fraudulent mortgages. He received this long sentence based largely on the fact that he used otherwise law-abiding people in his fraud. They included several central to the scheme, as well as a few gullible straw purchasers. The amount of money and number of people involved were miniscule compared to those in the instant case.

In this case, a non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005). In light of *Butler* and *Khemraj*, a non-guidelines sentence

42

is warranted to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Moreover, the defendant's significant psychological problems will make it more difficult for him to serve a prison sentence than either Butler or Khemraj. *See* 18 U.S.C. § 3553(a)(1) (requiring the court to consider "the history and characteristics of the defendant"). A ninety-six month sentence with significant post-incarceration supervision, combined with the substantial restitution, will be sufficient to incapacitate this defendant and to deter both Marsh and others who seek to perpetrate similar frauds.

### B.  Nicole Marsh

#### 1.  Background

Nicole Marsh, now thirty-one years old, was born in Staten Island, New York in 1979. Her mother is a teacher and her father is a sales manager at a textile plant. Nicole Marsh PSR ¶¶ 64. Defendant and her sister were raised in a middle-income household by their parents and maternal grandmother, who resided with them. *Id.* ¶ 67-68. She shares a good relationship with her family, who is aware of her arrest and remain supportive. *Id.* ¶ 64.

Defendant graduated from high school in 1997 and attended Florida Atlantic University in Boca Raton, Florida for three years. *Id.* ¶ 82. She stopped attending school because of a loss of focus and the lack of a major area of study. *Id.* She attended an aesthetician program at a trade school in Florida in 2004 and received a facial license from the Florida Board of Cosmetology, which expired in 2007. *Id.* ¶ 81.

From 1999 to 2000, Nicole Marsh was employed as a sales assistant for a financial institution in Florida, earning $30,000 a year. *Id.* ¶ 90. It was at this firm that she met Kenneth

Marsh, her future spouse.  *Id.*  In 2000, Nicole and Kenneth Marsh resigned from the firm to start their own short-lived business, Warwick Investments, Inc.  *Id.* ¶ 89.  At about this time, they began dating.  *Id.* ¶ 69.  When Kenneth Marsh took a job working as a stock broker at a brokerage firm from 2000 to 2004, Nicole Marsh acted as his unofficial assistant.  *Id.* ¶ 88.

The couple married in October 2005.  For the first few years of the marriage, she worked as a receptionist at a doctor's office in New Jersey, earning $640 per week.  *Id.* ¶ 86.  She stopped working there when she became pregnant in 2007.  *Id.*  In 2008, she gave birth to their son, D.  *Id.* ¶ 69, 79.  Then she began working at Gryphon with her husband.  *Id.* ¶¶ 85-86.

As already noted, Kenneth Marsh is bipolar and addicted to numerous illegal drugs.  This combination led to verbal abuse of his wife.  *Id.* ¶ 69.  Throughout the courtship and marriage, he was manipulative and lied to her.  For example, he claimed he went to Georgetown University and gave her a tour of the campus.  *Id.*  She later found out he never attended that school.  *Id.*

The couple attended marriage counseling in 2008, but could not resolve their marital problems.  *Id.* ¶ 74.  In August 2009, Nicole Marsh threatened to leave her husband.  *Id.* ¶ 69.  In response, he attempted to kill himself.  *Id.* ¶ 69.  Because of the emotional nature of their situation, and considering what would be in the best interest of their son, she decided to continue with the marriage.  *Id.* ¶ 69.

The reconciliation was short lived.  On March 19, 2010, Nicole Marsh again tried to leave the marriage.  *Id.* ¶ 69.  As he had the first time, her husband made it difficult for her to do so—this time, by attempting to physically prevent her from leaving their home.  *Id.* ¶ 69.  She was only able to escape after calling the police.  *Id.* ¶ 69.  Immediately after the incident, she

obtained a temporary order of protection and temporary custody of their son, although her husband later was granted joint custody. They divorced in April 2010. *Id.*

Kenneth Marsh has been incarcerated in connection with this case since November 19, 2010, and will remain in prison for a significant amount of time. *Id.* ¶ 69. Nicole Marsh currently cares for her son, and her parents provide financial support. *Id.* ¶ 84. Her parents are able to, and will, care for the boy while she is incarcerated. *Id.* ¶ 70.

Ms. Marsh has been unemployed since March 2010. She currently receives unemployment and Medicaid benefits. *Id.* ¶ 84. She expects to begin working as a part-time administrative assistant. *Id.*

### 2. Offense

Ms. Marsh worked as a bookkeeper and office manager for Gryphon from 2007 to March 2010. *Id.* ¶ 85. She was a co-owner of Gryphon and managed central aspects of its operation, including the fraud scheme. *Id.* ¶ 24. As noted in Part II(A)(2), *supra,* her role in the fraud was different from that of the other defendants. Her responsibilities included handling payroll, employee scheduling, and customer service. She was not responsible for opening customer accounts or calling clients. While she facilitated Gryphon's fraudulent activities, she did not directly participate in them.

On October 20, 2010, this defendant pled guilty to all counts of a three-count information. Count One charges that between January 2007 and April 2010, Nicole Marsh, together with others, violated 18 U.S.C. § 1349 by conspiring to: (a) defraud Gryphon customers and obtain money and property through wire fraud in violation of 18 U.S.C. § 1343; and (b) commit the violation detailed in Count Two. Count Two charges that, during the same time

frame, Nicole Marsh executed and attempted to execute a scheme to defraud Gryphon customers in connection with securities in violation of 18 U.S.C. § 1348.  Count Three charges that Nicole Marsh, together with others, violated 18 U.S.C. § 371 by conspiring to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6, and 80b-17.

The total offense level is thirty-five.  Addendum to Nicole Marsh PSR ¶ 59.  This includes a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, a twenty-point enhancement for causing losses of $19,900,077.48, and a three-point enhancement for her role as a scheme manager.  *Id*. ¶¶ 45-57.  Her criminal history category is I, yielding a guidelines range of imprisonment of 168 to 210 months.  *Id.* ¶ 105.  The maximum imprisonment term for Count One and Two is twenty-five years, 18 U.S.C. §§ 1348, 1349, and the maximum term for Count Three is five years, 18 U.S.C. §371.

Ms. Marsh gave substantial assistance to the government in prosecuting other defendants.  Her cooperation was particularly significant with regard to the early years of the fraud, providing the government with valuable information regarding the creation of Gryphon and the hiring of Baldwin Anderson, the company's first employee.  This evidence was a considerable factor in persuading Kenneth Marsh and Baldwin Anderson—two of the most culpable defendants—to plead guilty.

Nicole Marsh's choice to cooperate was particularly noteworthy because she helped the government prosecute the father of her son, even as he threatened to turn him against her if she cooperated.  Tr. of Nicole Marsh, Sentencing Hr'g, Aug. 22, 2011, at 27:16-22.

### 3.    Sentence

Nicole Marsh had a sentencing hearing on August 22, 2011.  She was sentenced on September 14, 2011 to three months of incarceration and three years of supervised release.  A $300 special assessment was imposed.  No fines were imposed because the defendant does not have any assets, and it is unlikely that she will have any in the future to pay a fine.  She is jointly and severally liable with all co-defendants for restitution to the victims in the amount of $10,583,829.47.  She is also jointly and severally liable with Kenneth Marsh for restitution to CMS in the amount of $484,546.45.  No restitution is to be paid to CMS until all other victims have received full restitution.  *See* 18 U.S.C. § 3664(j)(1).  Defendant consented to forfeiture of property located at 14 Bayside Lane and at 661 Johnson Terrace, both on Staten Island.  *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220.  This sentence is appropriate.  Generally, in cases where both parents of a young child receive incarceratory sentences, the court considers staggered service, where one parent completes the incarceratory portion of his or her sentence before the other so that one parent is always available to care for the child.  In the instant case, that option is not available.  Kenneth Marsh, the child's father, will be incarcerated for many years.  Although Nicole Marsh's parents are financially and physically capable of taking care of the child while she is incarcerated, it is in

the best interest of the child to ensure that he is not separated from both of his parents for a significant amount of time.

According to Ms. Marsh, her son has recently begun questioning the whereabouts of his father and becomes anxious when she leaves the house.  Tr. of Nicole Marsh, Sentencing Hr'g, Aug. 22, 2011, at 35:12-17.  A sentence that would require Kenneth and Nicole Marsh's son to be separated from both of his parents for a significant period would likely cause undue stress to the child.  These extraordinary family circumstances are relevant to the sentencing determination.  *See, e.g.*, *United States v. Bueno*, 09-CR-625, 2010 WL 2228570, at *3 (S.D.N.Y. June 3, 2010) (taking into consideration that "[t]he [defendants'] three children were in a stable, two-parent household, with an obviously caring mother, and they will now lose both parents to significant terms of imprisonment"); *United States v. Kon*, 04-CR-271-03, 2006 WL 3208555, at *2, 5-6 (S.D.N.Y. Nov. 2, 2006) (imposing a non-guidelines sentence in light of family circumstances where defendant was the mother of a two year-old daughter and the father was no longer involved in raising the child).

An incarceratory sentence is necessary to provide adequate general and specific deterrence.  Mrs. Marsh has expressed genuine remorse about her participation in the fraud, and has provided substantial assistance to the government.  Moreover, although she was fully aware of the fraud, her role in the enterprise did not involve interacting with clients or making fraudulent statements directly to the victims, making her less culpable than other defendants.  Given Ms. Marsh's history as a law abiding and productive citizen, her close ties to her family, and the domineering role of her former husband, upon leaving prison she is likely to become an honest and productive member of society.  A sentence of three months provides sufficient

48

general and individual deterrence.  It will also ensure that her young son will not be separated from both of his parents during a significant stage of his development.

C.      **Baldwin Anderson**

1.      **Background**

Baldwin Anderson, now fifty-seven years old, was born in Kingston, Jamaica in 1954. Baldwin Anderson PSR ¶ 63.  He immigrated to the United States at the age of eighteen.  *Id.* ¶ 65.  Six years later, he arranged for his family to follow him.  *Id.*  He subsequently gained permanent residence status.  *Id.*  Since moving to the United States, he has lived on Staten Island. *Id.*

Anderson earned his high school diploma in 1969 while he was living in Jamaica.  *Id.* ¶ 83.  After arriving in the United States, he attended Wagner College on Staten Island for three years, but did not obtain his degree because he had difficulty balancing full-time work with academic demands.  *Id.* ¶ 82.

In 1975, Anderson married J. Anderson.  *Id.* ¶ 66.  Together, they had two daughters, ages thirty-two and thirty-four.  *Id.* ¶ 67.  The couple separated in 1980 and legally divorced in 1982, but they remain friendly.  *Id.* ¶ 66.  J. Anderson is aware of Anderson's arrest and remains supportive.  *Id.*

In 1985, Anderson married G. Anderson.  They have two sons, ages twenty-six and twenty-four, and a daughter, age eighteen.  *Id.* ¶ 69.  Anderson's family has remained supportive throughout the proceedings, despite the significant financial and emotional difficulties they have experienced since his arrest.  *Id.* ¶¶ 69-71.

Defendant worked at several jobs prior to his involvement with Gryphon. Between 1972 and 1981, he was employed in various capacities by the Mission of the Immaculate Virgin at Mount Loretto. *Id.* ¶ 92. He eventually stopped working there because it did not provide sufficient income. *Id.* Between 1981 and 2003, he held managerial and sales positions at several real estate companies, and was self-employed for a time as an independent contractor. Between 2003 and 2006, he worked as a manager and construction supervisor on Staten Island, making $40,000 a year. *Id.* ¶ 91. For nine months in 2006, he managed commercial mortgages, making $30,000 a year. *Id.* ¶ 90. He was then employed as a bed salesman in New Jersey, earning $45,000 a year. *Id.* ¶ 89. In April 2007, he began working at Gryphon. *Id.* ¶ 88.

Anderson has significant health problems. He had a heart attack in September 2010 and had a pacemaker surgically installed. *Id.* ¶ 79. Due to a ventricular malfunction the pacemaker, it requires monitoring at least every three months. *Id.* He has no history of mental or emotional problems. *Id.* ¶ 77.

### 2. Offense

Anderson was one of the first employees at Gryphon. He began working at the company as a sales representative in April 2007. *Id.* ¶ 22. He remained with Gryphon until April 2010. *Id.* His tenure at Gryphon was one of the longest. *See* Tr. of Baldwin Anderson Sentencing Hr'g, Sept. 13, 2011, at 28:8-12.

Defendant sold Gryphon customers subscriptions to the company's investment newsletters, as well as specific trade recommendations costing between $1,000 and $50,000. His pay consisted of commission from these fraudulent sales. He did not manage customers' investment accounts or money directly.

Anderson personally made misrepresentations to Gryphon clients about the credentials of the company's employees, the scope of its operations, and the performance of prior investment recommendations. For example, he solicited investments for the company Australia program, when there was no office in Australia and no plans to open one. *Id.* at 27:8-20. He is accountable for at least 250 victims. Baldwin Anderson PSR ¶ 22.

On June 14, 2011, after two days of trial, Anderson pled guilty to Count One of a twenty-nine count superseding indictment. Count One charges that between April 2005 and April 2010, the defendant, together with others, conspired to (a) defraud Gryphon customers and to obtain money and property from customers through wire fraud, in violation of 18 U.S.C. § 1343; and (b) defraud Gryphon customers in connection with securities, in violation of 18 U.S.C. § 1348. Count One is a violation of 18 U.S.C. § 1349, constituting conspiracy.

The total offense level is thirty-seven. This includes a base offense level of seven, a two-point reduction for acceptance of responsibility, a two-point enhancement for abuse of a position of trust, a four-point enhancement for a securities violation by an investment advisor, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 43-50. His criminal history category is I, yielding a guidelines range of 210 to 262 months. The offense carries a statutory maximum sentence of twenty-five years. *See* 18 U.S.C. § 1348.

### 3. Sentence

Defendant had a sentencing hearing on September 13, 2011. He was sentenced on September 15, 2011 to twenty-four months of incarceration and three years of supervised release. A $100 special assessment was imposed. No fines were imposed because the defendant does not

have any assets, and it is unlikely that he will have any in the future to pay a fine.  He is jointly

and severally liable with all co-defendants for restitution to the victims in the amount of

$10,583,829.47, although his individual cap on liability is $3,024,333.53.  He is subject to a

forfeiture of $1,111,738.32.  *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. §

2461.  As a result of this conviction, he is likely to be deported.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S.

220.  The defendant has a long history of legal employment, a strong work ethic, and a loving,

supportive family.  It is highly unlikely that he will engage in any criminal activity upon his

release.  Moreover, his various health problems argue in favor of a reduced sentence.

In comparison to many of the other defendants, a more substantial incarceratory sentence

is necessary.  Anderson worked at Gryphon for a considerable length of time.  During his tenure,

he trained other employees to perpetrate the fraud.  And while other defendants cooperated with

the government, he did not accept responsibility and pled guilty until after two days of trial.

The most significant consequence that Anderson may face as a result of this proceeding is

one over which this court has no control—his deportation.  The permanent separation from his

family is itself a significant punishment.  An incarceratory sentence of twenty-four months,

along with the restitution, forfeiture, and supervised release make it unlikely that he will engage

in further criminal activity, and provide significant general deterrence.

### D.   Richard Borrello

### 1.    Background

Richard Borrello, now twenty-seven years old, was born in Queens, New York. Richard Borrello PSR ¶ 59. He is the eldest of six children. His mother was a homemaker; his father was an independent contractor in the construction business. *Id.*

Borrello grew up in below-average economic circumstances. *Id.* ¶ 61. The family suffered frequent periods of instability and deprivation on account of his father's problem with crack-cocaine. *Id.* ¶ 59. Drug use sometimes caused Borrello's father to abandon work for months. *Id.* ¶ 61. During these periods, the family was forced to rely on the generosity of neighbors for food and necessities. *Id.* His mother sometimes collected public assistance. *Id.*

The defendant's father died of a drug overdose in 2006, when Borrello was twenty-three. *Id.* ¶ 59. At that point, the defendant assumed the responsibility of being "the man of the house." *Id.* ¶ 61.

Despite his father's substance abuse problem, the defendant had a good relationship with him and maintains strong ties with his mother and siblings. His eldest brother and two eldest sisters work and attend college, while his two youngest siblings, ages ten and thirteen, live with his mother and attend primary school. *Id.* ¶ 60. Borrello plays an active role in his siblings' lives and assists his mother with caretaking. *Id.* ¶ 61. All but his two youngest siblings are aware of his arrest and are supportive.

Borrello married G., a freelance food stylist, in August 2010. *Id.* ¶ 63. Both describe their relationship as very good. *Id.* ¶ 64. They have no children, but they are looking forward to starting a family. *Id.* ¶¶ 63-64.

Borrello had some difficulties as a young man. In his late teens and early twenties, the defendant experimented with drugs. *Id.* ¶ 70. During the same period, he was arrested once for assault in the third degree and once for petit larceny after stealing tires from a parked car. *Id.* ¶¶ 54-56. Borrello has not been arrested since. Since he was adjudicated as a youthful offender on both occasions, his criminal history category remains I. Defendant does not currently have a substance abuse problem. *Id.* ¶ 72.

Despite these early difficulties, Borrello was academically successful, graduating in the top ten percent of his class at Manhattan's Washington Irving High School, where he was actively involved in extracurricular activities. *Id.* ¶¶ 75, 62. He attended John Jay College of Criminal Justice from August 2000 to May 2002, and Nassau Community College from January 2003 to May 2005. *Id.* ¶¶ 73-74. He left school in order to work, since he could not continue his studies without financial support. *Id.* ¶ 73.

Borrello worked consistently beginning in high school. While still in school, he was employed part-time as a stock associate at a grocery store and as an operator for a car service. *Id.* ¶ 85. From 2000 to 2005, while pursuing a college degree, he assisted his father with construction jobs. *Id.* ¶ 84. Depending on his school schedule, he was able to work one to six days a week, earning $60 per day. From 2003 to 2005 he worked part-time at a shipping company for $10 an hour. *Id.*

Upon leaving school in 2005, Borrello became a sales associate at a car dealership, Boss Motors. *Id.* ¶ 83. He was promoted to sales manager, earning $10,000 per month. *Id.* In 2006, he became general sales manager at Major World, a car dealership in Queens. *Id.* ¶ 82. There he met Michael Scarpaci and John Degliuomini, with whom he would later work at Gryphon. He

was promoted to business manager, earning approximately $20,000 per month through commissions. *Id.* He left the post in July 2008 because of the demanding hours. *Id.* From August 2008 to October 2008, he worked at a car dealership on Long Island, but his hours did not improve. *Id.* Seeking a better work-life balance, he resigned.

Borrello worked at Gryphon as a sales representative from October 2008 until the enterprise ended in March 2010. *Id.* ¶ 80. He was unemployed from April 2010 to October 2010, helping his father-in-law with unspecified work in return for financial assistance. In October 2010, he was hired as the Business Manager of Millennium Toyota, where he is currently employed. *Id.* ¶¶ 78-79.

### 2. Offense

Like other sales representatives, the defendant sold Gryphon customers subscriptions to the company's investment newsletters, as well as specific trade recommendations costing between $1,000 and $50,000. The defendant personally made misrepresentations to clients about the credential of the company's employees, the scope of its operations and the performance of prior investment recommendations. Tr. of Richard Borrello Plea, Sept. 16, 2010, at 29:15-20. When calling customers, he employed the fake names of "Richard Lanza" and "Rich Lanza." Richard Borrello PSR at 2.

Of the defendants in this case, Borrello was among the more culpable. His tenure of seventeen months at Gryphon was substantial. As a sales representative, Borrello brought in more money—over $2.8 million—than any of his colleagues. Tr. of Richard Borrello Sentencing Hr'g, Aug. 19, 2011, at 22:17-19. He is accountable for at least 250 victims.

Although he did not serve as a manager or leader within Gryphon, Borrello did help train other defendants to perpetrate the fraud. *Id.* at 22:20-23. His own statements make his feelings regarding the fraud and his role in it clear. According to Borrello, "Success in this business, to me, is making a shitload of fuckin' money." *Id.* at 25:13-14. He was particularly vicious in his use of manipulative tactics to encourage victims to buy more Gryphon services. *Id.* at 25:21 – 29:13.

On September 16, 2010, Richard Borrello pled guilty to Count Three of a three-count indictment. Count Three charges that the defendant, with others, violated 18 U.S.C. § 371 by conspiring to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6, and 80b-17. Tr. of Richard Borrello Criminal Cause for Pleading, Sept. 16, 2010.

The total offense level is thirty-one. This includes a base offense level of six, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. Richard Borrello PSR ¶ 22. His criminal history category is I, *id.* ¶ 57, yielding a guidelines range of 108 to 135 months, *id.* ¶ 95. The offense carries a statutory maximum sentence of five years. *See* 18 U.S.C. § 371.

### 3.    Sentence

Borrello had a sentencing hearing on August 19, 2011. He was sentenced on September 14, 2011, to eighteen months incarceration and three years of supervised release. A $100 special assessment was imposed. No fines were imposed because the defendant does not have any

assets, and it is unlikely that he will have any in the future to pay a fine. He is jointly and severally liable with all co-defendants for restitution to the victims in the amount of $10,583,829.47, although his individual cap on liability is $3,289,382.51. Defendant is subject to forfeiture in the amount of $1,152,890.96. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. Although the defendant has some prior criminal history, these were isolated incidents during his youth. The defendant has strong family ties and has made continuing efforts to support them through lawful employment.

A longer sentence is required for this defendant as compared to other defendants who were sales representatives. Although he was not a supervisor, he helped train others in how to perpetrate the fraud. While Borrello currently shows remorse for his conduct, he had little regard for the severe consequences of his actions on his victims at the time.

An incarceratory sentence of eighteen months, together with a long term of supervised release and the significant burdens of restitution and forfeiture, make it unlikely that Borrello will engage in any further criminal activity. The sentence provides significant general deterrence.

###### E.     <u>Robert Anthony Budion</u>

####### 1.     **Background**

Robert Anthony Budion, now twenty-nine years old, was born in Brooklyn, New York. Robert Anthony Budion PSR ¶ 70. His family later moved to Oceanside, New York. *Id.* ¶ 75. His father left soon after his birth; the defendant has had no contact with him since. *Id.*

Defendant was raised by his mother and maternal aunt in a lower- to middle-income household. *Id.* ¶ 74. He has three older maternal half-siblings and one paternal half-brother. *Id.* ¶ 72. His family was surprised by his involvement in this case; they have struggled to deal with his arrest, but this has only caused the family to "come together even more and become even stronger." *Id.* ¶ 71. They remain supportive of the defendant.

Budion graduated from Oceanside High School in 2000. He received average to below-average grades and was repeatedly suspended for truancy and involvement in fights. *Id.* ¶ 88. During this period, he was also arrested for gun possession, although the charge was later dismissed. *Id.* ¶¶ 67-68. After graduating from high school, he moved to Woodland Hills, California for a year to live with his brother. *Id.* ¶ 75. He did not attend college.

Beginning at a young age, Budion worked for his brother at Elite Tuxedos. *Id.* ¶ 94. When he started at the company in 1995, his responsibilities mainly involved cleaning shoes. *Id.* He worked his way up to the position of salesperson. *Id.* After graduating from high school, he purchased a portion of the business from his brother. *Id.* The company folded in 2007. *Id.* ¶ 94.

For approximately six months in 2007, Budion was employed as a salesperson at Karako Suits in Union, New Jersey, earning $10 an hour. *Id.* ¶ 93. After he left that job, he was unemployed until April 2008, supporting himself through his personal savings, with some financial assistance from his fiancée. *Id.* ¶ 92.

Between April 2008 and March 2010, Budion worked for Gryphon as a salesperson. *Id.* ¶ 91. After Gryphon was shut down, Budion was unemployed until December 2010, when he started working as a salesperson and assistant manager at My Suit in Manhattan. *Id.* ¶¶ 89-90. He currently earns a weekly salary of $450, as well as a commission on sales. *Id.* ¶ 89.

Budion has never been married and does not have any children.  *Id.* ¶ 76.  For the past seven years, he has been involved in a romantic relationship with M.M., who works as a banker.  *Id.*  They are engaged to be married.  *Id.*  Ms. M. worked as a secretary at Gryphon, but she was not aware of the illegal nature of the business dealings and has not been charged with any criminal conduct in connection with the fraud.  *Id.*  Although Ms. M. was "distraught" when she learned of Budion's arrest and is concerned about the outcome of the case, their relationship remains strong.  *Id.*

Budion has a significant history of substance abuse.  *Id.* ¶ 84.  He began drinking at the age of thirteen.  *Id.*  By age fourteen, he was using marijuana on a daily basis.  *Id.*  During this period, Budion also experimented with cocaine, ecstasy, prescription pain killers, and ketamine.  *Id.* ¶ 84.  Between July 2006 and March 2007, he participated in a court-ordered outpatient drug treatment program with the Oceanside Counseling Center, Inc. after he pled guilty to a charge of operating a motor vehicle under the influence of alcohol.  *Id.* ¶¶ 61-63, 86.  He sought further treatment on his own in 2008 and 2009.  *Id.* ¶ 86.  He ceased using drugs prior to his arrest in early 2010 because "he was getting out of control, trying to forget [his] problems."  *Id.* ¶ 85.

Budion also has a history of gambling.  *Id.* ¶ 82.  When he started working at Gryphon, he began placing bets on the outcomes of football games.  *Id.*  On average, he bet on one to two football games, but sometimes up to twelve games, each week.  *Id.*  On average, he bet $2,000 on each game, but he made some wagers as high as $30,000.  *Id.*  He also gambled on blackjack and other games, betting as much as $3,000 per hand.  *Id.*  He ceased gambling in mid-2010 because he "knew [he] was getting out of control," specifically with regard to betting on football games, and because his fiancée demanded that he stop gambling when she found out about it.  *Id.*

Budion is in sound physical health.  *Id.* ¶ 83.  He claims to be in good mental health, although records provided by the Oceanside Counseling Center indicate that he received treatment for depression and anxiety between 2006 and 2007.  *Id.* ¶ 81.  The discharge reflects a referral to "continue therapy in a mental health setting."  *Id*.  He is currently taking anti-anxiety medication.  *Id.*

### 2.    Offense

Budion began working as a sales representative for Gryphon in April 2008.  *Id.* ¶ 80.  He remained until March 2010, when the operation was shut down.  *Id.*

Like other sales representatives, the defendant sold customers subscriptions to the company's investment newsletters, as well as specific trade recommendations costing between $1,000 and $50,000.  His pay consisted of commissions from these sales.  He did not manage customers' investment accounts or money directly.  Nor did he serve as a manager or leader.

Budion personally made misrepresentations to Gryphon clients about the credentials of the company's employees, the scope of its operations, and the performance of prior investment recommendations.  Tr. of Criminal Cause for Guilty Plea of Robert Anthony Budion, June 24, 2010, at 29:6-25.  He is accountable for at least 250 victims.  Robert Anthony Budion PSR ¶ 48.  His tenure of twenty-four months at Gryphon was substantial.  He played a role in stealing $2,839,834.27 from victims, earning $935,987.00 in commissions.

On June 24, 2010, Robert Budion pled guilty to all counts of a three-count indictment.  Tr. of Criminal Cause for Guilty Plea of Robert Anthony Budion, June 24, 2010.  Count One charges that, between January 2007 and April 2010, defendant, together with others, violated 8 U.S.C. § 1349 by conspiring to:  (a) devise a scheme and artifice to defraud Gryphon customers

and to obtain money and property from Gryphon customers by means of materially false fraudulent pretenses, representations and promises, and, for purposes of executing such scheme and artifice, to transmit and cause writings, signs, signals, pictures, and sounds, contrary to 18 U.S.C. § 1343; and (b) execute a scheme and artifice to defraud Gryphon customers in connection with securities of issuers with a class of securities registered under section 12 of the Securities Exchange Act of 1934, contrary to 18 U.S.C. § 1348.

Count Two charges that, between January 2007 and April 2010, defendant, together with others, executed and attempted to execute a scheme and artifice to defraud Gryphon customers in connection with one or more securities of issuers with a class for securities registered under section 12 of the Securities Exchange Act of 1934, in violation of 18 U.S.C. § 1348.

Count Three charges that, between January 2007 and April 2010, defendant, together with others, conspired to use the mails and means and instrumentalities of interstate commerce, directly and indirectly, to employ a device, scheme, and artifice to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6 and 80b-17, in violation of 18 U.S.C. § 371.

The total offense level is thirty-two. Robert Anthony Budion PSR ¶ 59. This includes a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 44-58. His criminal history category is I, yielding a guidelines range of 121 to 151 months. *Id.* ¶ 104. Counts One and Two carry a statutory maximum sentence of

twenty-five years.  *See* 18 U.S.C. § 1348.  Count Three carries a statutory maximum sentence of five years.  *See* 18 U.S.C. § 371.

Budion provided substantial assistance to the government in prosecuting co-defendants. Tr. of Robert Anthony Budion Sentencing Hr'g, Aug. 26, 2011, at 22:8-11.  He spent hours with prosecuting attorneys explaining what roles the other co-defendants played at Gryphon; correcting transcripts of audio tapes that helped secure guilty pleas from other co-defendants; and preparing to testify at the trial of co-defendant Baldwin Anderson.  *Id.* at 23:4-24:14. Budion's testimony at the Anderson trial possibly led that defendant to plead guilty.  *Id.* at 24:15-17.

Budion's cooperation was beneficial not just to the government, but to Budion himself.  It allowed him to reexamine the harm that was caused by his participation in the fraudulent scheme.  *Id.* at 24:22 – 25:4.  According to prosecutors who worked with Budion, he matured over the length of the relationship and became horrified by what he had done as a participant in the fraud.  *Id.* at 25:4-7.

### 3.    Sentence

A sentencing hearing was held on August 26, 2011.  Defendant was sentenced on September 15, 2011 to three months of incarceration and three years of supervised release.  A $300 special assessment was imposed.  No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  He is jointly and severally liable with all co-defendants for restitution to the victims in the amount of $10,583,829.47, although his individual cap on liability is $2,839,834.27.  He is subject to

forfeiture in the amount of $935,987.00. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. Defendant's role in fraud was less significant than that of other defendants. While he, like the other defendants, engaged in a pattern of deception, he was not as vicious in his pursuit of his victims as some others. Given the defendant's long history of lawful employment, his close relationships with his family and fiancée, and his remorse for his offense, it is unlikely that he will reoffend. The defendant provided substantial assistance to the United States Attorney's Office, and this should be given consideration.

### F.  John Degliuomini

#### 1.  Background

John Degliuomini, now thirty-five years old, was born and raised in Brooklyn, New York. John Degliuomini PSR ¶ 59. He is one of four children ranging in age from seventeen to thirty-seven. *Id.* ¶ 61. His father owns and operates a restaurant in Springfield, Massachusetts; his mother is a homemaker. *Id.* They now live in Portland, Connecticut. *Id.*

Throughout defendant's life, the family has lived comfortably in a middle-income neighborhood. Until Degliuomini was twenty-nine years old, he lived at his family's home in Brooklyn. *Id.* ¶ 62. Much of his extended family lived within blocks, and he shared close relationship with his grandparents, aunts, and cousins. *Id.* Degliuomini has a close relationship with his family, and frequently provides assistance to his relatives. *Id.* The family remains supportive and has assisted with expenses following the arrest. *Id.* ¶¶ 59, 61.

In 2005, Degliuomini married P. Degliuomini. *Id.* ¶ 64. The couple currently resides in Somerset, New Jersey. *Id.* ¶ 63. The couple has a strong marriage, and she remains supportive. *Id.* ¶ 69. They have two children, a four year-old daughter and a two year-old son. *Id.* ¶ 64. P. occasionally performs clerical work for a local florist, but spends the majority of her time taking care of their children. Both defendant's family and her family will assist her financially during the defendant's incarceration. *Id.* ¶ 69.

Degliuomini graduated from Xaverian High School in Brooklyn. *Id.* ¶ 74. He then attended Pace University in Pleasantville, New York from 1993 to 1994, pursuing an associate's degree in business administration. *Id.*

While at Pace, the defendant was accused of sexually assaulting a woman on campus. *Id.* ¶¶ 53-54. He was suspended pending an investigation of the incident. *Id.* ¶ 54. He left Pace University after pleading guilty to assault in the third degree. *Id.* The defendant was also arrested and convicted for criminal contempt in the second degree for violating an order of protection in the assault case. *Id.*

After leaving Pace, the defendant continued his education at Kingsborough Community College from 1994 to 1995, pursuing an associate's degree in business administration. *Id.* ¶ 74. He also worked part-time. *Id.* He did not obtain his degree because he wanted to make more money working full-time.

Degliuomini has consistently been employed since his first year of college. He started his career at RCS Computers in New York City, where he worked until 2000. *Id.* ¶ 82. He worked first as a salesman, earning $40,000-50,000 a year, then as store manager, earning $80,000 annually. *Id.* After business slowed down at RCS, the defendant joined his father's

company, Bi-State Steel, as a project manager, earning approximately $60,000 a year. *Id.* ¶ 81. In 2005, when his father closed the business, he became a salesman and finance business manager at a car dealership in Ridgewood, New York, earning $70,000 per year. *Id.* ¶ 80. In 2007, he began employment at the Major World car dealership in Queens, where he worked alongside Richard Borrello, Michael Scarpaci, and others who later became sales representatives with Gryphon. *Id.* ¶ 79. He earned approximately $120,000 annually. *Id.* He stopped working there once his family moved to New Jersey, since the commute from his new residence to the dealership was time consuming, and the hours long. *Id.*

Degliuomini was unemployed for approximately three months before he joined Gryphon in June 2008. *Id.* ¶ 79. Between March 2010, when operations at Gryphon were shut down, and July 2010, Degliuomini was again unemployed. *Id.* ¶ 76. From July 2010 through December 2010, he was a finance business manager at East Coast Toyota in Woodridge, New Jersey, where his net earnings were approximately $1,200 per week. *Id.* ¶ 75. He currently works as a manager in the finance and insurance department at Planet Honda in Queens. Tr. of John Degliuomini Sentencing Hr'g, Aug. 15, 2011, at 21:7-10.

The defendant is healthy, although depressed on account of the instant case. He has no significant history of drug or alcohol abuse. John Degliuomini PSR ¶¶ 70-71.

### 2. Offense

Degliuomini worked at Gryphon from approximately 2008 to March 2010 as a sales representative. *Id.* ¶ 77. As part of the fraud, he employed the fake name "John Stevens." *Id.* at 2. He did not serve as a manager or leader.

Defendant was one of the more vicious practitioners of the fraud. He squeezed one client, who he knew to be a quadriplegic, out of $125,000. Tr. of John Degliuomini Sentencing Hr'g, Aug. 15, 2011, at 42:14-19. He bragged about his ability to defraud a dairy farmer in Vermont of money that the defendant knew the victim could not afford. *Id.* 42:20 – 43:19.

He was also one of the more successful perpetrators. During one two-week period in February, he was paid $86,467 for his part in stealing money from fifty-three victims. *Id.* at 44:2-8.

On September 16, 2010, Degliuomini pled guilty to Count Three of a three-count indictment. It charges that the defendant, with others, conspired to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6, and 80b-17, a violation of 18 U.S.C. § 371, constituting Investment Advisor Fraud Conspiracy.

The total offense level is thirty-one. John Degliuomini PSR ¶ 52. This includes a base offense level of six, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 41-51. His criminal history category is I, yielding a guidelines range of 108 to 135 months. *Id.* ¶ 94. The offense carries a statutory maximum sentence of five years. *See* 18 U.S.C. § 371.

### 3. Sentence

Defendant had a sentencing hearing on August 15, 2011. He was sentenced on September 14, 2011 to eighteen months of incarceration and three years of supervised release. A

$100 special assessment was imposed.  No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  He is jointly and severally liable with all co-defendants for restitution to victims in the amount of $10,583,829.47, although his individual cap on liability is $1,942,222.00.  He is subject to a forfeiture of $542,125.29.  *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220.  Defendant has a long history of legal work, both before and after his involvement with Gryphon, and he is dedicated to his wife, children and extended family.  It is unlikely that he will reoffend after release from prison.  Yet a more significant sentence than other defendants is warranted because of this defendant's viciousness in perpetrating the fraud.

An incarceratory sentence of eighteen months, along with the significant burdens of restitution and forfeiture, make it unlikely that he will engage in any further criminal activity.  Significant general deterrence is provided.

### G.    <u>Jeanne Lada</u>

#### 1.    **Background**

Jeanne Lada, now forty-five years old, was born Jeanne Tramontana in Belleville, New Jersey.  Jeanne Lada PSR ¶ 57.  She was raised in an upper middle income household.  *Id.* ¶ 61. Her father, who died in 2004, was a restaurant owner and real estate investor.  *Id.* ¶ 57.  The defendant's mother worked as the Assistant Dean of Career Services at Fairleigh Dickinson University; she is currently a homemaker and resides in Manchester, New Jersey.  *Id.*

The defendant had a close relationship with her father.  His death in 2003 led to defendant's "mental breakdown," followed by a period of intense depression.  *Id.* ¶ 70.  She was

hospitalized at the time, and continues to suffer bouts of depression.  *Id.*  She is currently

undergoing treatment.  *Id.*

While she had a strong relationship with her father, her relationship with her mother was

turbulent.  *Id.*  Until her teens, her mother was verbally and physically abusive.  *Id.* ¶ 61.

Although she continues to see her mother once a week, this relationship remains strained.  *Id.* ¶

57. The defendant's current legal situation has exacerbated these tensions.  *Id.* ¶ 58

The defendant's only brother died of cancer in 1988 at the age of twenty-seven.  *Id.* His

death proved especially difficult for defendant's mother.  *Id.*  After her brother's death,

defendant helped care for her brother's son, now twenty-two years old.  *Id.* ¶¶ 58-59.

The defendant has been married and divorced twice.  In 1986, she married a New Jersey

Transit system employee. *Id.* ¶ 63.  Defendant and her ex-husband often argued about his

excessive use of alcohol, although there was no physical violence in the relationship.  *Id.*  They

divorced in 1997.  *Id.*  In 1993, she married R. Lada, who was then a union steward. *Id.* ¶ 65.

Mr. Lada's abuse of drugs and alcohol plagued the relationship, and he physically abused the

defendant.  The marriage ended in 2004 after Mr. Lada was accused of raping a relative.  *Id.*

Since 2005, the defendant has been romantically involved with New York City Police

officer.  *Id.* ¶ 67.  The two became engaged in 2009.  *Id.*  Upon learning of the instant offense, he

broke off the engagement at the urging of his supervisors at the NYPD.  *Id.*  The two continue to

speak on the telephone regularly.  *Id.* ¶ 68.

Her nephew and her cousin both remain supportive, as does her former fiancé.  All three

describe her as an extremely caring person.  They were shocked to learn of her involvement in

the Gryphon scheme, but noted her naiveté and trusting personality.  *Id.* ¶¶ 59, 60, 68.

Ms. Lada graduated in 1983 from Belleville High School, where she received good grades. *Id.* ¶ 77. While still in high school, she began working at her father's restaurant, Salvatore's Pizzeria; she continued working there as a cook and server on an as-needed basis until 1986. *Id.* ¶ 91. During this time, she also worked at the offices of the local newspaper as a typesetter, and as a receptionist at a pediatrician's office. *Id.*

In 1986, the defendant became a manicurist at a local Belleville salon, where she was employed full-time until 1993. *Id.* ¶ 88. For the next decade, she was a server at Carrabba's Italian Grill in Brick, New Jersey, earning approximately $1,000 per week. *Id.* ¶¶ 89-91. She also cleaned homes in Toms River, New Jersey. *Id.*

From 1989 to 1991, Lada attended Kean University in Union, New Jersey and completed courses towards a bachelor's degree in English. *Id.* ¶ 76. She withdrew to care for her father, who had become ill. *Id.* She resumed her studies ten years later at Georgian Court University in Lakewood, Virginia, and in 2003 earned a bachelor's degree in sociology, with an emphasis on education. *Id.* ¶ 75.

After receiving her degree, Lada worked as an investigator for the New Jersey Division of Youth and Family Services for a year, earning a salary of $38,000 a year. *Id.* ¶ 88. In 2004, she became a loan officer for Liberty Funding Services, Inc. *Id.* ¶ 87. This experience led her to strike out on her own, and in 2005 she opened her own mortgage company in Sea Girt, New Jersey. *Id.* ¶ 86. She earned $80,000 annually, but the economic downturn forced her to close the business in 2007. *Id.* She became a teacher at a local day care center, earning $9 an hour, but left this post after six months. *Id.* ¶ 85. She then worked for three months as a salesperson at

a cellular phone shop in early 2008, earning $1,500 per week. *Id.* ¶ 84.  During this time, she was constantly looking for better paying work.  *Id.*

The defendant joined Gryphon in May of 2008 and worked there until March 2010, when Gryphon was shut down. *Id.* ¶ 83.  Defendant describes herself as a subcontractor and editor.  *Id.*

Although defendant used cocaine in her youth and early adulthood, and continues to use marijuana occasionally, she does not have a serious substance abuse problem.  *Id.* ¶ 73.  She had never been arrested or convicted of any illegal activity prior to the instant offense.  *Id.* ¶ 54.

### 2. Offense

The worked for Gryphon from May 2008 to March 2010.  The government identifies her as a sales representative at the company.  *Id.* ¶ 22.  She had one of the longest tenures at Gryphon, twenty-three months total.  *Id.*  She did not serve as a manager or leader within Gryphon.

Ms. Lada was responsible for overseeing newsletter and website content creation and editing.  The website, advertisements, and newsletters persistently referenced fictional personalities and results. Tr. of Jeanne Lada Sentencing Hr'g, Aug. 12, 2011, at 38:3-8.  She assisted in the fraud by deceiving clients via the telephone, email newsletters, and website copy about the scope of Gryphon's operations and the value of its investment recommendations.  *Id.*  She understood that Gryphon clients acted on these recommendations.  *See* Tr. of Jeanne Lada Criminal Cause for Pleading, Sept. 13, 2010, at 25:15 – 26:6.  She bragged about her expertise in creating those pitches.  Tr. of Jeanne Lada Sentencing Hr'g, Aug. 12, 2011, at 38:9-11.  Ms. Lada may also have worked the phones as a sales representative for a period of months.  *Id.* at 37:15-22.  She used the fake name "Jeanne Greco."  Jeanne Lada PSR at 2.

On September 13, 2010, Jeanne Lada pled guilty to Count Three of a three-count indictment. It charges that the defendant, with others, violated 18 U.S.C. § 371 by conspiring to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6, and 80b-17.

The total offense level is thirty-one. Jeanne Lada PSR ¶ 52. This includes a base offense level of six, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 43-51. Her criminal history category is I, yielding a guidelines range of 108 to 135 months. *Id.* ¶¶ 55, 99. The offense carries a statutory maximum sentence of five years. *See* 18 U.S.C. § 371.

### 3. Sentence

Defendant had a sentencing hearing on August 12, 2011. She was sentenced on July 12, 2011, to one year and one day of incarceration and three years of supervised release. A $100 special assessment was imposed. No fines were imposed because the defendant does not have any assets, and it is unlikely that she will have any in the future to pay a fine. She is jointly and severally liable with co-defendants for restitution to the victims in the amount of $10,583,829.47. Her individual liability is capped at $2,665,475.27. She is subject to a forfeiture of $729,800.47. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. This sentence is appropriate in light of her non-supervisory role in the conspiracy and lack of criminal background. The defendant has a history of lawful employment and is likely to

return to such employment following her release.  Moreover, her close relationships with members of her family make it unlikely that she will reoffend.

An incarceratory sentence of one year and one day, along with the significant burdens of restitution and forfeiture imposed as part of defendant's sentence, are sufficient for specific deterrence.  Significant general deterrence is provided.

**H.**     **Anthony Dellaventura**

**1.**     **Background**

Anthony Dellaventura, now thirty-four years old, was raised in Staten Island, New York. Anthony Dellaventura PSR ¶¶ 64, 68.  Following the separation of his parents when he was eight, he lived with his mother and two siblings.  *Id.* ¶ 68.  His mother was physically and verbally abusive to the defendant and his siblings during their childhood, hitting them with her hands and with objects like a vacuum cleaner when they were disobedient.  *Id.*  As a result of this abuse, at the age of thirteen, the defendant chose to move in with his father and stepmother.  *Id.* His siblings followed him a few years later.  *Id.*

The defendant lived with his father and stepmother's family in a middle income household until he was eighteen.  In addition to his siblings, the household included his step-brother and half-brother.  *Id.* ¶ 66.  The family moved to Las Vegas, Nevada in 1991, then back to Staten Island in 1993.  *Id.* ¶¶ 68-69.

He reconciled with his mother in his late teens and now has a "decent" relationship with her.  *Id.* ¶ 70.  Defendant's relationship with his father has always been good, despite periodically not seeing him for months at a time.  *Id.*  Defendant attributes these absences to

72

problems between his father and mother.  *Id.*  He believes that his father contributed financially

to his upbringing, despite his mother's assertions to the contrary.  *Id.*

In October 2010, defendant's father died, and this loss has been difficult for the defendant

because.  *Id. ¶¶ 64, 71.*  He has close relationships with his siblings.  *Id. ¶ 71.*  After an initially

tense adjustment period, defendant now also has a good relationship with his stepmother.  *Id.*

Defendant graduated from Tottenville High School, where he played football, and then

attended Iona College in Westchester, New York, for one semester.  *Id. ¶¶ 83-84.*  He later went

to the College of Staten Island, but decided to leave because he wanted to concentrate on

working and "got burnt out at school."  *Id. ¶ 83.*

Defendant has never been married and has no children.  *Id. ¶ 72.*  He was previously

involved in a romantic relationship, but it ended in December 2010.  *Id.*

Beginning in 1995, the defendant was employed as a bouncer for various New York City

night clubs, earning approximately twenty dollars per hour.  *Id. ¶ 89.*  During this time, he also

held down short term jobs as a sales associate at Lowe's and Home Depot, a waiter and bus boy

at a country club, and a personal trainer at health clubs.  *Id. ¶¶ 89-94.*

Between 1998 and approximately October 2010, including the period when he was

employed at Gryphon, Dellaventura occasionally worked for his father's private investigation

company, Dellaventura Incorporated, earning eighteen to twenty-two dollars per hour.  *Id. ¶ 87.*

In May 2005, defendant began working as a fireman for the New York City Fire

Department in Staten Island earning approximately $80,000 annually.  *Id. ¶ 85.*  Dellaventura

was suspended by the department in February 2011 because of his arrest and conviction in the

instant case and put on "light duty" status.  *Id.*  He subsequently resigned from the fire

department and he is unlikely to be eligible for reinstatement. *Id*. ¶¶ 85-86; Tr. of Anthony Dellaventura Sentencing Hr'g, Sept. 13, 2011, at 16:7-19.

Dellaventura began working for Gryphon in September 2009 as a way to earn extra money, a routine practice for firemen. Tr. of Anthony Dellaventura Sentencing Hr'g, Sept. 13, 2011, at 12:12-14. He remained at the company until March 19, 2010. Anthony Dellaventura PSR ¶ 87.

Since his arrest, Dellaventura has been freelancing as a plumber and electrician at the firehouse where he used to work. Tr. of Anthony Dellaventura Sentencing Hr'g, Sept. 13, 2011, at 21:2-6.

The defendant has been taking Xanax for treatment of anxiety for about a year. Anthony Dellaventura PSR ¶ 76. He also attends weekly therapy sessions. *Id.* Apart from the anxiety disorder, the defendant has not reported any mental health problems.

In 1996, while working as a club bouncer, the defendant was stabbed in the left thigh. *Id.* ¶ 80. The wound required forty stitches. *Id.* In 2004, defendant underwent a procedure to remove a benign tumor from one of his salivary glands. *Id.* The defendant has not suffered any residual medical problems related to either of these incidents. He is, however, being treated for low testosterone levels. *Id.*

The defendant experimented with drugs between the ages of sixteen and twenty, including marijuana, ecstasy, and ketamine, but did not continue to use them. *Id.* ¶ 82. He plays poker recreationally a few times a week. *Id.* ¶ 79. On occasion, he travels, generally alone, to Atlantic City, betting between $500 and $1000 each night. *Id.*

### 2. Offense

Dellaventura worked as a sales representative for Gryphon from September 2009 to March 2010. *Id.* ¶ 23. His primary role was to open accounts and make cold calls, Tr. of Anthony Dellaventura Sentencing Hr'g, Sept. 13, 2011, at 23:4-6, using the alias "Anthony Jordan," Anthony Dellaventura PSR at 2. As with other sales representatives, he made false statements about the credentials of Gryphon's employees, the scope of its operations, and the performance of past recommendations. Tr. of Criminal Cause for Pleading of Anthony Dellaventura, Oct. 27, 2010, at 31:3-18. He was paid on commission. Dellaventura worked at Gryphon for the least amount of time—only six months—and earned the least of all the defendants. He had no organizing, leadership, or supervisory role. Anthony Dellaventura PSR ¶ 23.

On October 27, 2010, Dellaventura pled guilty to all counts of a three-count information. Count One charges that between April 2005 and April 2010, defendant, together with others, violated 18 U.S.C. § 1349 by conspiring to: (a) obtain money and property from Gryphon customers through materially false representations and for this purpose, transmit information by means of wire communication in interstate commerce in violation of 18 U.S.C. § 1343; and (b) commit the violation detailed in Count Two.

Count Two charges that, during the same period, Dellaventura executed and attempted to execute a scheme to defraud Gryphon customers in connection with securities of issuers with a class of securities registered under section 12 of the Securities Exchange Act of 1934 in violation of 18 U.S.C. § 1348.

Count Three charges that the defendant, with others, conspired to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6, and 80b-17. Count Three is a violation of 18 U.S.C. § 371, constituting Investment Advisor Fraud Conspiracy.

The total offense level is thirty-two. Anthony Dellaventura PSR ¶ 59. This includes a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 44-58. His criminal history category is I, yielding a guidelines range of 121 to 151 months. *Id.* ¶ 105. Counts One and Two carry a statutory maximum sentence of twenty-five years. *See* 18 U.S.C. § 1348. Count Three provides a statutory maximum sentence of five years. *See* 18 U.S.C. § 371.

Dellaventura provided substantial assistance to the government. Because of his small role in the fraud, he was only approached by the government after his indictment. Tr. of Anthony Dellaventura Sentencing Hr'g, Sept. 13, 2011, at 23:7-12. Significantly, however, he had audio recordings of Ken Marsh in his possession, which were used as evidence in the Baldwin Anderson trial. *Id.* at 23:19-24. According to the government, the defendant's cooperation is partially responsible for Nicole Marsh's pleading guilty, and for her subsequent cooperation. *Id.* at 24:1-12. The defendant also receives some credit for the pleas of Kenneth Marsh and Baldwin Anderson. *Id.* at 24:1-14.

### 3. Sentence

Defendant had a sentencing hearing on September 13, 2011. He was sentenced on September 15, 2011 to three months of incarceration and three years of supervised release. A $300 special assessment was imposed. No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine. Dellaventura is subject to a forfeiture of $102,520.90. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461. He is jointly and severally liable for restitution to the victims in the amount of $10,583,829.47, although his individual cap on liability is $473,186.50.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. The defendant has no previous criminal history and a consistent record of lawful employment. His previous career as a fireman is admirable. As a significant collateral consequence of this conviction, Dellaventura will likely no longer be able to continue this career. This should be taken into account. While an incarceratory sentence is necessary to provide adequate general deterrence, it is highly unlikely that this defendant will reoffend. Moreover, given his minor role in the fraud, his cooperation with the government, and his remorse for his offense, a longer sentence is not required.

## I. <u>James T. Levier</u>

### 1. Background

James Levier, now thirty-six years old, was born in Toms River, New Jersey. James T. Levier PSR ¶ 66. He has one sister. *Id.* ¶ 69. Both children were raised in a middle-income household. *Id.* ¶ 71.

Defendant has a close relationship with his parents and sees them every day.  *Id.* ¶ 66.
He is also close to his sister.  *Id.* ¶ 69.  He is the godfather of her oldest child, and they see each
other twice a week.  *Id.* ¶ 70.  His family is distressed by the defendant's arrest, but it remains
supportive.  *Id.* ¶¶ 66-70.

Defendant is currently engaged to, and living, with M.H.  *Id.* ¶ 72.  She is currently
employed as an internet sales manager at Unbeatable Sales.  *Id.*  While physically healthy, she
suffers from bipolar disorder.  *Id.*  The couple planned to marry in 2010, but postponed their
marriage until after the defendant is sentenced.  *Id.*  Together, they have a son, R., who is two
years old.  *Id.*  Riley was recently diagnosed with autism; his conduct suggests that he may suffer
from severe autism.  Tr. of James T. Levier Sentencing Hearing, Sept. 13, 2011, at 17:17 – 18:2.

Levier graduated from Toms River High School in 1992.  *Id.* ¶ 72.  He studied business
at Ocean County College in Toms River, New Jersey for two years, and then transferred to
Richard Stockton Community College in Galloway, New Jersey, where he earned his associate's
degree with an emphasis in business in 1997.  *Id.* ¶¶ 81-83.

Defendant has a long history of regular employment, often working at several jobs
simultaneously.  Between 1989 and 1999, he was employed as a waiter and short-order cook in
New Jersey.  *Id.* at ¶ 91.  In 1993, he took up a phone sales operator position, which he continued
until 1996.  *Id.*  From 1996 to 1997, he was a disc jockey at the radio station WRDR 104.9 in
Pomona, New Jersey.  *Id.*  From 1998 to 2001, Levier worked as an administrative assistant at
the CBS Sports Radio offices in Philadelphia, and then as an assistant to the director of sales at
the company's headquarters in Manhattan.  *Id.*  From 2001 to 2004, he was employed as the
director of graduate marketing for The Princeton Review.  *Id.*

Between 2004 and 2007, defendant worked as an assistant manager at a Burger King restaurant, earning $35,000 a year. *Id*. ¶ 90. He lost this job due to downsizing, *id.*, and was unemployed for several months, supporting himself through personal savings and unemployment benefits, *id*. ¶ 89. From November 2007 to May 2008, defendant worked as a door-to-door salesperson selling fiberoptic cable services, earning about $750 a week. *Id*. ¶ 88.

In May 2008, he began working at Gryphon. *Id*. ¶ 87. He earned a monthly income of about $20,000. *Id.*

Following his arrest in April 2010, Levier was unemployed and supported by his fiancée for ten months. *Id*. ¶ 86. In February 2011, he began working at Air Treatment, LLC, in New Jersey. *Id*. ¶ 85. He works full-time performing home demonstrations and sales of air purification vacuum cleaners, earning approximately $2,800 a month. *Id.*

Defendant suffers from Type II diabetes. *Id*. ¶ 78. As a result of his diabetes, he has impaired vision in his left eye, requiring a monthly direct steroid injection. *Id.* He has not had such treatment since December 2010, however, because it is not covered under his current health plan. *Id.* If he continues without treatment, he may lose his sight. Tr. of James T. Levier Sentencing Hr'g, Sept. 13, 2011, at 21:1-6.

Levier also suffers from a gambling addiction and attends Gamblers Anonymous meetings on a weekly basis. James T. Levier PSR ¶ 77. Beginning in high school, he placed bets on sporting events. *Id.* In 2005, his parents had to make him a personal loan of $75,000 so that he could pay off his gambling debts. *Id.* At this point, defendant voluntarily enrolled in a one week inpatient treatment program at Shoreline Behavioral Health. *Id.* He also voluntarily submitted his name to a list of individuals who are restricted from gambling in Atlantic City

casinos. *Id.* He has been delivering presentations about Gamblers Anonymous at high schools in New Jersey since 2008. *Id.* His sponsor indicates that Levier has abstained from gambling since 2008. This defendant has not used illegal drugs. *Id.* ¶ 79.

### 2. Offense

Levier was employed at Gryphon as a sales representative from May 2008 to April 2010. *Id.* ¶ 87. He had no organizing, leadership, or supervisory role.

The defendant was a middle-of-the-pack sales representative. Tr. of James T. Levier Sentencing Hr'g, Sept. 13, 2011, at 21:14-20. While he was at Gryphon for a relatively long period, he was neither one of the biggest earners nor particularly vicious. *Id.* Like other sales representatives at Gryphon, he made numerous misrepresentations to induce customers to buy subscriptions to the company's investment newsletters, as well as specific trade recommendations. Tr. of James T. Levier Criminal Cause for Guilty Plea, June 24, 2010, at 32:22 – 33:7. He is accountable for at least 250 victims. James T. Levier PSR ¶ 48.

On June 24, 2010, Levier pled guilty to all counts of a three-count indictment. *Id.* ¶ 1. Count One charges that between January 2007 and April 2010, defendant, together with others, violated 18 U.S.C. § 1349 by conspiring to: (a) defraud Gryphon customers and obtain money and property through wire fraud in violation of 18 U.S.C. § 1343; and, (b) commit the violation detailed in Count Two.

Count Two charges that during the same time frame, Marsh executed and attempted to execute a scheme to defraud Gryphon customers in connection with securities in violation of 18 U.S.C. § 1348.

Count Three charges that the defendant, with others, conspired to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6, and 80b-17. Count Three is a violation of 18 U.S.C. § 371, constituting Investment Advisor Fraud Conspiracy.

The total offense level is thirty-two. James T. Levier PSR ¶ 61. This includes a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 46-60. His criminal history category is I, yielding a guidelines range of 121 to 151 months. *Id.* ¶ 102. The maximum imprisonment term for Count One and Two is twenty-five years, 18 U.S.C. §§ 1348, 1349, and the maximum term for Count Three is five years, 18 U.S.C. §371.

Levier provided significant cooperation to the government. Tr. of James T. Levier Sentencing Hr'g, Sept. 13, 2011, at 23:23 – 24:22. He was one of the first defendants to assist and stood out for his frankness. *Id.* He explained the architecture of the fraud early on in the investigation of Gryphon. *Id.* at 24:10-15. This allowed the government to secure guilty pleas from several defendants relatively quickly. *Id.*

### 3. Sentence

Levier had a sentencing hearing on September 13, 2011. He was sentenced on September 15, 2011 to three months of incarceration and three years of supervised release. A $300 special assessment was imposed. No fines were imposed because defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine. He is jointly and severally

liable with the other co-defendants for restitution to the victims in the amount of $10,583,829.47. His individual liability is capped at $1,631,252.00. He is subject to a forfeiture of $561,632.95. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. His tenure of nearly two years at Gryphon was substantial. The need for punishment is mitigated by his valuable cooperation and his remorse. The defendant's health problems, as well as the impact his absence is likely to have on his young son, argue against long incarceration. Given his history and the strong support of his family, it is unlikely that the defendant will reoffend. An incarceratory sentence of three months, along with the substantial burdens of restitution and forfeiture, make it unlikely that he will engage in any further criminal activity. Significant general deterrence is provided.

### J. <u>Christopher Perrotta</u>

#### 1. **Background**

Christopher Perrotta was born in 1972 on Long Island, New York. Christopher Perrotta PSR ¶ 57. He was raised in a middle-income home on Staten Island, free of neglect, abuse, or traumatic events. *Id.* ¶ 59. His parents divorced in 1993, and his mother remarried in 1994. *Id.* ¶ 57. He has a younger brother who works as an officer with the New York City Police Department. *Id.* ¶ 58.

Perrotta married D. Perrotta in 2005. *Id.* ¶ 61. Together, they had two children: a five year-old daughter and a two year-old son. *Id.* ¶ 63. The couple separated in June 2009. *Id.* ¶ 61. Divorce proceedings are underway. *Id.* Their relationship remains hostile. *Id.* His wife has

primary custody of the children, although the defendant visits them regularly. *Id.* ¶ 62. Defendant pays alimony and $101 weekly in child support. *Id.*

Defendant's immediate family remains supportive. *See id.* ¶ 60. They are concerned about the effect of incarceration on Perrotta's children and his relationship with them. *Id.*

Perrotta attended Tottenville High School on Staten Island. *Id.* ¶ 70. He earned poor grades and received a GED in 1990. *Id.* He attended Five Towns College on Long Island for one year in 1994, but left school in order to work full time.

Between 1990 and 1995, the defendant held several low-paying positions as a bartender, a manager of a bowling alley, and a manager of a billiard hall. *Id.* ¶¶ 82-84. Beginning in September 1995, he was on a cable television program, "USA Live," on the USA Network, earning $85,000 annually. *Id.* ¶ 81. This position ended when the show was cancelled in June 1996. *Id.*

The defendant then tended bar from 1997 to 2000, and worked as a sommelier at a steakhouse in Manhattan from 2000 to 2002. *Id.* ¶¶ 79-80. From 2002 to 2009, he was employed as a sales manager for a series of wine and spirits distributors, earning $72,500 to $95,000 annually. *Id.* ¶¶ 76-78. Perrotta left his position in wine sales in December 2009 because of the stress of his marital problems and complications from a hernia, aggravated by the frequent travel required by the job. *Id.* ¶ 75.

From 2009 to March 2010, he worked for Gryphon. *Id.* ¶ 76. He was unemployed from March 2010 to September 2010. *Id.* ¶ 74. Since October 2010, he has worked as an assistant manager at a bar and restaurant on Staten Island, earning about $500 a week. *Id.* ¶ 74.

Defendant suffers from asthma, sleep apnea, and a number of other ailments. *Id.* ¶ 67. He smoked marijuana periodically from the age of sixteen until about 2009. *Id.* He has no history of mental health problems. *Id.* ¶ 66.

### 2. Offense

Perrotta worked for Gryphon as a sales representative from October 2009 through March 2010. Tr. of Christopher Perrotta Criminal Cause for Pleading, Aug. 13, 2010, at 23:6-7. He had no organizing or managerial duties. Christopher Perrotta PSR ¶ 22. His primary role was to answer the phones and have an initial conversation with customers before turning them over to more experienced salespeople. Tr. of Christopher Perrotta Sentencing Hr'g, Aug. 15, 2011, at 12:4-11. He used the fake name "Chris Gaines." Christopher Perrotta PSR at 2. He was not good at spinning the fraudulent tales necessary to draw in victims. Tr. of Christopher Perrotta Sentencing Hr'g, Aug. 15, 2011, at 16:24 – 17:2. The total amount of money that he made, and the total amount that he was responsible for stealing, was the second lowest of all the defendants. *Id.* at 16:10-15.

When he began working for Gryphon, he believed that it was a legitimate business. *Id.* at 11:24-25. At some point, he realized the criminal nature of the organization. *Id.* at 13:7-8. This led Perrotta to leave Gryphon before it was shut down. *Id.* at 12:24-25. He quickly accepted responsibility in the fraud. *Id.* at 17:11-13.

On August 13, 2010, Perrotta pled guilty to Count Three of a three-count indictment. Count Three charged that between January 2007 and April 2010, he, along with others, violated 18 U.S.C. § 371 by conspiring to use the mails and means and instrumentalities of interstate

commerce to employ a scheme to defraud clients and prospective clients, contrary to 15 U.S.C. § 80b-2(11), 80b-6, and 80b-17.

The total offense level is thirty-one. Christopher Perrotta PSR ¶ 52. This includes a base offense level of six, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 42-51. His criminal history category is I, *id.* ¶ 55, yielding a guidelines range of 108 to 135 months, *id.* ¶ 95. The offense carries a mandatory maximum sentence of five years. *See* 18 U.S.C. § 371.

### 3. Sentence

Perrotta had a sentencing hearing on August 15, 2011. He was sentenced on September 14, 2011 to six months of incarceration and three years of supervised release. A $100 special assessment was imposed. No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine. He is subject to forfeiture in the amount of $122,016.52. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461. He is jointly and severally liable for restitution to the victims in the amount of $10,583,829.47; his individual liability for restitution is capped at $488,741.97.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. The defendant was at Gryphon only for a short time. He had little enthusiasm for defrauding his customers and extricated himself from the company before it was shut down. The defendant has no prior criminal history and is unlikely to engage in further criminal conduct. A brief incarceratory sentence is necessary to provide adequate general deterrence.

85

### K.    Greg Prasker

#### 1.    Background

Greg Prasker, now thirty-two years old, was born in Brooklyn, New York.  Greg Prasker PSR ¶ 73.  His childhood was unremarkable.  *Id.* ¶ 78.  He currently resides with his parents, who both have physical ailments.  *Id.* ¶ 73.  His father, a retired limousine driver, suffers from vertigo, high blood pressure, and recently survived thyroid cancer.  *Id.*  His mother, who works for a limousine company in New York City, has a serious blood condition that is currently in remission.  *Id.*  He has one older sister.  *Id.* ¶ 76.

The defendant has close relationships with his family.  *Id.* ¶ 77.  Since his father has been ill, Prasker has provided significant emotional support and care to him, including driving him to and from doctor's appointments.  *Id.*  While the defendant's arrest has been upsetting for the family, they remain supportive.  *Id.* ¶¶ 74-75.

Beginning in February 2010, Prasker has been involved in a romantic relationship with C.K.  *Id.* ¶ 79.  C.K. is aware of Prasker's arrest and is supportive.  *Id.* ¶ 80.  Pending the outcome of the case, the two hope to marry.  *Id.* ¶ 79.

Defendant graduated from Port Richmond High School in 1997.  *Id.* ¶ 94.  He then attended Tulane University in New Orleans, Louisiana, where he received a bachelor's of science degree in computer information systems.  *Id.* ¶ 93.  He graduated with a 3.64 grade point average.  *Id.*

After graduating from college in 2004, the defendant has been almost continually employed.  Immediately following graduation, he opened the Big Apple Deli, a restaurant in New Orleans.  *Id.* ¶ 109.  As a result of Hurricane Katrina, he was forced to shut down this

business.  *Id.*  For the next two years, from August 2005 to July 2007, he worked for National Income Life Insurance, making $500 to $1,000 per week in commissions.  *Id.* ¶ 108.  He then was a server at Tao Restaurant in New York City.  *Id.* ¶ 107.

Between May 2008 and December 2008, the defendant was unemployed.  *Id.* ¶ 106.  During this period, he took care of his father, who was suffering from thyroid cancer and had just gone through back and neck surgery.  *Id.*

In December 2008, defendant began working for Opal Financial Group as a sales associate, earning $200 per week in commissions.  *Id.* ¶ 105.  He left Opal in March 2009 to work for Lava Lounge on Staten Island as a manager.  *Id.* ¶ 106.

In July 2009, Prasker began working at Gryphon.  *Id.* ¶ 103.  He remained with the company until it was shut down in April 2010.  *Id.*  The defendant then tried selling insurance.  *Id.* ¶ 102.  He subsequently worked for his brother-in-law, first as an employee at World Financial Group and then as a contractor with Zokor, LLC dba The Rosen Agency.  *Id.* ¶¶ 97-98.

In 1998, at the age of nineteen, defendant was arrested for forgery and drug possession in Louisiana.  *Id.* ¶ 67.  He was sentenced to five years custody, which was suspended, with five years of probation.  *Id.* ¶ 68.  The conviction was later expunged.  *Id.*  While Prasker has experimented with cocaine and marijuana, he does not appear to have a current addiction.  *Id.* ¶ 84.

Since his arrest in the current case, defendant has been attending therapy sessions to deal with his anxiety and is prescribed Celexa and Clonazepam.  *Id.* ¶ 83.  He also suffers from nephrotic syndrome, a kidney disease, although it is currently in remission.  *Id.* ¶ 87.

## 2. Offense

Prasker was employed by Gryphon from July 2009 to April 2010. Initially, he worked as a sales representative, using the alias "Greg Fox," *id.* at 2, but he neither enjoyed nor was good at that type of work, *id.* ¶ 44. He began writing ads for the company, as well as summarizing reports and doing research. *Id.* ¶ 45. At one point, he produced an ad that made false statements about his own life and lifestyle. *Id.* ¶ 47. He was not directly involved in taking people's money. Tr. of Greg Prasker Sentencing Hr'g, Sept. 13, 2010, at 20:3-8.

The defendant provided significant cooperation. He was helpful in inducing Jeanne Lada to plead guilty. *Id.* at 20 16 – 21:8. Because his job responsibilities consisted primarily of writing advertisements, he had hundreds of pages of emails from Lada instructing him on how to craft fraudulent advertisements. *Id.* The information he provided was also helpful in convincing Nicole Marsh to plead guilty. *Id.* at 21:9-18.

On September 13, 2010, Levier pled guilty to all counts of a three-count indictment. Tr. of Greg Prasker Criminal Cause for Pleading, Sept. 13, 2010. Count One charges that between January 2007 and April 2010, defendant, together with others, violated 18 U.S.C. § 1349 by conspiring to: (a) defraud Gryphon customers and obtain money and property through wire fraud in violation of 18 U.S.C. § 1343; and, (b) commit the violation detailed in Count Two.

Count Two charges that during the same time frame, Marsh executed and attempted to execute a scheme to defraud Gryphon customers in connection with securities in violation of 18 U.S.C. § 1348.

Count Three charges that the defendant, with others, conspired to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15

U.S.C. §§ 80b-2(11), 80b-6, and 80b-17. Count Three is a violation of 18 U.S.C. § 371, constituting Investment Advisor Fraud Conspiracy.

The total offense level is thirty-two. Greg Prasker PSR ¶ 65. This includes a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $14,399,248.39. *Id.* ¶¶ 50-64. His criminal history category is I, yielding a guidelines range of 121 to 151 months. *Id.* ¶ 119. The maximum imprisonment term for Count One and Two is twenty-five years, 18 U.S.C. §§ 1348, 1349, and the maximum term for Count Three is five years, 18 U.S.C. §371.

### 3. Sentence

Prasker had a sentencing hearing on September 13, 2011. He was sentenced on September 15, 2011 to three months of incarceration and three years of supervised release. A $300 special assessment was required. No fines were imposed because defendant does not have any assets, and it is unlikely that he will have any in the future. He is jointly and severally liable with the other co-defendants for restitution to the victims in the amount of $10,583,829.47; his individual liability is capped at $459,889.96. He is subject to a forfeiture of $99,794.64. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. The ads defendant wrote were critical in bringing customers to Gryphon. Nevertheless, defendant was among the least culpable defendants, working behind the scenes to create the fraud rather than directly encouraging victims to send money to Gryphon. He also assisted the

government.  Other than an isolated incident in his youth, Prasker has led a law-abiding life.  An incarceratory sentence of three months, along with the significant burdens of restitution and forfeiture imposed as part of defendant's sentence, make it unlikely that he will engage in any further criminal activity.  Significant general deterrence is provided.

**L.**     **Gregory Rossomando**

**1.**     **Background**

Gregory Rossomando, now thirty years old, was born on Staten Island.  Gregory Rossomando PSR ¶ 60.  He is the eldest of three children.  *Id.*  He was raised by his parents in a middle-income household.  *Id.* ¶ 63.  His father worked as a firefighter for the New York City Fire Department until he suffered an injury; he now owns and operates an asbestos removal company.  *Id.* ¶¶ 60, 63.  His mother is a secretary at a university.  *Id.* ¶ 60.  Defendant is close to his family; they remain supportive.  *Id.* ¶ 61.

Rossomando has never married and has no children.  *Id.* ¶ 64.  He currently lives in an apartment adjacent to his parents' home in a middle- to upper-income neighborhood in Staten Island.  *Id.*

He grew up in a middle-class household and had an uneventful childhood.  *Id.* ¶ 68.  He graduated from Monsignor Farrell High School, a Catholic school on Staten Island, in 1998.  *Id.* ¶ 77.  Between 1998 and 2002, he attended Pace University, the College of Staten Island, and Kingsborough Community College, but failed to earn a degree.  *Id.* ¶¶ 74-76.  He also worked part-time as a sales associate at a clothing store at the Staten Island Mall, earning about eight dollars an hour.  *Id.* ¶ 90.  He reports being interested in finance but being told he would not do

well in this field because of his poor performance in mathematics.  *Id.* ¶ 76.  He stopped

attending school when he was offered a job as a car salesman.  *Id.* ¶ 74.

The majority of defendant's work experience has been in car sales.  He started out as a

car salesman at a Toyota dealership in Brooklyn, earning $40,000 to $50,000 per year.  *Id.* ¶ 89.

He then worked as a manager at Toyota and Hyundai dealerships in Brooklyn and Manhattan

from 2004 to 2006, earning $80,000 to $100,000 annually.  *Id.* ¶¶ 87-88.  From 2006 to 2009, he

worked as a finance director and manager of a Toyota dealership, earning $125,000 to $150,000

annually.  *Id.* ¶ 86.  He was laid off and unemployed for two months in 2009.  *Id.* ¶ 85.

Beginning in July 2009, Rossomando worked briefly for a Nissan dealership in New

Jersey, then for another in Ozone Park, Queens.  *Id.* ¶¶ 83-85.  It was at this business that he met

Michael Scarpaci, who told him about Gryphon.  *Id.* ¶ 83.

Rossomando worked for Gryphon from September 2009 to March 2010.  *Id.* ¶ 82.  After

the company was shut down, defendant was unemployed from March 2010 to January 2011.  *Id.*

¶ 81.  He worked as a flooring salesperson from January to February 2011.  *Id.* ¶ 80.  He is

currently finance manager for a Honda dealership in New Jersey.  *Id.* ¶ 79.

The defendant has no record of criminal convictions.  He was arrested for harassment

after participating in a bar fight, but the charge was dismissed upon his completion of an anger

management course.  *Id.* ¶¶ 57-58.

Rossomando has a significant history of drug and alcohol abuse.  *Id.* ¶ 71.  He began

smoking marijuana habitually at age nineteen and reports using it every two to three days,

usually with friends, until his arrest of for the current offense.  *Id.*  While he experimented with

Ecstasy and cocaine, he does not use these drugs regularly.  *Id.*  He drinks alcohol in social

settings, consuming three to four glasses of red wine or six to seven beers, and he states that his drinking does not leave him feeling intoxicated. *Id.* ¶ 72.

Defendant suffers from chronic back pain, resulting from a degenerative disc disease. *Id.* ¶ 68. He takes prescription Oxycodone several times a day to treat the resulting pain. *Id.*

### 2. Offense

Rossomando worked for Gryphon as a sales representative from September 2009 to March 2010. *Id.* ¶ 82. Like other sales representatives at Gryphon, the defendant sold Gryphon customers both subscriptions to the company's investment newsletters and specific trade recommendations using the fake name "Greg Lehman." *Id.* at 2. He personally made misrepresentations to Gryphon clients as to the credential of the company's employees, the scope of its operations, and the performance of prior investment recommendations. Tr. of Gregory Rossomando Criminal Cause for Pleading, Sept. 13, 2010, at 24:9 – 25:1. Several clients provided him with information concerning their investments, and he falsely claimed to have tailored their trading recommendations to their individual circumstances. *Id.* at 25:8-11. He did not manage customers' investment accounts or money directly and had no organizational or managerial role.

His time at Gryphon was relatively short, only five and a half months. Tr. of Gregory Rossomando Sentencing Hr'g, Aug. 18, 2011, at 17:4-5. Initially, Rossomando did not apply himself to perpetrating the fraud. In November 2009, he was fired for showing up late and for not raising enough money. *Id.* at 17:4-9. He was then persuaded by his co-workers to ask Marsh for a second chance because he was missing a "golden opportunity." *Id.* at 17:12-14. Marsh

permitted him to return in the end of November 2009.  *Id.* at 17:15-17.  He was then much more effective, earning approximately $180,000 in four months.  *Id.* at 17:18-20.

The overall amount of money that Rossomando earned while he was employed by Gryphon—approximately $660,000—is among the lowest of all defendants.  *Id.* at 25:21-25.  It was significant given how short a time he was at Gryphon, indicating that when he applied himself he was particularly good at perpetrating the fraud.  *Id.* at 25:24-25.

In March 2010, before the company was shut down, Rossomando quit.  *Id.* at 17:23-25.  At the time, he hoped to set up a legitimate, non-fraudulent operation marketing financial newsletters.  *Id.* at 18:4-16.

On September 13, 2010, Rossomando pled guilty to Count Three of a three-count indictment.  Tr. of Gregory Rossomando Criminal Cause for Pleading, Sept. 13, 2010.  Count Three charged that between July 2007 and April 2010, he, along with others, violated 18 U.S.C. § 371 by conspiring to use the mails and means and instrumentalities of interstate commerce to employ a scheme to defraud clients and prospective clients, contrary to 15 U.S.C. § 80b-2(11), 80b-6, and 80b-17.

The total offense level is thirty-one.  Gregory Rossomando PSR ¶ 53.  This includes a base offense level of six, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48.  *Id.* ¶¶ 43-52.  His criminal history category is I, yielding a guidelines range of 108 to 135 months.  *Id.* ¶ 102.  The offense carries a mandatory maximum sentence of five years.  *See* 18 U.S.C. § 371.

Although Rossomando did not formally cooperate with the government, he was honest and forthcoming in his one proffer session. Tr. of Gregory Rossomando Sentencing Hr'g, Aug. 18, 2011, at 26:19-24.

### 3. Sentence

Defendant was sentenced on August 11, 2011, to one year and one day of incarceration and three years of supervised release. A $100 special assessment was imposed. No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future. He is subject to forfeiture in the amount of $203,584.23. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461. He is jointly and severally liable for restitution to the victims in the amount of $10,583,829.47, with his individual liability for restitution capped at $660,126.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. The defendant has no criminal history and a long record of lawful employment. He was involved in the fraud for a relatively short period and extricated himself before Gryphon was shut down.

While the risk of recidivism for this defendant is low, an incarceratory sentence is necessary to provide adequate general deterrence. A longer sentence, as compared to the other defendants, is necessary given the circumstances of his involvement in the fraud. Although he initially showed distaste for or disinterest in the work, the lure of financial gain induced him to plead for his job at Gryphon when he was fired. After he returned to the company, he applied himself to the fraud with vigor. He did not seek to cooperate with the prosecution.

### M. __Michael Scarpaci__

## 1.    Background

Michael Scarpaci, now thirty-five years old, was born in Brooklyn, New York.  Michael Scarpaci PSR ¶ 72.  He is the youngest of five children, with three older brothers and one older sister.  His father died prematurely of stomach cancer in 1985, when Scarpaci was nine years old.  *Id.*  Before his death, his father owned and operated the Scarpaci Funeral Home, now operated by two of the defendant's siblings.  *Id.*  ¶¶ 72-73.  Until Scarpaci was fourteen years-old, the family was financially comfortable, relying on money left by the father to make ends meet.  *Id.*  ¶ 74.  At that time, all of the siblings began to work to support the family.  *Id.* ¶ 72.

Defendant's mother resides in Staten Island.  *Id.*  She recently underwent a double hip replacement and has been receiving treatment for depression.  *Id.*  Scarpaci is her primary provider.  *Id.*

All of the defendant's siblings live in the New York metropolitan area.  *Id.* ¶ 73.  All are gainfully employed.  *Id.*

In 2002, Scarpaci married D. Scarpacci.  *Id.* ¶ 76.  They have four children ranging in age from eight to one years old.  *Id.* ¶ 77.  All of the children are in good health, although one daughter was born with fifty percent hearing loss and wears a hearing aid.  *Id.*  The Scarpacis' relationship remains good.  Ms. Scarpaci and the children regularly visit the defendant in custody.  *Id.* ¶¶ 76-77.

Prior to the birth of the children, Ms. Scarpaci worked as a teacher.  *Id.* ¶ 76.  She is attempting to regain her certification so that she can return to work.  *Id.*  Since Scarpaci's arrest and incarceration, his siblings have assisted her with house payments and expenses, although they are unsure if they can continue to do so for an extended period.  *Id.* ¶ 75.

Scarpaci attended Xaverian High School and Fort Hamilton High School in Brooklyn, New York. He dropped out after his sophomore year in 1993 to work and assist in supporting his family. *Id.* ¶ 92. He received his GED in 1994. *Id.* ¶ 91. In 1995, he attended a one-year program that enabled him to test for his Insurance Broker License, which he obtained in 1997. *Id.* ¶ 94.

From 1991 to 1996, defendant worked as a pallbearer, floor manager, and driver at the Scarpaci Funeral Home, earning approximately $32,000 annually. *Id.* ¶ 105. After receiving his insurance broker license, he worked at MetLife in Brooklyn, earning an annual salary of $100,000. *Id.* ¶ 104. In 1997, he left to purse an opportunity at another insurance brokerage, Regency Agency, where he worked until 2002. *Id.* ¶ 103.

In anticipation of his marriage, the defendant sought a higher salary in the automotive sales industry. Although he claims that he began work as a sales associate at Major World, a car dealership in Queens in 2002, the employer's records reflect that he began employment with them in 2005. *Id.* ¶ 102. Notably, other sales representatives of Gryphon were employed by Major World, including Richard Borrello, John Degliuomini, and Anthony Vecchione. Employment at Major World proved lucrative for the defendant; he originally earned $350,000 as a finance manager and then $500,000 as a sales manager. *Id.* During this time, 2007 to 2008, he also worked at East Hills Chevrolet on Long Island earning a substantial amount there as well. *Id.* ¶ 101. He left these posts in search of an easier commute. *Id.* He became a sales manager at Queens Nissan, where he earned $250,000 annually. *Id.* ¶ 100.

At the urging of former colleagues who had joined Gryphon, he left his position at Queens Nissan and joined the company in October 2009. *Id.* ¶ 98. In 2009, he and co-defendant

Anthony Vecchione formed a conspiracy, detailed *infra* Part V(Q)(1), to extort money from co-defendant Kenneth Marsh, although Scarpaci was never charged with that crime. He left Gryphon in March 2010 to start his own business. *Id.*

Scarpaci recently started working again at Queens Nissan, where he earns approximately $4,000 per month. Tr. of Michael Scarpaci Sentencing Hr'g, Sept. 14, 2011, at at 27:18-23.

The defendant has an extensive criminal history. In 1998, at the age of twenty-one, he was charged with forgery and falsification of records; the case was dismissed after he successfully completed a pretrial diversion program. Michael Scarpaci PSR ¶¶ 65-66. At the age of twenty-five, he was convicted of assault in the second degree after he and three others stabbed a man. *Id.* ¶¶ 53-54. In his early thirties, in 2008 and 2009, defendant was twice arrested and convicted of driving under the influence of alcohol. *Id.* ¶¶ 55-58. On one of these occasions he was charged with criminal possession of a weapon in the fourth degree because brass knuckles were found in his car. *Id.* ¶¶ 55-56.

Scarpaci is an associate of the Gambino organized crime family. *Id.* ¶ 61. In April 2010, he was arrested for his involvement in a racketeering enterprise. *Id.* He was charged with participating in and profiting from a number of crimes, including managing and operating and running a high-stakes poker game. *Id.* He pled guilty in December 2010 and was sentenced on May 12, 2011 to eighteen months of incarceration and three years of supervised release, and a $100 special assessment. Addendum to Michael Scarpaci PSR ¶ 1.

Defendant has struggled to control his long-time drug and alcohol abuse and his gambling habits. Michael Scarpaci PSR ¶¶ 83, 87-90. He began drinking and using cocaine at the age of thirteen. *Id.* ¶ 87. At times he would spend $500 on cocaine every month. *Id.* He

also frequently used ecstasy during the late 1990s to 2000s.  *Id.*  He would frequently drink until he became intoxicated.  *Id.* ¶ 88.

While in high school, defendant began betting on sporting events.  *Id.* ¶ 83.  As he got older, he began gambling in card games.  *Id.*  As described above, he was recently convicted for his involvement in the Gambino crime family's bookmaking business and high-stakes poker game.  Shortly after he began working at Gryphon, he voluntarily sought treatment for his drug and gambling addictions, and attended fifteen to twenty treatment sessions.  *Id.* ¶ 89.

Although defendant is generally healthy, he suffers from ulcers as well as the effects of childhood sports injuries, which make walking difficult.  *Id.* ¶¶ 85-86.

### 2. Offense

Scarpaci joined Gryphon as a sales representative in October 2009, and worked there until March 2010.  *Id.* ¶ 98.  He supervised other sales representatives and trained them.  *Id.* ¶ 22; Tr. of Michael Scarpaci Sentencing Hr'g, Sept. 14, 2011, at 38:16-19.  While he had a relatively short tenure with Gryphon—six months—he had a leadership role in executing the fraud.  Michael Scarpaci PSR ¶ 22.

Scarpaci is responsible for over 250 victims.  *Id.* ¶ 22.  Using the fake name "Michael Stern," *id.* at 2, he told customers that he had been a trader for twenty years, that he had been working at Gryphon for eleven years, and that he had been a partner at Gryphon for six years, Tr. of Michael Scarpaci Sentencing Hr'g, Sept. 14, 2011, at 37:19-23.  None of these statements were true.  He was Gryphon's most successful salesman, helping the company earn in five months the equivalent of what it had previously stolen in three and a half years.  *Id.* at 38:22-25.

Scarpaci left Gryphon before it was shut down. But there is some dispute as to whether this was to abandon the fraud or to open up a similar company selling fraudulent investment advice with Nicole Marsh. *Compare id.* at 40:11-22, *with id.* at 42:8-16.

Scarpaci pled guilty on October 7, 2010, to Count Three of a three-count indictment. Tr. of Michael Scarpaci Criminal Cause for Guilty Plea, Oct. 7, 2010. Count Three charges that the defendant, with others, conspired to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6, and 80b-17. Count Three is a violation of 18 U.S.C. § 371, constituting Investment Advisor Fraud Conspiracy. The remaining counts of the indictment were dismissed.

The total offense level is thirty-one. Tr. of Michael Scarpaci Sentencing Hr'g, Sept. 14, 2011, at 9:11-12. This includes a base offense level of six, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. Michael Scarpaci PSR ¶¶ 41-50. His criminal history category is III, yielding a guidelines range of 168 to 210 months. *Id.* ¶ 113. The offense carries a statutory maximum sentence of five years. *See* 18 U.S.C. § 371.

### 3.    Sentence

Defendant was sentenced on September 14, 2011, to twenty-five months of incarceration and three years of supervised release. A $100 special assessment was imposed. No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine. Pursuant to his plea agreement, Scarpaci consents to forfeiture of $855,018.35. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461. He is jointly

and severally liable for restitution to the victims in the amount of $10,583,829.47, capped at $2,195,650.27.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. This sentence is appropriate because of defendant's commitment to his family and efforts to support them. It is unclear whether his family will be able to support itself in his absence, since his siblings cannot provide long-term financial assistance and his wife is still trying to regain her teaching certification. His addiction to drugs and to gambling will require ongoing treatment, which may be best accomplished in a community setting with the support of his family.

A substantial incarceratory sentence is necessary for this defendant. Given his extensive criminal history, it is likely that Scarpaci understood what was going on at Gryphon earlier than the other defendants. Moreover, he had a supervisory role and was one of the most successful salesman. During his term at Gryphon, he was responsible for stealing the lion's share of money from victims. Given Scarpaci's past association with the Gambino crime family, it is more likely that he will reoffend.

### N. <u>Robert Seidor</u>

#### 1. **Background**

Robert Seidor, now forty-two years old, was born in Brooklyn, New York. Robert Seidor PSR ¶¶ 65, 66. Defendant and his sister were raised by both parents until their divorce in 1975. *Id.* ¶ 67. Following the divorce, he and his sister lived with his mother. *Id.*

While their basic needs were met, the family struggled financially. *Id.* Although his father provided financial assistance when he was able to, defendant left school after the tenth

grade to help support the family. *Id.* The divorce was emotionally difficult for him and his

mother. *Id.* Seidor's father remarried, and Seidor has two half-sisters from this remarriage. *Id.* ¶

66. Defendant is close to his mother and sister and has now reestablished a close relationship

with his father. *Id.* All family members have remained supportive. *Id.* ¶¶ 66, 68.

Seidor married in 1990. *Id.* ¶ 71. Following defendant's arrest, the family moved to

Flint, Michigan to be closer to Ms. Seidor's family. Tr. of Robert Seidor, Sentencing Hr'g, Sept.

13, 2011. The couple has two children, a nineteen year old son and a twelve year old daughter.

Robert Seidor PSR ¶ 72. Their son has Type I diabetes. *Id.* ¶ 71. He was also recently involved

in a criminal incident in Michigan, which is still pending. Tr. of Robert Seidor, Sentencing Hr'g,

Sept. 13, 2011, at 13:13 – 14:18. Defendant's wife and children remain supportive. *Id.* ¶¶ 71-

72.

The family will struggle financially in the event of defendant's incarceration. *Id.* ¶ 73.

Ms. Seidor is currently employed as a jewelry salesperson at a J.C. Penney department store and

does not make enough to support the family. *Id.* Seidor and his wife are currently going through

bankruptcy proceedings. Tr. of Robert Seidor, Sentencing Hr'g, Sept. 13, 2011, at 15:7-9.

Prior to 1994, Seidor worked for a car dealership and various apparel companies in New

York. Robert Seidor PSR ¶ 89. In 1994, he launched an apparel company in Brooklyn called

Elite Tuxedos and Formal Wear. *Id.* This business closed in 2000 after personal conflicts

developed with his partner. *Id.* He began working as a store and area manager at a formal wear

store in Michigan, earning $65,000 annually. *Id.* ¶ 88. He lost this job because of downsizing in

March 2007, *id.* ¶ 88, but found employment as an assistant store manager in a similar store in

the same town, *id.* ¶ 87.  He earned $52,000 annually until April 2008, when he left the position

because the company "could not afford him."  *Id.*

Seidor was unemployed until June 2008, when he found work as a sales representative at

Brooks Brothers in Detroit, earning $32,000 annually.  *Id.* ¶ 86.  He left this position in August

2009 to work at Gryphon.  *Id.* ¶ 85.

Defendant was employed by Gryphon until March 2010, when it was dissolved.  He was

then hired for a month as a telemarketer with Life Alert in Manhattan, earning approximately

$300.  *Id.* ¶ 84.  When he was allowed to move to Michigan under pretrial supervision in August

2010, he began working as a sale representative with an appliance warehouse.  *Id.* ¶ 83.

Although never formally diagnosed, Seidor believes that he has Attention Deficit

Hyperactivity Disorder (ADHD).  *Id.* ¶ 77.  He had trouble concentrating in school.  *Id.*

Seidor has some history of cocaine and marijuana use.  He tried cocaine some half dozen

times in his teenage years, and had been a daily user of marijuana from the age of fourteen until

his arrest in 2010.  *Id.* ¶ 80.  Defendant, his father, and wife contend he does not have a problem

with the excessive use of drugs.  *Id.* ¶¶ 80-81.

### 2.    Offense

Seidor was brought into the scheme by his cousin, Robert Budion, a co-defendant.

Robert Seidor PSR ¶ 70.  Both his wife and father maintained that defendant became involved in

the Gryphon scheme without knowing it was illegal.  *Id.* ¶¶ 70, 73.  His father had Seidor meet

with an attorney and accountant prior to joining Gryphon, and both assured him that the

company was legitimate.  *Id.* ¶ 70.

Seidor worked at Gryphon as a sales representative for eight months from August 2009 to March 2010. *Id.* ¶ 85. He had no supervisory or managerial role. *Id.* ¶ 24. He was primarily an account opener, making cold calls selling the $99 Gryphon newsletter, Tr. of Robert Seidor Sentencing Hr'g, Sept. 13, 2010, at 21:16-20, using the alias "Robert Vincent." He was not particularly adept at perpetrating the fraud. *Id.* at 21:11-16. His earnings at Gryphon were at the low end of the spectrum. *Id.* at 21:21-24.

Defendant was arrested on June 21, 2010 and pled guilty on the same day to all counts of a three-count indictment. Tr. of Robert Seidor Criminal Cause for Pleading, June 21, 2010. Count One charges that between January 2007 and April 2010, defendant, together with others, violated 18 U.S.C. § 1349 by conspiring to: (a) defraud Gryphon customers and obtain money and property through wire fraud in violation of 18 U.S.C. § 1343; and, (b) commit the violation detailed in Count Two.

Count Two charges that during the same time frame, defendant executed and attempted to execute a scheme to defraud Gryphon customers in connection with securities in violation of 18 U.S.C. § 1348.

Count Three charges that the defendant, with others, conspired to use the mails and instrumentalities of interstate commerce to defraud clients and prospective clients, contrary to 15 U.S.C. §§ 80b-2(11), 80b-6, and 80b-17. Count Three is a violation of 18 U.S.C. § 371, constituting Investment Advisor Fraud Conspiracy.

The total offense level is thirty-two. Robert Seidor PSR ¶ 60. This includes a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the

crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48.  *Id.* ¶¶ 45-59.  His criminal history category is I, yielding a guidelines range of 121 to 151 months.  *Id.* ¶ 100.  The maximum imprisonment term for Count One and Two is twenty-five years, 18 U.S.C. §§ 1348, 1349, and the maximum term for Count Three is five years, 18 U.S.C. §371.

Seidor provided significant assistance to the government.  Tr. of Robert Seidor Sentencing Hr'g, Sept. 13, 2010, at 22:4-12.  He took extensive notes during the training sessions run by Kenneth Marsh and others, all of which he provided to the government.  *Id.* at 21:11-16.  His information allowed the government to secure several early guilty pleas from co-defendants.  *Id.* at 22:6-12.  He was ready to testify.  *Id.*

### 3.     Sentence

Defendant had a sentencing hearing on September 13, 2011.  He was sentenced on September 15, 2011, to three months of incarceration and three years of supervised release.  A $300 special assessment was imposed.  No fines were ordered because defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  He consented to forfeiture of $218,823.86.  *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.  He is jointly and severally liable for restitution to the victims in the amount of $10,583,829.47, capped at $218,823.86.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220.  Defendant had a limited role in the fraud.  He worked at Gryphon for a short period and was not good at the work.  His cooperation with the government's prosecution was substantial.

Throughout his life, Seidor has worked hard to support his family.  Individual deterrence is not a significant concern.  While an incarceratory sentence is necessary to provide adequate general deterrence, the family will suffer financially during his absence.  Moreover, his presence appears needed at home to help supervise his son.  A sentence of three months is appropriate.

**O.    Dominic Spinelli**

**1.    Background**

Spinelli, now thirty-three years old, was born in Staten Island, New York.  Dominic Spinelli PSR ¶ 66.  He has four older paternal half-siblings and three older maternal half-siblings.  *Id.* ¶¶ 68-69.  He was raised in a middle-income household.  *Id.* ¶ 71.  His father, who died in 2009, was employed as butcher and a manager of the New York State Thruway Authority.  *Id.* ¶ 66.  His mother, formerly a waitress, currently supports herself through income from rental property.  *Id.*

Defendant is close to his mother, who lives next door.  *Id.*  Although he has not spoken to his paternal half-siblings after a dispute over his father's will, *id.* ¶ 68, he maintains a good relationship with his maternal half-siblings, *id.* ¶ 69.

Defendant married in 2009.  *Id.* ¶ 72.  The couple has two children, a one year-old son and a newborn daughter.  Ms. Spinelli is currently employed as a court reporter.  *Id.*  His wife is supportive.  *Id.*

Spinelli attended several grade schools.  *Id.* ¶¶ 87-91.  When his mother suffered from an illness that impaired her nervous system in 1988, the defendant became upset, and his performance at school suffered.  *Id.* ¶ 71.  He received generally poor grades, was frequently absent, and had some disciplinary problems.  *Id.* ¶¶ 87-91.  His performance improved at the last

school he attended, but he dropped out prior to completing his senior year to obtain a GED. *Id.* ¶ 87. He did not attend college because he was afraid that he would fail, and because he wanted to start working. *Id.* ¶ 86. He attempted to obtain a Series 7 General Securities Representative certificate in 1998 in order to become a stock broker, but he did not pass the examination. *Id.* ¶ 85.

Beginning in 1994, while he was still in high school, Spinelli held a variety of part-time jobs, from busing tables and washing dishes at a restaurant and pizza parlor to working as a bouncer at a nightclub. *Id.* ¶ 101. From 1998 to 2001, he worked as a stockbroker trainee at two different financial firms, earning a weekly net income of $500. *Id.* ¶ 100. In 2003, he was employed for six months as a sales representative for Atlantis Waterproofing in Woodbridge, New Jersey. *Id.* ¶ 99. After a period of unemployment, he started a similar job with Poseidon Waterproofing, Inc. in Jersey City, New Jersey, in 2004. *Id.* ¶ 97. He left Poseidon in 2005 to work as a car rental agent at Execu-Ride, Inc., a Dollar Car Rental Agency franchise in Edison, New Jersey. *Id.* ¶ 96.

Spinelli worked for Gryphon from October 2007 to September 2009. *Id.* ¶ 95. In May 2010, after another period of unemployment, he returned to his former job at Execu-Ride, Inc. *Id.* ¶ 93.

Spinelli has an extensive history of substance abuse. His drug use began when he was fourteen, triggered by his feelings about his mother's illness. *Id.* ¶ 71. It increased in frequency while he was at Gryphon, since many of the other employees also used illegal drugs. *Id.* ¶ 84.

Defendant began using marijuana at age fourteen, and currently uses it twice a week. *Id.* ¶ 83. As a teenager, he experimented with PCP, Ecstasy, and LSD, but does not currently use

these drugs. *Id.* ¶ 84. He previously used ketamine and prescription pain medication on a daily basis and cocaine sporadically. *Id.* He stopped using these drugs because he could no longer afford them after leaving Gryphon. *Id.* He believes that he is addicted to marijuana and would benefit from drug treatment. *Id.*

Spinelli was diagnosed with diabetes in 2010 after collapsing from a diabetic attack. *Id.* ¶ 79. He also suffers from occasional back pain due to injuries he sustained during several automobile accidents. *Id.* ¶ 80. Although he was depressed following the deaths of several co-workers in the September 11, 2001 terrorist attack, he did not seek any formal psychological treatment, instead self-medicating with marijuana. *Id.* ¶ 78.

### 2. Offense

Spinelli began working as a sales representative for Gryphon in October 2007. Like other sales representatives, he sold Gryphon subscriptions to the company's investment newsletters, as well as specific trade recommendations costing between $1,000 and $50,000, under the alias "John Gage." His pay consisted of commission from these sales. He did not manage customers' investment accounts or money directly. He is accountable for at least 250 victims. *Id.* ¶ 24.

Defendant's tenure of twenty-four months at Gryphon was substantial. He left Gryphon in September 2009, long before it was shut down. *Id.* While his departure was partially motivated by his personal conflicts with Kenneth Marsh, he believes he would have left anyway. Tr. of Dominic Spinelli Sentencing Hr'g, Aug. 15, 2011, at 16:13 – 17:22.

On June 24, 2010, Spinelli pled guilty to all counts of a three-count indictment. Count One charges that between January 2007 and April 2010, Spinelli, together with others, violated

18 U.S.C. § 1349 by conspiring to (a) devise a scheme or artifice to defraud Gryphon customers, and to obtain money and property from Gryphon customers by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signs, signals, pictures and sounds, contrary to 18 U.S.C. § 1343; and (b) execute a scheme and artifice to defraud Gryphon customers in connection with securities of issuers with a class of securities registered under Section 12 of the Securities and Exchange Act of 1934, in violation of 18 U.S.C. § 1348.

Count Two charges that between January 2007 and April 2010, Spinelli, together with others, executed and attempted to execute a scheme and artifice to defraud persons in connection with securities of issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, in violation of 18 U.S.C. § 1348.

Count Three charges that between January 2007 and April 2010, Spinelli, together with others, conspired to use the mails and instrumentalities of interstate commerce, directly and indirectly, to employ a device, scheme and artifice to defraud clients and prospective clients contrary to 15 U.S.C. §§ 80b-2(a)(11), 80b-6 and 80b-17, in violation of 18 U.S.C. § 371.

The total offense level is thirty-two. Dominic Spinelli PSR ¶ 61. This includes a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 46-61. His criminal history category is I, yielding a guidelines range of 121-151 months. *Id.* ¶ 107. Counts One and Two carry a statutory maximum sentence of

twenty-five years.  *See* 18 U.S.C. § 1348.  Count Three carries a statutory maximum sentence of five years.  *See* 18 U.S.C. § 371.

Spinelli provided substantial assistance to the government.  When he heard that Gryphon had been shut down, he immediately called his attorney, who then contacted the United States Attorney's Office.  Tr. of Dominic Spinelli Sentencing Hr'g, Aug. 15, 2011, at 16:13-19.  He was in possession of a number of critical documents that aided the prosecution.  *Id.* at 17:24 – 18:11.  They included Baldwin Anderson's training scripts and handwritten documents by Kenneth Marsh and Baldwin Anderson explaining the scheme.  *Id.*  They would have been critical pieces of evidence.  *Id.* at 18:12-14.  Defendant also spent hours with prosecutors preparing to testify at the Anderson trial.  *Id.* at 18:14-18.

### 3.  Sentence

Following a sentencing hearing on August 15, 2011, Spinelli was sentenced on September 15, 2011 to three months of incarceration and three years of supervised release.  A $300 special assessment was imposed.  No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  He is subject to a forfeiture in the amount of $887,306.50.  *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.  He is jointly and severally liable for restitution to the victims in the amount of $10,583,829.47, capped at $2,350,858.50.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220.  An incarceratory term is necessary for general deterrence purposes.  The defendant did not have a supervisory role in the conspiracy, nor was he one of the more successful salespeople.  He

left Gryphon long before the government closed the company, although his reasons for leaving were mixed.

The defendant has a long history of lawful employment and a loving family, including a newborn child, making it unlikely that he will reoffend. His remorse and the substantial assistance that he provided to the United States Attorney's Office militate against a long period of incarceration.

P.  **Paul Stokes**

1.  **Background**

Paul Stokes, now thirty-two years old, was born in New Brunswick, New Jersey. Paul Stokes PSR ¶ 78. He and his younger sister grew up under average economic circumstances. *Id.* ¶¶ 79-80. His father worked as a manager for Verizon before he retired. *Id.* ¶ 78. His mother is a teacher. *Id.* Defendant has a close relationship with his parents and his sister. *Id.* ¶¶ 78-80. The family remains supportive. *Id.*

Since 2009, he has been engaged to C. W., who is employed as a housekeeper through a house cleaning business in Staten Island. *Id.* ¶ 81. She remains supportive. Stokes and his fiancée currently reside at his parents' house in Staten Island. *Id.* ¶ 82.

Stokes' life has been substantially shaped by his extensive history of drug abuse. He first experimented with marijuana at age thirteen. *Id.* ¶ 87. By fourteen, he was smoking marijuana on a daily basis. *Id.* In the years that followed, he began using Ecstasy, hallucinogens (including mescaline and acid), Valium, cocaine, alcohol, ketamine, crystal methamphetamine, hydroxyl butyrate ("GHB"), and crack-cocaine. *Id.* ¶¶ 88-96.

He began high school at Richmond High School on Staten Island in 1994, but dropped out before completing ninth grade. *Id.* ¶ 105. His parents had him admitted him to the Dynamite Youth Community, Inc. adolescent drug treatment program in South Fallsburg, New York in 1995. *Id.* ¶ 97. He was transferred to an out-patient program in Brooklyn in 1996, but frequently relapsed. *Id.* He felt at the time that the drug program was forced upon him by his parents, that he enjoyed getting high, and that he could handle his drug use. *Id.* ¶¶ 97-98. Progress notes from the program indicate that when defendant began the program he expressed a strong negative attitude towards his family and the other residents and staff, that he seemed resistant to living a sober lifestyle, and that he was manipulative. *Id.* ¶ 97. He left the program in July 1999. *Id.*

As part of the out-patient drug program, Stokes received his GED. *Id.* ¶ 104. He attended the College of Staten Island on a part-time basis from 1997 through 1998, but left because he needed to work and complete his drug treatment. *Id.* ¶ 103.

After leaving college, Stokes held positions as an electrician's assistant and an installer of commercial telecommunications systems. *Id.* ¶ 112. From 2002 to 2004, he was employed as a plumber's assistant at Richmond's Plumbing on Staten Island, where he earned $10 an hour. *Id.* ¶ 111, 112. During periods of unemployment, he was financially supported by his parents. *Id.* ¶ 112.

Stokes was arrested in March 2002 for sale of a controlled substance in Richmond County, New York. *Id.* ¶¶ 63-65. He was arrested again less than a month later for conspiracy to distribute a controlled substance and possession with intent to distribute in violation of federal law. *Id.* ¶¶ 65-69. In 2004, he was sentenced to one to three years of incarceration on the state

charge and forty-six months of incarceration on the federal charge. *Id.* ¶¶ 63, 65. He remained in state custody until May 2006, at which time he was released on parole into federal custody. *Id.* ¶ 64. He was incarcerated on the federal charges until November 2007, when he was released to supervision. *Id.* ¶¶ 65-67. As a condition of supervised release, he was accepted into a drug court program, which he successfully completed in 2009. *Id.* ¶ 99. He then participated in outpatient drug treatment at Community Health Action of Staten Island. *Id.* He did not test positive for illegal drug use while he was on supervised release from November 2007 to January 2009. *Id.*

After his release from federal custody, with the exception of one month when he worked for RCI Plumbing on Staten Island, Stokes was unemployed until September 2008. *Id.* ¶ 110. He then began working as a sales representative at Gryphon. *Id.* ¶ 109. While at Gryphon, he recommenced using Oxycontin, Percocet, and ketamine several times a week. *Id.* ¶¶ 100-101. He has a pending case in Richmond County, New York on charges of criminal possession of marijuana. *Id.* ¶¶ 73-74.

Following his arrest, Stokes voluntarily participated in an inpatient drug program at Marworth in Waverly, Pennsylvania. *Id.* ¶ 102. From September 2010 to December 2010, this defendant Stokes worked on off-the-books construction jobs. *Id.* ¶ 108. After a period of unemployment, defendant began working as an account opener in the debt settlement department of Credit 911 Financial in Brooklyn in July 2011. *Id.* ¶¶ 106-07.

## 2. Offense

Stokes began working as a sales representative for Gryphon in September 2008. *Id.* ¶ 24. He remained until March 2010. *Id.* Like other sales representatives at Gryphon, Stokes sold

customers subscriptions to the company's investment newsletters as well as specific trade recommendations costing between $1,000 and $50,000. Using the fake name "Paul Ross," he personally made misrepresentations to Gryphon clients to induce them to buy these products. Tr. of Paul Stokes Criminal Cause for Pleading, June 25, 2010, at 31:23 – 32:12. He is accountable for at least 250 victims. Paul Stokes PSR ¶ 24. His pay consisted of commissions from fraudulent sales. He did not manage customers' investment accounts or money directly.

His tenure at Gryphon was substantial, approximately one and a half years. Stokes was a successful salesman. Tr. of Paul Stokes Sentencing Hr'g, Sept. 14, 2011, at 11:16-18. Most of the time, he was under the influence of narcotics. *Id.* at 11:19-24. He shared drugs with Kenneth Marsh, as well as other co-workers. *Id.*

On June 25, 2010, Stokes pled guilty to Counts One, Two and Three of a three-count indictment. Count One charges that between January 2007 and April 2010, Stokes, together with others, violated 18 U.S.C. § 1349 by conspiring to (a) defraud Gryphon customers and to obtain money and property from customers through wire fraud, in violation of 18 U.S.C. § 1343; and (b) defraud Gryphon customers in connection with securities, in violation of 18 U.S.C. § 1348.

Count Two charges that between January 2007 and April 2010, Stokes, together with others, defrauded Gryphon customers in connection with securities, in violation of 18 U.S.C. § 1348.

Count Three charges that between January 2007 and April 2010, Stokes, together with others, conspired to use the mails and means of instrumentalities of interstate commerce to defraud clients and prospective clients contrary to 15 U.S.C. §§ 80b-2(a)(11), 80b-6 and 80b-17, in violation of 18 U.S.C. § 371.

The total offense level is thirty-two. Paul Stokes PSR ¶ 60. This includes a base offense level of seven, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 45-59. His criminal history category is IV, yielding a guidelines range of 168-210 months. *Id.* ¶ 120. Counts One and Two carry a statutory maximum sentence of twenty-five years. *See* 18 U.S.C. § 1348. Count Three carries a statutory maximum sentence of five years. *See* 18 U.S.C. § 371.

Stokes provided significant assistance to the government. Tr. of Paul Stokes Sentencing Hr'g, Sept. 14, 2011, at 11:25 – 14:25. In particular, he repeatedly debunked various defenses related to "advice of counsel." *Id.* at 12:17-23. According to the Stokes, the defendants were not telling the company's lawyers the full truth. *Id.* According to the government, Stokes, perhaps more than any other defendant, accepted the fact that he had been lying to people to steal their money. *Id.* at 12;11-14. He prepared for, and stood ready to testify at, the trial of Baldwin Anderson and any preliminary *in limine* hearings. *Id.* at 13:9-22.

### 3. Sentence

Stokes was sentenced on September 15, 2011, to six months of incarceration and three years of supervised release. A $300 special assessment was imposed. No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine. Defendant is subject to forfeiture in the amount of $519,612.50. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461. He is jointly and severally liable

for restitution to the victims in the amount of $10,583,829.47, although his individual liability for restitution is capped at $1,730,458.97.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. While the defendant's tenure at Gryphon was relatively long, he was neither particularly vicious in perpetrating the fraud nor a high earner. His responsibility is arguably mitigated somewhat by his heavy drug use during the period, which often occurred in the company of his co-workers, which likely affected his judgment. Defendant has since fully accepted responsibility for his crime, has expressed remorse, and provided substantial assistance to the government. His efforts to stay sober may be better served by drug treatment in the community, where he can be supported by this family and fiancée, rather than by incarceration.

An incarceratory term is necessary for general deterrence purposes. Moreover, a longer term is imposed, as compared to other cooperators in this case, because of his significant criminal history.

### Q.    Anthony Vecchione

#### 1.    Background

Anthony Vecchione, who is now forty-one years old, was born in Brooklyn, New York. Anthony Vecchione PSR ¶ 62. He is the youngest of three sons. The oldest is William Vecchione, another defendant. *Id.* ¶ 63. The brothers were raised by married parents under middle-class circumstances. *Id.* ¶ 64. Their father worked as a stockbroker; their mother owned a delicatessen. *Id.* ¶ 62. No neglect, abuse, or drug and alcohol abuse was reported. *Id.* ¶ 64. Their father died of pancreatic cancer in 1985. *Id.* ¶ 62. Their mother suffers from several

serious ailments, including diabetes and heart disease. *Id.* She is a breast cancer survivor. *Id.* ¶ 64.

Vecchione married L.A. in September 1997. *Id.* ¶ 66. She currently works for a real estate agent as well as at an All-State Insurance office. *Id.* The two have six children, ages three through twelve, all of whom are in good health. *Id.* ¶ 67. The arrest has been difficult for the family. Ms. Vecchione was friendly with Nicole Marsh before her husband started working at Gryphon and learned of the company through her. *Id.* ¶ 68. She feels responsible for her husband's arrest. *Id.* The case has put stress on the children. *Id.* Defendant's family remains supportive. *Id.* ¶ 62, 64.

Defendant attended Xaverian High School in Bay Ridge, Brooklyn, from 1983 to 1985. *Id.* ¶ 79. He then went to the Brooklyn Academy High School in the Bedford-Stuyvesant section of Brooklyn. *Id.* He withdrew in the eleventh grade, after his father's death, to work in the family's delicatessen. *Id.* Defendant's mother sold the store in 1987. William Vecchione PSR ¶ 89. In 1993, Vecchione obtained a GED. Anthony Vecchione PSR ¶ 78. No information is provided concerning defendant's employment between 1987 and 1997.

In 1997, the defendant worked as a securities broker for Meyers, Pollack & Robins. *Id.* ¶ 95. He left this position because he moved to Florida. *Id.* In November 1997, six brokers employed by Meyers, Pollack & Robins were indicted and charged with participating in a pump-and-dump securities conspiracy coordinated with the Bonnanno and Genovese crime families. Benjamin Weiser, *Brokers and Mob Linked in Swindle*, N.Y. Times, Nov. 26, 1997, at A1, *available at* http://www.nytimes.com/1997/11/26/nyregion/brokers-and-mob-linked-in-swindle.html (reporting the indictment of nineteen defendants by the United States Attorney's

Office for the Southern District of New York).  Defendant was not charged in connection with this conspiracy, and it is unclear what, if any, awareness or involvement he had in that crime.

Vecchione worked for a cigar store in Florida in 1997 and 1997, earning about $800 each week.  Anthony Vecchione PSR ¶ 94.  After obtaining his stock broker's license in 1997, *id.* ¶ 80, he returned to New York City and worked as a stock broker for J.B. Oxford Holdings from 1998 to 2000, making about $100,000 annually.  *Id.* ¶ 93.  He left after being sued by an elderly female customer who felt she should have made more money from her trades with him. *Id.*

There is no indication where defendant was employed between 2000 and 2003.  Between 2003 and 2008, he worked in sales and finance for six different car dealerships in Brooklyn, Queens, and the Bronx, earning between $4,000 and $15,000 per month.  *Id.* ¶¶ 87-92.  One of these dealerships was Major World in Queens, where he met several other defendants.  *Id.* ¶ 89.

From October 2008 to March 2010, defendant was employed by Gryphon.  *Id.* ¶ 86.  In 2009, he and co-defendant Michael Scarpaci formed a conspiracy to extort money from co-defendant Kenneth Marsh.  Vecchione agreed to tell a false story that he had been threatened by Scarpaci and other individuals in order to convince Marsh to pay money to them.  *Id.* ¶ 58.  On November 30, 2010, he pled guilty to conspiracy to commit extortion in the Southern District of New York and was sentenced to fifteen months' incarceration, with the sentence to begin upon disposition of the instant case.  *Id.* ¶¶ 58-59.  Defendant was previously convicted of operating a motor vehicle while impaired by alcohol when he was sixteen.  *Id.* ¶¶ 54-55.

Between September 2010 and January 2011, defendant worked at a pair of car dealerships in Brooklyn and Queens. *Id.* ¶¶ 84-85. He has been unemployed since January 2011. *Id.* at 1.

Vecchione suffers from heart disease; he has had two heart attacks and has undergone three heart surgeries, including a triple bypass. *Id.* ¶ 74. He takes prescription medications for this ailment and for a number of sports-related injuries. *Id.* He has no history of mental health problems. *Id.* ¶ 73. He drinks socially a few times a year and reports limited drug use during his teen years. *Id.* ¶¶ 75-76.

### 2. Offense

Vecchione worked for Gryphon as a sales representative from October 2008 to March 2009 and from October 2009 to March 2010. *Id.* ¶ 86. His wife briefly worked for Gryphon as well. *Id.* ¶ 66.

Defendant had no organizing or managerial role at Gryphon. *Id.* ¶ 22. Using the aliases "Anthony Lanza" and "Andrew Goldman," *id.* at 2, he induced customers to give increasingly large amounts of money to Gryphon in exchange for worthless investment advice. *See* Tr. of Anthony Vecchione Criminal Cause for Pleading, Sept. 10, 2010, at 30:3-7. For example, Vecchione told customers that Ken Maseka was recommending certain stock picks, when Maseka did not exist. *Id.* at 30:8-13.

Vecchione was arrested on September 10, 2010 and pled guilty to a single-count indictment the same day. *Id.* The indictment charged that between January 2007 and April 2010, he, together with others, conspired to use the mails and means and instrumentalities of

interstate commerce to employ a scheme to defraud clients and prospective clients, contrary to 15 U.S.C. § 80b-2(11), 80b-6, and 80b-17.

The total offense level is twenty-nine.  Tr. of Anthony Vecchione Sentencing Hr'g, Aug. 11, 2011, at 33:8-17.  This includes a base offense level of six, a three-point reduction for acceptance of responsibility, a six-point enhancement because the crime affected over 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48.  Anthony Vecchione PSR ¶¶ 42-49.  Per his plea agreement, he was not subject to a two-point enhancement for sophisticated means.  Tr. of Anthony Vecchione Sentencing Hr'g, Aug. 11, 2011, at 31:21 – 33:3.  His criminal history category is I, yielding a guidelines range of 87 to 108 months.  *Id.* at 38:19-21.  The offense carried a maximum sentence of five years.  *See* 18 U.S.C. § 371.

### 3. Sentence

After a sentencing hearing on August 11, 2011, defendant was sentenced on September 20, 2011 to one year and one day of incarceration and three years of supervised release.  A $100 special assessment was imposed.  No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.  Pursuant to his plea agreement, defendant is subject to forfeiture in the amount of $231,348.67  *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461.  He is jointly and severally liable for restitution to the victims in the amount of $10,583,829.47, capped at $708,363.15.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220.  This sentence is appropriate in light of defendant's non-supervisory role in the conspiracy, his remorse for his offense, and his continuing efforts to support his family through lawful

employment. Plaintiff's conspiracy to extort Kenneth Marsh indicates that he poses a greater risk of recidivism than some of his co-defendants. Considering the fifteen-month sentence he received for that crime and the effect a lengthy prison sentence would have on his children, some measure of compassion is warranted. An incarceratory sentence is necessary to provide adequate general deterrence.

### R. William Vecchione

#### 1. Background

William Vecchione, who is now fifty-two years old, was born in Brooklyn, New York. William Vecchione PSR ¶ 56. He was raised, along with his brother, co-defendant Anthony Vecchione, in stable, middle-class circumstances. *See supra* Part V(Q)(1).

In 1988, Vecchione married M. Vecchione. William Vecchione PSR ¶ 60. She currently works as a legal secretary. *Id.* The couple has three children: two sons, ages twenty and twenty-two, and a daughter, age fourteen. *Id.* ¶ 61. The daughter attends a private school, *see id.* ¶ 92, and the sons are in college, *id.* ¶ 61. The Vecchiones live with their daughter in an apartment in a house they own in Windsor Terrace, a middle-income, residential neighborhood in Brooklyn. *Id.* ¶ 63. The two sons live in a separate apartment in the house. *Id.* His wife describes defendant as a devoted father. *Id.* ¶ 62.

The family is experiencing financial difficulties. *Id.* Mrs. Vecchione has expressed some concerns about whether she can support the family on her own. *Id.* They remain supportive. *Id.* ¶¶ 60-61.

Defendant attended Xaverian High School in Bay Ridge, Brooklyn. *Id.* ¶ 71. He attended Kingsborough Community College for six months, but left to work at his family's

delicatessen. *Id.* ¶ 72. He worked there until 1987, when his mother sold the business. *Id.* ¶ 89. From 1987 to 1996, he was self-employed, delivering fresh bread from bakeries to customers, earning $300 to $400 per week. *Id.* ¶ 88.

Vecchione began working in the financial industry in the late 1990s. He reports earning a securities license in 1996, but no supporting records have been provided. *Id.* ¶ 73. He worked as securities broker for Meyers, Pollack & Robins for two months in 1996. As noted above, *see supra* Part V(Q)(1), other brokers at this company were later indicted for a securities conspiracy involving several mob families.

After leaving Meyers, Pollack & Robins, defendant worked at Royal Hutton Securities from 1997 to 2000. William Vecchione PSR ¶¶ 86-87. He reports earning a real estate license in 1998. *Id.* ¶ 73. He worked as a realtor in Millstone, New Jersey, from 1999 to 2000, and in Brooklyn from 2000 to 2005. *Id.* ¶¶ 84-85. From 2005 to 2007, he worked as a salesman at a Chevrolet dealership in Queens and a Chrysler/Jeep dealership in Freehold, New Jersey, making about $700 per week. He was briefly unemployed in 2006 and was unemployed from mid-2007 to October 2008. *Id.* ¶¶ 80-83. His wife supported the family during his periods of unemployment. *Id.* ¶ 80.

Vecchione worked at Gryphon from November 2008 to March 2010. *Id.* ¶ 79. After leaving Gryphon, he worked briefly at a Kia dealership in Brooklyn as a sales associate. *Id.* ¶ 78. From May 2010 to December 2010, he was self-employed, selling iced tea for $200 to $300 per week. *Id.* ¶ 77. Since December 2010, he has been a sales representative at a used car dealership in Brooklyn, making $325 to $350 weekly. *Id.* ¶ 76.

Vecchione suffers from diabetes, hypertension, and heart disease, for which he takes a number of prescription medications. *Id.* ¶ 67. He is currently being treated for anxiety. *Id.* ¶ 66. In the past, he drank to excess, consuming enough alcohol to be intoxicated two to three times a week. *Id.* ¶ 69. This caused significant marital friction. *Id.* In order to resolve the marital problems, he drastically reduced his alcohol consumption and drinks only moderately. *Id.* He has no prior criminal history. *Id.* ¶ 53.

### 2. Offense

Vecchione worked for Gryphon as a sales representative from November 2008 to March 2010. *Id.* ¶ 22; Tr. of William Vecchione Criminal Cause for Pleading, Aug. 31, 2010, at 23:24 – 24:5. He learned of the company through his brother, Anthony Vecchione, who had joined the conspiracy in October 2008. Anthony Vecchione PSR ¶ 22; William Vecchione PSR ¶ 62. His time at Gryphon—approximately one and a half years—was substantial.

Defendant had no organizing or managerial role. William Vecchione PSR ¶ 22. Under the aliases "William Lanza" and "Bill Lanza," *id.* at 2, he lied to his customers about Gryphon's operations, the credentials of its employees, and the performance of its recommended investments. Tr. of William Vecchione Criminal Cause for Pleading, Aug. 31, 2010, at 23:24 – 24:5. He made investment recommendations with the expectation that clients would trade based upon them, and some clients reported to him that they had done so. *Id.* at 24:6-13.

Vecchione's work was primarily as an account opener. Tr. of William Vecchione Sentencing Hr'g, Aug. 15, 2011, at 39:3-5. He was apparently terrible at his job, suggesting that he did not ardently embrace the opportunity to defraud. *Id.* at 39:6-9.

Defendant was arrested on June 21, 2010. *Id.* ¶ 22. On August 31, 2010, he pled guilty to Count Three of a three-count indictment. Count Three charged that between July 2007 and April 2010, he, along with others, violated 18 U.S.C. § 371 by conspiring to use the mails and means and instrumentalities of interstate commerce to employ a scheme to defraud clients and prospective clients, contrary to 15 U.S.C. § 80b-2(11), 80b-6, and 80b-17.

The total offense level is thirty-one. William Vecchione PSR ¶ 51. This includes a base offense level of six, a three-point reduction for acceptance of responsibility, a two-point enhancement for the use of sophisticated means of fraud, a six-point enhancement because the crime affected 250 victims, and a twenty-point enhancement for causing losses of $19,900,077.48. *Id.* ¶¶ 43. His criminal history category is I, yielding a guidelines range of 108 to 135 months. *Id.* ¶ 97. The offense carries a maximum sentence of five years. *See* 18 U.S.C. § 371.

### 3. Sentence

Following a sentencing hearing on August 15, 2011, defendant was sentenced on September 15, 2011 to one year and one day of incarceration and three years of supervised release. A $100 special assessment was imposed. There was no fine imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future. Pursuant to his plea agreement, defendant is subject to forfeiture in the amount of $342,705.80. *See* 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461. He is jointly and severally liable for restitution to the victims in the amount of $10,583,829.47, capped at $1,278,204.15.

A non-guideline sentence is imposed under 18 U.S.C. § 3553(a) and *Booker*, 543 U.S. 220. The defendant has no previous criminal history. Throughout his life, he has made

significant efforts to support his family through lawful employment. The risk of recidivism is low. His family, which is already struggling financially, will suffer from his absence. The defendant's many health problems will also make it harder for him to serve a prison term.

An incarceratory sentence is necessary to provide adequate general deterrence. A longer sentence than those imposed on others is necessary because of the length of time that the defendant was at Gryphon. He did not cooperate meaningfully with the government.

## VI.    <u>Conclusion</u>

Kenneth Marsh, together with the other defendants, perpetrated a massive fraud that stole millions of dollars from over 5,000 people. Many of these victims could not afford the fraudulent advice they bought from Gryphon. They were pressured and cajoled into the purchase through highly effective sales techniques used by the defendants, which misrepresented the nature of the company, the value of the advice it gave, and the identity of the sales representatives themselves.

The majority of these defendants were law-abiding, lured into crime by greed. In most cases, individual deterrence is not a major concern. After their incarceration, they will return to their homes and families, and resume lawful lives.

General deterrence is of primary importance. Each of the defendants will serve an incarceratory sentence. By sentencing all of the defendants together, the court was able to take into account the differences in culpability, as well as relevant personal circumstances. Kenneth Marsh, as the creator and ringleader of the scheme, in the most culpable, and therefore received the longest term.

Taken individually and together, these sentences are sufficiently lengthy to specifically deter the defendants and to deter others from perpetrating a similar scheme, 18 U.S.C. § 3553(a)(2)(B)-(C); "reflect the seriousness of the offense," *id.* § 3553(a)(2)(A); "promote respect for the law, and . . . provide just punishment," *id.*; provide each defendant with necessary correctional treatment, *id.* § 3553(a)(2)(D); take into account the sentencing guidelines, sentencing commission policies and recommendations, and the other sentences available, *id.* § 3553(a)(3)-(5); avoid unnecessary sentencing disparities, *id.* § 3553(a)(6); and provide appropriate retribution, *id.* § 3553(a)(7). These sentences are "sufficient, but not greater than necessary" to accomplish these goals. *Id.* § 3553(a)

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: November 3, 2011
       Brooklyn, New York

# VII.    Appendix A: Restitution Order


WHEREAS, the defendants in the above-captioned cases have pleaded guilty to various criminal violations related to the operation of Gryphon Financial, Inc. and the Court has determined that the individual victims of those crimes are entitled to a restitution order in the amount of $10,583,829.47, to be paid to the list of victims attached hereto as Exhibit A, jointly and severally by all the defendants in the above-captioned cases subject to certain caps on joint and several liability set forth below; and

WHEREAS, the Court has considered the provisions of Title 18, United States Code, Section 3663A, which provides that:

> the court shall order . . . that the defendant make restitution to the victim[s] of the offense". A "victim" means "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of . . . a conspiracy . . . any person directly harmed by the defendant's criminal conduct in the course of the . . . conspiracy." 18 U.S.C. §§ 3663A(a)(2). "If the return of the property . . . is impossible, impracticable, or inadequate, [the defendant must] pay an amount equal to the greater of (I) the value of the property on the date of the damage, loss or destruction; or (II) the value of the property on the date of sentencing." 18 U.S.C. §§ 3663A(b)(1)(B)(i)(I) and (II), and
> WHEREAS, the Court finds that all the defendants in the above-captioned cases

participated in the Gryphon Financial scheme to defraud customers of money based on false statements and misrepresentations about the qualifications, credentials and performance of Gryphon's investment recommendations and that the defendants jointly used fraudulent marketing materials, jointly trained one another on how to execute the fraud and shared jointly in commissions with Gryphon management and with one another; and

WHEREAS the Court has also made specific findings about the total monies raised by each defendant on an independent basis and on a joint basis with other defendants and such findings are reflected in the liability caps set forth below, and

WHEREAS the Court finds that there were a total of 5,466 individual victims of the fraud, each of whom were subject to the joint efforts of the defendants independently and as joint efforts among the co-conspirators; and

WHEREAS the Court finds that the government, through diligent efforts, has identified 1,059 victims who paid fees totaling $10,583,829.47 to Gryphon in the course of this fraudulent scheme as set forth in the attachment hereto; and

WHEREAS the Court has considered the September 8, 2011 application of Complete Merchant Solutions, LLC ("CMS"), a credit card payment marketer for restitution in the amount of $484,546.45 under Title 18, United States Code, Section 3664(j)(1); and

WHEREAS the Court has found that CMS's losses are attributable only to defendants Kenneth Marsh and Nicole Marsh, who both executed a signed agreement indemnifying CMS for its losses through credit card chargebacks, the terms of which may not have been known by the other defendants; and

WHEREAS, the Court has also considered the provisions of Title 18, United States Code, Section 3664(f), which provide as follows:

(1) (A) In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the Court and without consideration of the economic circumstances of the defendant.
(2) Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of –

        (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

        (B) projected earnings and other income of the defendant; and

        (C) any financial obligations of the defendant including obligations to dependents.

(3) (A) A restitution may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.

        (B) A restitution order may direct the defendant to make nominal periodic payments if the court finds from the facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments; and

WHEREAS the Court has considered the information related to age, education, family obligations, employment, income, assets and projected earning capacity, which is contained in the Pre-Sentencing Reports for the various defendants and the outstanding forfeiture obligations to the United States of the defendants.

        NOW THEREFORE IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

        1. The defendant BALDWIN ANDERSON, who has forfeited to the United States a money judgment in the amount of $1,111,738.32 is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned case, except, this defendant's joint and several liability toward the restitution order shall be capped at $3,024,333.53 (i.e., the total amount of money that he raised independently and with others at Gryphon), and he shall, upon being released from prison, make restitution payments toward his $3,024,333.53 restitution obligation due immediately but payable according to Restitution Schedule set forth in paragraph 19 below.

2. The defendant RICHARD BORRELLO, who has forfeited to the United States a money judgement in the amount of $1,152,890.96 and certain other assets totaling approximately $50,000 to be credited toward the forfeiture money judgment, and who has had certain assets frozen by the Securities and Exchange Commission liquidated and applied to his restitution obligations consistent with this Court's September 9, 2011 Order, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $3,289,382.51 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison make payments toward his $3,289,382.51 in restitution obligations, due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

3. The defendant ROBERT BUDION, who has forfeited to the United States a money judgment in the amount of $935,987.00, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $2,839,834.27 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall immediately make a lump sum payment of $56,000 toward his $2,839,834.27 in restitution obligations and, upon being released from prison make payments toward his restitution obligations, due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

4. The defendant JOHN DEGLIUOMINI, who has forfeited to the United States a money judgment in the amount of $542,125.29, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $1,942,222.00 (i.e., the total amount of money that he raised independently and with 8 others at Gryphon) and he shall, upon being released from prison make restitution payments toward his $1,942,222.00 in restitution obligations, due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

5. The defendant JEANNE LADA, who has forfeited to the United States a money judgment in the amount of $729,800.47 and who has had certain assets frozen by the Securities and Exchange Commission liquidated and applied to her restitution obligations consistent with this Court's Order, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $2,665,475.27 (i.e., the total amount of money that she raised independently and with others at Gryphon) and she shall, upon being released from prison make restitution payments toward her $2,665,475.27 in restitution obligations, due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

6. The defendant JAMES LEVIER, who has forfeited to the United States a money judgement in the amount of $561,632.95 is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution

order shall be capped at $1,631,252.00 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison make payments toward his $1,631,252.00 in restitution obligations, due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

7. The defendant KENNETH MARSH, who has forfeited to the United States: (A) $774,792.15, which represents combined proceeds from the sale of the property located at 661 and/or 667 Johnston Terrace, Staten Island, New York; the sale of the property located at 14 Bayside Lane, Staten Island, New York; and the sale of one 2007 Two Door Black Porsche, Model 911 Turbo, VIN# WPOAD29927S783584; (B) All right, title, and interest in funds on deposit at THINKORSWIM, INC, held in the name of Gryphon Holdings, Inc., Account Number 86784634, and all proceeds traceable thereto; (C) All right, title, and interest in funds on deposit at TD Bank, held in the name of Falk and Associates, LLC., Special 1, Account Number 4247290127, and all proceeds traceable thereto; (D) All right, title, and interest in funds on deposit at UBS Financial Services, Inc., held in the name of Kenneth E. Marsh and Nicole F. Marsh, Account Number WE49301FC, and all proceeds traceable thereto; (E) All right, title, and interest in funds on deposit at UBS Financial Services, Inc., held in the name of Kenneth E. Marsh and Nicole F. Marsh, Account Number XL49301T1, and all proceeds traceable thereto; (F) All right, title, and interest in funds on deposit at UBS Financial Services, Inc., held in the name of Nicole Marsh, Account Number 8000178896-9, and all proceeds traceable thereto; and (G) All right, title, and interest in funds on deposit at UBS Financial Services, Inc., held in the name of Kenneth E. Marsh, Account Number 8000178897-2, and all proceeds traceable thereto; is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid

jointly and severally with the other defendants to be sentenced in the above-captioned cases and he shall, upon being released from prison make restitution payments toward his $10,583,829.47 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below. And, KENNETH MARSH is hereby further subject to restitution obligations of $484,546.45 to be paid jointly and severally with the defendant Nicole Marsh, for the benefit of Complete Merchant Solutions, LLC, except that payments toward this restitution shall not be made until the total of the defendants' $10,583,829.47 restitution obligation has been completely satisfied to the individual victims consistent with Title 18, United States Code, Section 3664(j)(1); such payments will also be due immediately, but payable according to the Restitution Schedule set forth in paragraph 19 below.

8. The defendant CHRISTOPHER PERROTTA, who has forfeited to the United States a money judgment in the amount of $122,016.52, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $488,741.97 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison make restitution payments toward his $488,741.97 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

9. The defendant GREG ROSSOMANDO, who has forfeited to the United States a money judgment in the amount of $203,584.23, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward

the restitution order shall be capped at $660,126.00 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison make restitution payments toward his $660,126.00 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

10. The defendant MICHAEL SCARPACI, who has forfeited to the United States a money judgement in the amount of $855,018.35 and had certain other assets totaling approximately $238,191.00 seized, but which will be credited to the forfeiture money judgement, and who has had certain additional assets frozen by the Securities and Exchange Commission liquidated and applied to his restitution obligations consistent with this Court's September 9, 2011 Order, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $2,195,650.27 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison, make payments toward his restitution obligations of $2,195,650.27 due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

11. The defendant ROBERT SEIDOR, who has forfeited to the United States a money judgment in the amount of $218,823.86, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $858,229.99 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison make

restitution payments toward his $858,229.99 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

12. The defendant DOMINIC SPINELLI, who has forfeited to the United States a money judgment in the amount of $887,306.50, and who has had certain assets frozen by the Securities and Exchange Commission liquidated and applied to his restitution obligations consistent with this Court's September 9, 2011 Order, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $2,350,858.50 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison make restitution payments toward his $2,350,858.50 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

13. The defendant PAUL STOKES, who has forfeited to the United States a money judgment in the amount of $519,612.50, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $1,730,458.97 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison make restitution payments toward his $1,730,458.97 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

14. The defendant WILLIAM VECCHIONE, who has forfeited to the United States a money judgement in the amount of $342,705.80, is hereby subject to a restitution order in the

amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $1,278,204.15 (i.e., the total amount of money that he raised independently and with others at Gryphon), and he shall immediately make a lump sum payment of $100,000.00 toward his $1,278,204.15 in restitution obligations and, upon being released from prison make payments toward his further restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

15. The defendant ANTHONY VECCHIONE, who has forfeited to the United States a money judgement in the amount of $231,348.67, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $708,363.15 (i.e., the total amount of money that he raised independently and with others at Gryphon), and he shall, upon being released from prison make payments toward his restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

16. The defendant GREG PRASKER, who has forfeited to the United States a money judgment in the amount of $99,794.64, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except this defendant's joint and several liability toward the restitution order shall be capped at $459,889.96 (i.e., the total amount of money that he raised independently and with others at Gryphon) and he shall, upon being released from prison make

restitution payments toward his $459,889.96 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

17. The defendant ANTHONY DELLAVENTURA, who has forfeited to the United States a money judgment in the amount of $102,520.90, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in the above-captioned cases, except, this defendant's joint and several liability toward the restitution order shall be capped at $473,186.50 (i.e., the total amount of money that he raised independently and with others at Gryphon), and he shall, upon being released from prison make restitution payments toward his $473,186.50 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below.

18. The defendant NICOLE MARSH, who has forfeited to the United States her right, title and interest in certain properties on Staten Island, and had certain assets frozen by the Securities and Exchange Commission liquidated and applied to her restitution obligations consistent with this Court's August 22, 2011 Order, is hereby subject to a restitution order in the amount of $10,583,829.47, to be paid jointly and severally with the other defendants to be sentenced in th above-captioned cases and shall, upon being released from prison and/or placed on Probation, make restitution payments toward her $10,583,829.47 in restitution obligations due immediately but payable according to the Restitution Schedule set forth in paragraph 19 below. And, Nicole Marsh is hereby further subject to restitution obligations of $484,546.45 to be paid jointly and severally with the defendant Kenneth Marsh, for the benefit of Complete Merchant Solutions, LLC, except that payments toward this restitution shall not be made until the total of the defendants' $10,583,829.47 restitution obligation has been completely satisfied to the

individual victims consistent with Title 18, United States Code, Section 3664(j)(1); such payments will also be due immediately, but payable according to the Restitution Schedule set forth in paragraph 19 below.

19. The Restitution Schedule, as referred to herein is as follows:

| Income Range | Payment Toward Restitution Obligation |
|---|---|
| $0 - $3,000 | 5% of monthly income. |
| $3,001 - $6,000 | 10% of monthly income. |
| $6,001 - $9,000 | 15% of monthly income. |
| Greater than $9,000 | 20% of monthly income. |

20. For purposes of this Order, "income" means that part of earnings remaining after the deduction of amounts required by law to be withheld. It shall also include income from other sources, such as, inheritances, IRA distributions, gifts, tax refunds, payments from rental properties, and personal expenses paid by another person or entity.

21. In the event of an unforseen circumstance or a significant change in financial condition, the respective defendants may make an application to this Court to modify their respective restitution obligations set forth herein. Further, each and every defendant is obligated to inform the Court, the Probation Department and the United States Attorney's Office of any unusual accretions of net assets equal to or exceeding $50,000 so that appropriate modifications to the payment schedule may be made.

22. All payments made pursuant to this restitution order shall be directed to the Clerk of the Court, 225 Cadman Plaza East, Brooklyn, New York 11201 and, with respect to the joint and several liability of $10,583,829.47 be distributed in equitable share proportion to the victims set

forth on the attached restitution chart, and upon completion of those restitution obligations, with respect to the $484,546.45 to be paid jointly and severally by the defendants Kenneth Marsh and Nicole Marsh, such payments shall be distributed to Complete Merchant Solutions, LLC, c/o Rotenberg Lipman Rich, PC, 369 Lexington Avenue, 16th Floor, New York, New York 10017.

23. This restitution order is designed to both adhere to the statute's requirements that defendant only be ordered to pay restitution for losses that he is "directly and proximately" responsible, and permits the orderly distribution of all proceeds from the defendants in this and the related cases.

24. Interest on the respective restitution obligations will begin to accrue only if the Court's orders are willfully not followed by the defendant with respect to periodic or other payments.


Dated: Brooklyn, New York
      September 14, 2011

                          _____/s/_____
                          HONORABLE JACK B. WEINSTEIN
                          UNITED STATES DISTRICT JUDGE

# VIII. Appendix B: Sentencing Charts

## A. Table 1: Sentence

| Defendant | Offense Level | Criminal History | Guidelines Range | Incarceration | Supervised Release | Restitution Cap | Forfeiture | Special Assessment |
|-----------|---------------|------------------|------------------|---------------|--------------------|-----------------|------------|--------------------|
| Kenneth Marsh | 36 | I | 188-235 months | 96 months | 5 years | $10,583,829.47 + $484,546.45 | $774,792.15* | $100 |
| Baldwin Anderson | 37 | I | 210-262 months | 24 months | 3 years | $3,024,333.53 | $1,111,738.32 | $100 |
| Richard Borello | 31 | I | 60 month statutory maximum | 18 months | 3 years | $3,289,382.51 | $1,152,890.96 | $100 |
| Robert Anthony Budion | 32 | I | Counts 1 & 2: 121-151 months<br><br>Count 3: 60 months | 3 months | 3 years | $2,839,834.27 | $935,987.00 | $300 |
| John Degliuomini | 31 | I | 60 month statutory maximum | 18 months | 3 years | $1,942,222.00 | $542,125.29 | $100 |
| Jeanne Lada | 31 | I | 60 month statutory maximum | 1 year and 1 day | 3 years | $2,665,475.27 | $729,800.47 | $100 |
| James T. Levier | 32 | I | Counts 1 & 2: 121-151 months<br><br>Count 3: 60 months | 3 months | 3 years | $1,631,252.00 | $561,632.95 | $300 |
| Christopher Perrotta | 31 | I | 60 month statutory maximum | 6 months | 3 years | $488,741.97 | $122,016.52 | $100 |
| Gregory Rossomando | 31 | I | 60 month statutory maximum | 1 year and 1 day | 3 years | $660,126.00 | $203,584.23 | $100 |
| Michael Scarpaci | 31 | III | 60 month statutory maximum | 25 months | 3 years | $2,195,650.27 | $855,018.35 | $100 |
| Robert Seidor | 32 | I | Counts 1 & 2: 121-151 months<br><br>Count 3: 60 months | 3 months | 3 years | $858,299.99 | $218,823.86 | $300 |
| Dominic Spinelli | 32 | I | Counts 1 & 2: 121-151 months<br><br>Count 3: 60 months | 3 months | 3 years | $2,350,858.50 | $887.306.50 | $300 |
| Paul Stokes | 32 | IV | Counts 1 & 2: 168-210 months | 6 months | 3 years | $1,730,458.97 | $519,612.50 | $300 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Count 3: 60 months | | | | | |
| Anthony Vecchione | 29 | I | 60 month statutory maximum | 1 year and 1 day | 3 years | $708,363.15 | $231,348.67 | $100 |
| Greg Prasker | 32 | I | Counts 1 & 2: 121-151 months<br><br>Count 3: 60 months | 3 months | 3 years | $459,889.96 | $99,794.64 | $300 |
| Anthony Dellaventura | 32 | I | Counts 1 & 2: 121-151 months<br><br>Count 3: 60 months | 3 months | 3 years | $473,186.50 | $102,520.90 | $300 |
| Nicole Marsh | 35 | I | Counts 1 & 2: 168-210 months<br><br>Count 3: 60 months | 3 months | 3 years | $10,583,829.47 + $484,546.45 | ** | $300 |
| William Vecchione | 31 | I | 60 month statutory maximum | 1 year and 1 day | 3 years | $1,278,204.15 | $342,705.80 | $100 |

\* Kenneth Marsh also forfeited title to several bank accounts, the value of which is yet to be determined.  *See* Appendix A, Master Restitution Order.

\*\* Nicole Marsh has forfeited several properties in Staten Island and had assets frozen by the Securities and Exchange Commission.  *See* Appendix A, Master Restitution Order.

## B. Table 2: Sociological Factors

| Defendant | Physical and Mental Health | Family | Education | Substance Abuse | Employment |
|---|---|---|---|---|---|
| Kenneth Marsh | History of mental health problems: severe mood swings, depression, multiple suicide attempts. Physically healthy. | Divorced; one son (3 years old). | Attended several colleges but did not receive a degree. High school diploma. | Extensive history of substance abuse: ecstasy, cocaine, gamma-Hydroxybutyic acid (HGB), Ketamine, and oxycodone. | Employed as a stockbroker with various companies from 1996 to 2006. He lost his stockbroker's license in 2006. |
| Baldwin Anderson | Various health problems. Had a heart attack in 2010 and had a pacemaker surgically placed, which requires monitoring at least every three months. Also suffers hypertension, dizziness, and acute dermatitis. No history of mental or emotional problems. | Several siblings. Divorced from a first marriage; two daughters (34 and 32). Remarried; two sons (26 and 24) and one daughter (18). Strong family ties. Family is very supportive. | Attended some college, but dropped out. | No significant substance abuse. | Employed by the Mission of the Immaculate Virgin from 1972 and 1981. Then held managerial and salesperson positions at several estate companies until 2003. Worked as a manager and construction supervisor until 2006. In 2006, managed commercial mortgages. From November 2006 to April 2007, worked as a bed salesman. |
| Richard Borello | None. | Five younger siblings. Married his wife in August 2011. | Some college, but dropped out because it was too expensive and needed to work. | Tried marijuana a couple of times and drinks socially. | Construction and car sales. After father passed away from a drug overdose, was responsible for supporting his five younger siblings. |
| Christopher Perrotta | Takes hydrocodone for sciatica and knee pain. | Going through difficult divorce with wife. Two children (three and five years old). | Attended one year of college. | No significant substance abuse. | Previously in wine industry; since arrest, has been working as a restaurant manager and at an auto repair shop. |

| Robert Anthony Budion | Good physical health. Claims to be in good mental health. Records provided by Oceanside Counseling Center indicate that, in addition to substance abuse treatment, he received treatment for depression and anxiety between 2006 and 2007. | Three older maternal half-siblings and one paternal half-brother whom he has never met. Has never been married and does not have children. Engaged to a woman who currently works as a banker, but who worked at Gryphon as a secretary. | Did not attend college. | Significant history of substance abuse. Began drinking at the age of thirteen, smoking marijuana on a daily basis at the age of fourteen. Experimented cocaine, ecstasy, prescription pain killers, and ketamine ("Special K"). Ceased using drugs in early 2010 (prior to his arrest). | Significant experience selling suits and tuxedos.<br><br>Currently working as a suit/tuxedo salesperson again. |
|---|---|---|---|---|---|
| Jeanne Lada | Suffered a "mental breakdown" after the death of her father in 2003. Experienced intense depression, was hospitalized, and is currently undergoing treatment. | Twice divorced. No children, although she cares for her nephew (twenty-two years old), and has done so since her brother passed away in 1988.<br><br>Was engaged to a police officer until her arrest.<br><br>Had one brother who died at age twenty-seven of cancer-related complications. Father died in 2003. Has a complicated relationship with her mother, who was physically and verbally abusive | Graduated from college in 2003 with a bachelor's degree in sociology (with an emphasis on education). | No significant substance abuse. | Worked at different restaurants, and then as an investigator and a loan officer for some institution. Opened her own mortgage company in 2005. In 2007, became a teacher at a local day care center. |

| James T. Levier | Member of Gamblers Anonymous, but has abstained from gambling since 2008. Suffers from Type II diabetes and is on medication for this condition. Diabetes resulted in an impaired vision in his left eye, which requires direct steroid injection. | One sister. Engaged to and living with fiancée. She suffers from bipolar disorder but is otherwise healthy. They have a son, who might suffer from autism. | Earned an associate's degree with an emphasis in business in 1997. | No significant substance abuse. | History of regular employment. Several odd jobs until 2002. Director of graduate marketing for The Princeton Review from 2002 to 2004. Then an assistant manager at a restaurant from 2004 to 2007. Following some time unemployed, worked from November 2007 to May 2008 as a door-to-door salesperson. Currently a vacuum salesperson. |
|---|---|---|---|---|---|
| John Degliuomini | Good mental and physical health. | Wife, two children (two and four years old), third on the way. | Went to college for a year and a half; pursued associate's degree in business administration. | Experimented with marijuana and Ecstasy in his 20s; cocaine about ten times. | Constantly employed prior to working for Gryphon, usually as a sales person in the computer and car industries. Currently employed at Planet Toyota. They hope to have him continue with the company after serving his sentence. |
| Gregory Rossomando | Suffers chronic back pain. Takes prescription Oxycodone several times a day. | Two siblings; not married; no children. | Dropped out of college. | Significant history of drug and alcohol abuse. Not willing to seek substance abuse treatment. | Worked in clothing and car sales, then as the finance director and manager of car dealerships. Currently the finance manager for a Honda dealership. |
| Michael Scarpaci | None. | Youngest of five children. Father died in 1985. Married since 2002, four children (one, three, six, and seven years old). Wife is a homemaker, previously worked as a teacher. | Received his GED. Dropped out of college after two years, to work. Obtained an insurance broker license in 1997. | Struggled with alcohol and drug, as well as gambling abuses. He began drinking and using cocaine at age thirteen. | Worked at the family business, and then in the insurance and automotive industries prior to joining Gryphon. |

| | | | | | |
|---|---|---|---|---|---|
| Robert Seidor | Generally good health. | Parents divorced when he was six. Lived with his mother and sister. Has two half-sisters from father's remarriage.<br><br>Married since 1990. Has two children, a nineteen year old with Type I diabetes (currently in college) and a twelve old.<br><br>Family currently lives in Flint, Michigan. | Dropped out of high school after 10th grade to help support family. | History of using cocaine and marijuana. Has been daily user of marijuana from age fourteen. | Worked for car dealership prior to 1994. Co-owner of formalwear business from 1994 to 2000. Worked for various formalwear stores prior to 1994 and from 2000 until 2008. Currently works as a sales representative in Michigan. |
| Dominic Spinelli | Diabetes.<br><br>Neck and back pain due to injuries he sustained in several automobile accidents. | Married since 2009 to longtime girlfriend. Has two young children (a one year old and a newborn). Has several supportive half-siblings. | Attended several grade schools where he had disciplinary problems. Dropped out of high school prior to completing his senior year to get GED. Failed Series 7 securities representative exam in 1998. | Regular use of marijuana, ketamine, prescription pain medication and Ecstasy. Sporadic use of cocaine, LSD, PCP. | Worked as a rental car agent and as a sales representative for a waterproofing business started by a friend.<br><br>Currently works for a family-run car rental company. |
| Paul Stokes | None. | Never married, no children. Lives with fiancée (since 2009) in parents' house. | Dropped out of high school after ninth grade. Received GED through drug program. Attended college part-time for a year, plus an additional semester while on supervised release. | Extensive history of drug abuse. Began marijuana at thirteen, followed by Ecstasy, hallucinogens, Valium, cocaine, alcohol, ketamine, crystal meth., GHB and crack-cocaine. Numerous relapses after drug programs. | Has worked as an electrician's assistant and installing commercial telecommunications systems. From 2002-2004, employed as plumber's assistant. |

| | | | | | |
|---|---|---|---|---|---|
| Anthony Vecchione | Suffers from heart disease; has suffered two heart attacks and has undergone three heart surgeries | Three brothers (including defendant William Vecchione). Married since 1997; six children. | Withdrew from high school in the eleventh grade, to work in the family's business. Obtained a GED in 1993, and a stock broker's license in 1997. | Drinks socially and used some drugs during his teen years. | Obtained his stockbroker's license in 1997. Worked in the stockbrokerage industry. Later worked in different car dealerships. |
| Greg Prasker | Suffers from gastritis and acid reflux | Lives with his parents who both have physical ailments (father suffers from vertigo, high blood pressure and thyroid cancer, mother from a blood condition currently in remission). Has one older sister who lives nearby. Hopes to marry his girlfriend. | Received a bachelor's of science degree in computer information systems from Tulane in 2004. | Limited substance abuse problems. | Owned a delicatessen in New Orleans that closed as a result of Hurricane Katrina. Between 2005 and 2007, worked as a manager at National Income Life Insurance before leaving that job to return to food service as a waiter. Was unemployed for eight months before starting work at Gryphon in December 2008. |
| Anthony Dellaventura | Has no major physical problems. Has been taking Xanax for about a year. Suffers physiological symptoms of anxiety, including panic attacks, a racing heart, feeling faint or dizzy, chills, chest pains, and breathing difficulties. Apart from anxiety, has not reported any past mental health problems. | Two siblings, one step-brother, one half-brother. He was raised by both of his parents until age 8, when they separated. Lived with his mother thereafter, who was physically and verbally abusive. Resided after at age thirteen with his father (who died in October 2010). Reconciled with his mother and now has a "decent" relationship with her. | Attended college for one semester and dropped out to concentrate on working. | Experimented with drugs between the ages of sixteen and twenty, including marijuana, ecstasy, and ketamine. | Between 1995 and 2005, held several odd jobs, including as a bouncer for night clubs. , Employed a fireman for the FDNY from 2005 to 2011. Has since resigned as a result of this case.

Currently doing freelance plumbing and electrical work. Hopes to become a licensed x-ray technician or physical trainer. |

| | | | | | |
|---|---|---|---|---|---|
| Nicole Marsh | Diagnosed with Attention Deficit Hyperactivity Disorder in summer of 2010. She was prescribed Adderall. | Divorced from Kenneth Marsh; one son (three years old). One older sister. | Attended some college, but dropped out because of a loss of focus. Attended an aesthetician program, and obtained a facial license that expired in 2007. | No serious substance abuse issues. Occasionally used marijuana and MDMA pills while in college, but has discontinued such use since then. | From 1999 to 2000, was employed as a sales assistant. Resigned to incorporate Warwick Investments, Inc. with Kenneth Marsh. Employed as a receptionist at a doctor's office from 2006 to 2007. Currently unemployed and receiving unemployment and Medicaid benefits. |
| William Vecchione | Diabetes, hypertension and coronary artery disease (heart disease). Suffers from anxiety, for which he takes Alprazolam. | Wife and three children (fourteen, twenty, and twenty-two years old). | High School degree. Community college for six months, but dropped out to work. | Experimented with marijuana as a teenager; used to have a drinking problem, but does not any more. | Previously employed in the family business, then as a securities broker. Was a stay-at-home father from 2007 to 2008. Heard about Gryphon through brother Anthony. |

**IX.**     **Appendix C: Victim List (SEALED)**